ACCEPTED
15-25-00104-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
10/8/2025 3:14 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00104-CV**

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
10/8/2025 3:14:05 PM
CHRISTOPHER A. PRINE
~~Clerk~~

PUBLIC UTILITY COMMISSION OF TEXAS AND
NORTH FORT BEND WATER AUTHORITY,

*Appellants,*

*v.*

CITY OF FULSHEAR, TEXAS,

*Appellee.*

On Appeal from the 53rd District Court of Travis County, Texas
The Hon. Maya Guerra Gamble, Presiding Judge, Cause No. D-1-GN-24-004710

## BRIEF OF APPELLANT PUBLIC UTILITY COMMISSION OF TEXAS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division

JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

ATTORNEYS FOR APPELLANT
PUBLIC UTILITY COMMISSION OF
TEXAS

October 8, 2025

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

| **Party** | **Counsel** |
|---|---|
| Appellant Public Utility Commission of Texas | Ken Paxton<br>Attorney General of Texas |
| | Brent Webster<br>First Assistant Attorney General |
| | Ralph Molina<br>Deputy First Assistant Attorney General |
| | Austin Kinghorn<br>Deputy Attorney General for Civil Litigation |
| | Kellie E. Billings-Ray<br>Chief, Environmental Protection Division |
| | Jordan Pratt<br>Assistant Attorney General<br>jordan.pratt@oag.texas.gov |
| | Office of the Attorney General of Texas<br>Environmental Protection Division<br>P.O. Box 12548 (MC-066)<br>Austin, Texas 78711-2548<br>(512) 463-2012 | Fax: (512) 320-0911 |

| **Party** | **Counsel** |
|---|---|
| Appellant North Fort Bend Water Authority | Andrew S. "Drew" Miller<br>drew.miller@kempsmith.com<br><br>Kemp Smith LLP<br>2905 San Gabriel Street, Suite 205<br>Austin, Texas 78705<br>(512) 320-5466 \| Fax: (512) 320-5431 |
| Appellee City of Fulshear, Texas | C. Joe Freeland<br>jfreeland@mandf.com<br><br>Mathews & Freeland, LLP<br>2105 East MLK Jr. Blvd<br>Austin, Texas 78702<br>(512) 404-7800 \| Fax: (512) 703-2785 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................ ii

INDEX OF AUTHORITIES................................................................................ vi

GLOSSARY OF ACRONYMS AND TECHNICAL TERMS.............................x

STATEMENT OF THE CASE................................................................................ xi

STATEMENT REGARDING ORAL ARGUMENT ............................................ xii

STATEMENT REGARDING CITATIONS ......................................................... xii

ISSUE PRESENTED ........................................................................................ xiii

INTRODUCTION ..............................................................................................1

STATEMENT OF FACTS ..................................................................................3

    I.    Legal and regulatory framework ..........................................................3

    II.    Fulshear uses groundwater to provide its retail customers with water service in a region subject to subsidence. ......................................................................................5

    III.    Fulshear filed a petition with the Commission to appeal the Water Authority's decision to increase the GRP Fee. ..........................................................................................11

    IV.    Fulshear filed a petition for judicial review of the Commission's Final Order. ................................................................14

STANDARD OF REVIEW .................................................................................15

SUMMARY OF THE ARGUMENT ....................................................................17

ARGUMENT .....................................................................................................18

    I.    The Commission lacks jurisdiction because the GRP Fee is not an amount paid for water service.....................................18

II. The Commission lacks jurisdiction because Fulshear does not receive water service from the Water Authority. ...................................................................26

    A. The Water Authority does not furnish Fulshear with actual water. ..........................................................26

    B. The Water Authority has no lines or facilities used by or committed to Fulshear. ..............................33

CONCLUSION ...............................................................................37

PRAYER ........................................................................................38

CERTIFICATE OF COMPLIANCE ...........................................40

CERTIFICATE OF SERVICE ......................................................41

INDEX TO APPENDIX ................................................................42

# INDEX OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acker v. Tex. Water Comm'n,*
790 S.W.2d 299 (Tex. 1990) ...............................................................27

*Barshop v. Medina Cnty. Underground Water Conservation Dist.,*
925 S.W.2d 618 (Tex. 1996) ...............................................................21

*City of Corpus Christi v. City of Pleasanton,*
276 S.W.2d 798 (Tex. 1955) ...............................................................20

*City of Sherman v. Pub. Util. Comm'n of Tex.,*
643 S.W.2d 681 (Tex. 1983) ...............................................................20

*Edwards Aquifer Auth. v. Day,*
369 S.W.3d 814 (Tex. 2012) ...............................................................29

*Friendswood Dev. Co. v. Smith-Sw. Indus., Inc.,*
576 S.W.2d 21 (Tex. 1978)...................................................................21

*Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Env't Quality,*
393 S.W.3d 417 (Tex. App.—Austin 2012, pet. denied) ....................16

*Hous. & T.C. Ry. Co. v. East,*
81 S.W. 279 (Tex. 1904)......................................................................20

*N. E. Indep. Sch. Dist. v. Riou,*
598 S.W.3d 243 (Tex. 2020) .................................................................3

*Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio,*
53 S.W.3d 310 (Tex. 2001)...................................................................20

*Pub. Util. Comm'n of Tex. v. Tex. Indus. Energy Consumers,*
620 S.W.3d 418 (Tex. 2021) ......................................................... 16, 26

*R.R. Comm'n of Tex. v. Pend Oreille Oil & Gas Co.,*
817 S.W.2d 36 (Tex. 1991), *abrogated by, Ammonite Oil & Gas Corp. v. R.R. Comm'n of Tex.,* 698 S.W.3d 198 (Tex. 2024)..........................3

*Sommers for Ala. and Dunlavy, Ltd. v. Sandcastle Homes, Inc.*,
  521 S.W.3d 749 (Tex. 2017) ...........................................................27

*Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*,
  652 S.W.2d 358 (Tex. 1983) ...........................................................19

*Tex. Comm'n on Env't Quality v. Friends of Dry Comal Creek*,
  669 S.W.3d 506 (Tex. App.—Austin 2023, pet. denied) ............................ 16, 17

*Tex. Comm'n on Env't Quality v. Maverick Cnty.*,
  642 S.W.3d 537 (Tex. 2022) ...........................................................16

*Tex. Dept. of Pub. Safety v. Alford*,
  209 S.W.3d 101 (Tex. 2006) ...........................................................15

*Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*,
  665 S.W.2d 446 (Tex. 1984) ...........................................................17

*Thomas v. State*,
  733 S.W.2d 675 (Tex. App.—Tyler 1987, writ ref'd)...................................27

**Statutes**

Tex. Gov't Code
  § 2001.174...........................................................................16
  § 2001.174(2)(F).....................................................................15
  § 2001.175(e)........................................................................16
  § 311.011(a)..................................................................... 27, 33
  § 311.023(4).........................................................................27

Tex. Spec. Dist. Code
  § 8813.002............................................................................8
  § 8813.005(a)................................................................... 10, 25
  § 8813.008...........................................................................23
  § 8813.051............................................................................8
  § 8813.052(a)(3).....................................................................8
  § 8813.052(b)(2)(A)..................................................................8
  § 8813.056(a)........................................................................8
  § 8813.056(e)........................................................................8
  § 8813.103(a)................................................................... 10, 22
  § 8813.103(b)........................................................................22

§ 8813.103(f)(1)-(8) .................................................................23

§ 8813.103(g) ..........................................................................31

§ 8834.001(6) ............................................................................5

§ 8834.003(a) ..................................................................... 5, 29

§ 8834.101 ................................................................................6

§ 8834.206 ................................................................................6

§ 8834.206(a) ..........................................................................29

Tex. Water Code

§ 12.013(a) ................................................................................4

§ 12.013(d) ....................................................................... 4, 28

§ 13.001(c) ........................................................................ 3, 19

§ 13.002(19) ...................................................................... 4, 20

§ 13.002(21) ................................................... 4, 19, 26, 27, 33

§ 13.041(a) ................................................................................4

§ 13.042(a) ................................................................................4

§ 13.043(f) ...................................................................... 4, 19, 32

§ 13.381 ..................................................................................15

§ 36.002(a) ......................................................................... 5, 29

§ 36.002(e)(3) ........................................................................29

§ 36.116(a)(2) ........................................................................24

§ 36.205(c) .............................................................................24

**Rules & Regulations**

16 Tex. Admin. Code § 24.41(b) ..........................................................19

34 Tex. Admin. Code § 3.731 ...............................................................25

**Other Authorities**

*Actual*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/actual (last accessed Oct. 1, 2025) ...............................32

*Commit*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/commit (last accessed Oct. 1, 2025) ..........................33

*Furnish*, Black's Law Dictionary 608 (5th ed. 1979) .............................................27

*Supply*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/supply (last accessed Oct. 1, 2025) .............................27

*Use*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/use (last accessed Oct. 1, 2025) ....................................33

# GLOSSARY OF ACRONYMS AND TECHNICAL TERMS

| Term | Meaning |
|---|---|
| ALJ | Administrative Law Judge |
| AR | Administrative Record |
| Commission | Public Utility Commission of Texas |
| Fulshear | City of Fulshear |
| GRP | Groundwater Reduction Plan |
| PFD | Proposal for Decision |
| SOAH | State Office of Administrative Hearings |
| Subsidence District | Fort Bend Subsidence District |
| Water Authority | North Fort Bend Water Authority |

# STATEMENT OF THE CASE

| | |
|---|---|
| Nature of the Underlying Case: | Plaintiff–Appellee City of Fulshear, Texas ("Fulshear") filed suit for judicial review of a Final Order of the Public Utility Commission of Texas ("Commission") dismissing Fulshear's petition to review changes made to fees charged by the North Fort Bend Water Authority ("Water Authority") for lack of jurisdiction and failure to state a claim for which relief can be granted. |
| Trial Court: | The Honorable Maya Guerra Gamble, Judge of the 459th Judicial District Court, Travis County, Texas, sitting as the Presiding Judge for this case in the 53rd Judicial District Court, Travis County, Texas. |
| Course of Proceedings Below: | The court reversed and remanded the Commission's Final Order provision finding that Fulshear does not receive water service from the Water Authority. |
| Orders on Appeal: | The trial court's Final Judgement and Order, dated May 15, 2025. CR 622. |

## STATEMENT REGARDING ORAL ARGUMENT

The Commission respectfully requests oral argument. This case involves the interplay between the Commission's ratemaking authority and a legislatively created regulatory scheme to control groundwater pumping. Oral argument will provide an opportunity for the Commission to answer questions regarding its jurisdiction to aid in the Court's decision-making process.

## STATEMENT REGARDING CITATIONS

In this brief, citations to the Clerk's Record will be in the following form: CR at [Page number]. Citations to the Reporter's Record will be in the following form: RR at [Page number]. Citations to the Administrative Record and the Supplemental Administrative Record, which were admitted into evidence in the Reporter's Record, will be in the following form: RR, AR [Item number] at [Page number] and RR, Suppl. AR [Item number] at [Page number]. All cited page numbers refer to the document's original page numbers.

## ISSUE PRESENTED

Was the Commission's conclusion that it lacked jurisdiction over Fulshear's complaint because Fulshear does not receive water service from the Water Authority arbitrary and capricious?

## INTRODUCTION

The Public Utility Commission of Texas ("Commission") lacked jurisdiction over the City of Fulshear's ("Fulshear") rate-review petition because it does not involve a matter within the Commission's limited appellate jurisdiction. The Texas Legislature only delegates authority to the Commission to set certain water-utility rates and, in limited circumstances, the authority to review water rates set by other entities to determine if they are just and reasonable. But what is at issue in this case is neither. The regulatory fee at issue here is associated with the Legislature's mandated limitations on groundwater pumping to control subsidence and not within the Commission's rate-setting authority or its limited appellate jurisdiction. For this reason, the Commission properly dismissed Fulshear's complaint against the North Fort Bend Water Authority ("Water Authority").

The district court's judgment to the contrary results in a significant expansion of the Commission's jurisdiction to include fees unrelated to the costs of providing water service. Were the judgment to stand, the Commission's jurisdiction would extend to all similar groundwater pumping fees charged by the numerous subsidence and groundwater conservation districts throughout the State. But the Legislature has not granted the Commission any authority over the groundwater pumping fee at issue in this case. Such fees are not water rates subject to Commission review but part of

a comprehensive regulatory scheme that the Legislature has created to reduce subsidence by controlling groundwater pumping in Fort Bend County.

Fulshear, a retail public utility, provides water service to its customers with groundwater from wells that it owns and operates. Its wells are in a region of the State that is subject to subsidence, which the Legislature has sought to mitigate through this scheme. To meet its subsidence reduction obligations, Fulshear participates in the Water Authority's Groundwater Reduction Plan ("GRP"). As explained below, under the statutory requirements and the GRP, Fulshear pays a regulatory fee to the Water Authority to satisfy its obligations regarding subsidence. After the Water Authority increased this regulatory fee, Fulshear complained to the Commission. Following a hearing, the Commission concluded that it lacked appellate jurisdiction to review the fee increase because Fulshear does not pay this fee for water service but instead to satisfy its subsidence-control obligations.

The district court wrongly found that the Commission's conclusion that Fulshear does not receive water service from the Water Authority was arbitrary and capricious. Specifically, the district court found that the Commission's conclusion has no rational connection to the facts in the record based on three factual determinations. CR at 622-23. Fulshear raised these three specific arguments in the contested case hearing, and based on the record evidence, the administrative law judge ("ALJ") rejected them in the proposal for decision ("PFD") adopted by the

2

Commission. The district court impermissibly reweighed the evidence to substitute its judgment for that of the Commission to reach its conclusion that the Commission's Final Order was arbitrary and capricious. *See N. E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020) (quoting *R.R. Comm'n of Tex. v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 41 (Tex. 1991), *abrogated by*, *Ammonite Oil & Gas Corp. v. R.R. Comm'n of Tex.*, 698 S.W.3d 198 (Tex. 2024) (The substantial evidence rule precludes courts from "usurping the agency's adjudicative authority even though the court would have struck a different balance.")).

The Commission correctly applied the Texas Water Code ("Water Code") definition of "service" to the facts in the record to conclude that Fulshear does not receive water service from the Water Authority. Thus, the Court should reverse the district court's judgment and render judgment affirming the Commission's Final Order.

## STATEMENT OF FACTS

### I. Legal and regulatory framework

The Legislature granted the Commission authority to regulate retail public water utilities within its jurisdiction to ensure that rates, operations, and services are just and reasonable. Tex. Water Code § 13.001(c). Retail public utilities are defined as "any person, corporation, public utility, water supply or sewer service corporation, municipality, public utility agency, political subdivision or agency

3

operating, maintaining, or controlling in this state facilities for *providing potable water* service or sewer service, or both, *for compensation*." *Id*. § 13.002(19) (emphasis added). The Commission has the authority to set the rates and supervise retail public utilities within its jurisdiction. *Id*. § 13.041(a). However, not all water utilities are within the Commission's ratemaking jurisdiction: municipalities have exclusive original jurisdiction over rates, services, and operations provided by water and sewer utilities within their corporate limits. *Id*. § 13.042(a).

The Commission maintains appellate jurisdiction over rates charged by retail public utilities, even when such rates fall outside of the Commission's exclusive original jurisdiction. For example, the Commission has appellate jurisdiction over utilities that furnish raw or treated water at wholesale for any purpose mentioned in Chapter 11 or 12 of the Water Code. *Id*. § 12.013(a), (d). Additionally, as relevant here, "a retail public utility that receives water or sewer service from another retail public utility or political subdivision of the state . . . may appeal to the [C]ommission a decision of the provider of water or sewer service affecting the amount paid for water or sewer service." *Id*. § 13.043(f). "Service" is defined as "any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter." *Id*. § 13.002(21).

4

## II. Fulshear uses groundwater to provide its retail customers with water service in a region subject to subsidence.

Fulshear is a municipal corporation in northwestern Fort Bend County, acting as a retail public utility that provides retail water service to its residents from groundwater wells that it owns and operates. RR, AR Item 64 at 1, 2. Fulshear retains ownership rights of the groundwater that it pumps from the wells on its property. Tex. Water Code § 36.002(a) ("The legislature recognizes that a landowner owns the groundwater below the surface of the landowner's land as real property.").

Fulshear's groundwater wells are located in a region that is subject to subsidence, which occurs when subsurface compaction lowers the elevation of land because of the withdrawal of groundwater. Tex. Spec. Dist. Code § 8834.001(6). This process can cause or contribute to flooding, making the issue particularly dangerous in areas that are prone to storms and hurricanes, as is the case here. *Id.* § 8834.003(a). Subsidence can also contribute to fault movement and ultimately damage infrastructure, such as wells and pipelines. RR, Suppl. AR Item 105 at 1.

In 1989, the Legislature sought to mitigate the subsidence issue in Fort Bend County by creating the Fort Bend Subsidence District ("Subsidence District"), a conservation and reclamation district under Section 59, Article XVI of the Texas Constitution. The purpose of the Subsidence District is to regulate the withdrawal of groundwater to prevent subsidence. Tex. Spec. Dist. Code § 8834.003(a). The Subsidence District is authorized to develop a regulatory plan to carry out its

statutory purpose and duties. *Id*. § 8834.101. Under this authority, the Subsidence District adopted a plan to (1) limit the amount of groundwater used within its jurisdiction and (2) adopt alternative sources of water ("District Plan"). RR, Suppl. AR Item 105 at 1. The District Plan provided an overall goal to reduce groundwater withdrawal to no more than 40% of total water demand. *Id*. The District Plan recognized that subsidence is a regional problem that requires concerted efforts throughout the region to solve. *Id*. at 2. Therefore, the burden of controlling subsidence and reducing groundwater withdrawal was placed on all groundwater users within its jurisdiction. *Id*. at 1.

To monitor and regulate the amount of groundwater withdrawn in Fort Bend County, the statute creating the Subsidence District requires permitting for all groundwater wells within its jurisdiction, including Fulshear's. Tex. Spec. Dist. Code § 8834.206. A groundwater well in the Subsidence District is only exempt from this requirement under specified limited circumstances not relevant here. RR, Suppl. AR Item 95 at 16. Additionally, all non-exempt groundwater wells within Fort Bend County are required to comply with the District Plan. RR, Suppl. AR Item 105 at 6. Consistent with the goals of reducing groundwater withdrawal, well permits set a maximum amount of groundwater that may be withdrawn. RR, Suppl. AR Item 95 at 10. However, well permits may be aggregated within the region such that the amount of groundwater authorized for withdrawal is based on all wells in the

6

aggregated permit. *Id*. Under an aggregated permit, as long as the amount of alternative water supply utilized is in compliance with the groundwater reduction requirements, then the wells within the aggregated permit are deemed in compliance with the District Plan. *Id*. at 11.

The Subsidence District charges a "disincentive fee" for well owners that fail to comply with its groundwater reduction requirements as (1) a disincentive to over-reliance on groundwater and (2) achieve compliance with groundwater reduction requirements. *Id*. at 15. The purpose of the disincentive fee is to create an economic incentive for groundwater users to take steps to reduce groundwater consumption. RR, Suppl. AR Item 105 at 3. The disincentive fee is applied to permitted groundwater wells that exceed the groundwater reduction requirements in the District Plan. *Id.* at 3. However, disincentive fees are avoided by aggregating well permits and maintaining compliance with a certified groundwater reduction plan. RR, Suppl. AR Item 95 at 15.

In 2005, the Legislature took an additional step to control subsidence in Fort Bend County, creating the Water Authority to develop and implement a strategy to comply with the Subsidence District's groundwater regulations and requirements. RR, AR Item 64 at 1, 2. The Water Authority was created as a conservation and reclamation district under Section 59, Article XVI of the Texas Constitution. The Legislature granted the Water Authority the power to: (1) acquire and provide

7

surface and groundwater; (2) reduce groundwater withdrawals; (3) conserve, preserve, protect, and recharge groundwater; (4) prevent the waste of groundwater; and (5) control subsidence caused by the withdrawal of water from groundwater reservoirs. Tex. Spec. Dist. Code § 8813.002. The Water Authority is a political subdivision of the State. *Id.*

The Water Authority is divided into seven precincts and governed by a board of directors with one director from each precinct. Tex. Spec. Dist. Code § 8813.051. The retail water providers within each precinct jointly appoint the director to represent their precinct. *Id*. § 8813.056(a). If the retail water providers submit one nominee for director, then the board will appoint that nominee without an election. *Id*. § 8813.056(e). But if more than one nominee is submitted to the board, then the retail water providers within the precinct vote to elect that precinct's director. *Id*. To qualify for the board, the nominee must have served as a director of a retail water provider. *Id*. § 8813.052(a)(3). Significantly here, the statute expressly grants Fulshear representation on the board by allowing the director from the precinct encompassing the city be a former member of the city council or former mayor. *Id*. § 8813.052(b)(2)(A).

In 2008, the Water Authority released its GRP detailing its strategy to meet the Subsidence District's restrictions for Fort Bend County. RR, Suppl. AR Item 94 at 3. The GRP sets out the Water Authority's requirements for transitioning from the

use of groundwater to the use of surface water in multiple phases and provides for an expansion of the water transmission system to accomplish the goal of 30% reduction in groundwater use by 2013, 60% reduction of ground water use by 2025, and continued water transmission expansion to meet more stringent subsidence regulation and increased demand projected out to 2055. *Id*. at 1. However, while the GRP requires many of its participants to transition to surface water use, some areas within the boundaries of the Water Authority will continue to use groundwater exclusively. *Id*. at 35. These areas will be allowed to continue groundwater pumping because other areas within the Water Authority's jurisdiction will be reducing their groundwater use as they transition to surface water provided through the Water Authority's infrastructure.

GRP participants consist of well owners within the Water Authority's jurisdiction that are subject to the Subsidence District's disincentive fee. *Id*. at 3. GRP participants can comply with Subsidence District's requirements to reduce groundwater pumping by aggregating their wells with other wells within the Water Authority's jurisdiction. To accomplish this, the Subsidence District issues an aggregate water well permit to the Water Authority comprising all the permitted non-exempt groundwater wells within its service area. RR, Suppl. AR Item 93 at 10. As the permittee, the Water Authority is responsible for all administrative matters, such as permit renewal, payment of permit fees, requests for permit rebates, and year-end

reporting requirements. *Id*. Nonetheless, each non-exempt well owner in the aggregated permit maintains ownership and operational responsibility of its groundwater wells. *Id*. However, well owners within the Water Authority's jurisdiction were given the opportunity to opt out of the GRP and instead individually comply with the Subsidence District's groundwater reduction requirements. Tex. Spec. Dist. Code § 8813.005(a). Fulshear did not opt out, instead choosing to satisfy its subsidence-control obligations by participating in the Water Authority's GRP. RR, AR Item 64 at 2.

The Water Authority is statutorily authorized to impose user fees on utilities within its jurisdiction to fulfill these regulatory functions. Tex. Spec. Dist. Code § 8813.103(a). Pursuant to this authorization, the Water Authority has adopted a fee based on the amount of groundwater pumped monthly from owners of wells within its jurisdiction ("GRP Fee"). RR, Suppl. AR Item 93 at 5. By paying this fee, GRP participants achieve collective compliance with the District Plan, and each avoids paying the Subsidence District's disincentive fee for excessive groundwater pumping. The Water Authority also adopted a different fee that is charged to those GRP participants that receive surface water from the Water Authority based on the monthly amount of surface water they receive from the Water Authority ("Surface Water Fee"). *Id*. at 6. The GRP participants that pay the Surface Water Fee similarly

10

achieve collective compliance for paying the fee, but in addition, receive actual water.

Fulshear did not to opt out of the Water Authority's jurisdiction. RR, AR Item 64 at 2. Thus, Fulshear is a GRP participant with groundwater wells located within the jurisdiction of both the Subsidence District and the Water Authority. *Id*. Fulshear pays the GRP Fee but does not pay the Surface Water Fee and has never received surface water from the Water Authority. *Id*. Additionally, none of the Water Authority's facilities are currently used, designed with the purpose, or currently committed to provide Fulshear with surface water. RR, Suppl. AR Item 106 at 4.

## III. Fulshear filed a petition with the Commission to appeal the Water Authority's decision to increase the GRP Fee.

On December 16, 2021, the Water Authority issued an Amended Rate Order that raised the GRP Fee from $4.25 to $4.55 for each thousand gallons pumped from a non-exempt well and raised the Surface Water Fee from $4.60 to $4.90 for each thousand gallons of surface water received from the Water Authority. RR, Suppl. AR Item 93 at 5, 6.

On March 16, 2022, Fulshear filed a petition with the Commission appealing the Amended Rate Order under Water Code § 13.043(f). RR, AR Item 1. On August 24, 2022, the Commission referred the case to the State Office of Administrative Hearings ("SOAH"). The next day, the Commission issued a Preliminary Order dividing the case into two phases, with phase one assessing the Commission's

11

authority to hear the appeal under Water Code §§ 12.013 or 13.043(f) and, if necessary, phase two to assess the merits of Fulshear's petition. RR, AR Item 15 at 2. To establish jurisdiction under Water Code § 12.013(d), the facts must demonstrate the Water Authority furnishes water to Fulshear on a wholesale basis. *Id*. at 3. Similarly, under Water Code § 13.043(f), jurisdiction exists only if the facts demonstrate Fulshear receives water service from the Water Authority. *Id*.

On June 23, 2023, the ALJ assigned to the matter issued a PFD addressing the phase one issues identified in the Preliminary Order. RR, AR Item 46. First, the ALJ concluded that the Commission did not have jurisdiction to review the rates under Water Code § 12.013 because the Water Authority did not furnish water to Fulshear. *Id*. at 14. The ALJ noted that Fulshear (1) pumped groundwater from wells that it owned and maintained operational responsibility for, (2) did not receive surface water from the Water Authority, and (3) did not pay the Surface Water Fee. *Id*. at 13. Furthermore, the ALJ noted that the Water Authority had no control over Fulshear's groundwater wells and was only administratively responsible for the groundwater well permits. *Id*. Second, the ALJ concluded that Fulshear did not receive water service from the Water Authority and, as such, the Commission did not have jurisdiction under Water Code § 13.043(f). *Id*. at 20. In reaching this conclusion, the ALJ applied a legal standard for determining whether a specific tract of land was receiving water service.

On November 1, 2023, the Commission adopted the PFD in part, rejected it in part, and remanded the proceeding to SOAH. RR, AR Item 58. The Commission adopted the PFD with regard to Water Code § 12.013 and concluded that the Water Authority did not furnish water to Fulshear. *Id*. at 5. Thus, the Commission did not have jurisdiction as to the first issue. However, the Commission rejected the ALJ's finding under Water Code § 13.043(f) and instead concluded that the ALJ's legal standard was inapplicable and that sufficient guidance was present in the Water Code's definition of "service" to determine whether Fulshear receives water service from the Water Authority. *Id*. at 4.

On April 4, 2024, the ALJ issued a PFD on remand that applied the Water Code's definition of service. With regard to the sole remaining question of jurisdiction under Water Code § 13.043(f), the ALJ determined that the Water Authority did not "furnish" or "supply" water to Fulshear. RR, AR Item 74 at 9. Additionally, the ALJ found that Fulshear did not dispute that the Water Authority does not have any facilities or lines currently used to provide Fulshear with water. *Id*. The ALJ concluded that Fulshear's financial obligation to pay for facilities or lines through the GRP Fee that may be used in the future is not encompassed by the plain meaning of "facilities or lines committed to or used." *Id*. at 9-10. Lastly, the ALJ concluded that the acts performed by a retail public utility must be in the performance of its duties under Chapter 13 of the Water Code, and paying a fee to

13

collectively comply with the groundwater reduction requirements is not a duty under Chapter 13. *Id*. at 11. Based on these findings, the ALJ recommended dismissal for lack of jurisdiction.

On May 23, 2024, the Commission adopted the PFD and issued its Final Order. RR, AR Item 86. The Commission concluded that the Water Authority's change to its GRP Fee and Surface Water Fee did not affect the amount that Fulshear pays for "water service." *Id*. at 5. Therefore, the Commission concluded that Fulshear did not invoke the Commission's jurisdiction under Water Code §§ 12.013(a) or 13.043(f) and dismissed Fulshear's petition in full. *Id*. at 6.

## IV. Fulshear filed a petition for judicial review of the Commission's Final Order.

On July 31, 2024, Fulshear filed a petition for judicial review of the Final Order in Travis County District Court. CR at 4. Of note, Fulshear did not challenge the Commission's conclusion that the Water Authority does not furnish water to Fulshear under Water Code § 12.013. Instead, Fulshear's only challenge was to the Commission's conclusion that Fulshear does not receive water service from the Water Authority, and the resulting dismissal of its petition for lack of jurisdiction under Water Code § 13.043(f). CR at 63.

On May 15, 2025, following briefing and a hearing on the merits, the district court found that the Commission's conclusion that Fulshear does not receive water service from the Water Authority was arbitrary and capricious and reversed and

14

remanded the Final Order. CR at 622. Specifically, the district court found that the Commission's conclusion had no rational connection to the facts in the record and that Fulshear did receive water service from the Water Authority based on three factual determinations: (1) Fulshear's status as a member of a group that receives surface water from the Water Authority, (2) the Water Authority's construction of facilities to eventually provide surface water specifically to Fulshear, and (3) the Water Authority's control, as the permitee, of the production of groundwater from Fulshear's wells. CR at 622-23.

## STANDARD OF REVIEW

This is an administrative appeal of a final order of the Commission following a contested-case hearing. The Water Code authorizes judicial review of a final order of the Commission under the substantial evidence rule. Tex. Water Code § 13.381. In applying the substantial evidence rule, the Court's focus is on the agency's decision without any deference to the trial court's judgment. *Tex. Dept. of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006).

Under the substantial evidence rule, the Court may reverse and remand for further proceedings an agency decision that is arbitrary, capricious, or characterized by abuse of discretion. Tex. Gov't Code § 2001.174(2)(F). "Although an administrative decision that is supported by substantial evidence is generally not arbitrary and capricious," there are a few "narrow circumstances" where a court may

15

reverse an agency order as arbitrary and capricious even when it is supported by substantial evidence. *Tex. Comm'n on Env't Quality v. Friends of Dry Comal Creek*, 669 S.W.3d 506, 517 (Tex. App.—Austin 2023, pet. denied) (internal quotation omitted). Those circumstances may arise when the agency: (1) fails to consider a factor the Legislature directs it to consider; (2) considers an irrelevant factor; or (3) considers only relevant factors but still reaches a completely unreasonable result. *Pub. Util. Comm'n of Tex. v. Tex. Indus. Energy Consumers*, 620 S.W.3d 418, 427 (Tex. 2021).

The reviewing court must determine whether the agency genuinely engaged in reasoned decision-making. *Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Env't Quality*, 393 S.W.3d 417, 423 (Tex. App.—Austin 2012, pet. denied). The Court's review of an agency decision is confined to the record developed before the agency, and the Court may not substitute its judgment for that of the agency on the weight of the evidence on questions committed to agency discretion. Tex. Gov't Code §§ 2001.174, 2001.175(e); *Tex. Comm'n on Env't Quality v. Maverick Cnty.*, 642 S.W.3d 537, 544 (Tex. 2022). While the arbitrary-and-capricious standard encourages the Court to examine whether the agency has "taken a hard look at the salient problems," it should not be interpreted as a broad, all-encompassing standard for reviewing the rationale of agency decisions. *Friends*

*of Dry Comal Creek*, 669 S.W.3d at 518; *see also Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 454 (Tex. 1984).

## SUMMARY OF THE ARGUMENT

The Commission's Final Order dismissing Fulshear's petition for lack of jurisdiction correctly applied the Water Code's definition of "service" to the facts in the record and was not arbitrary and capricious. The Court should reverse the district court's judgment and render judgment affirming the Commission's Final Order.

As a threshold matter, Fulshear does not pay the GRP Fee for water service because the GRP Fee is not related to any duties under Chapter 13 of the Water Code. Instead, the GRP Fee is part of the legislatively created regulatory scheme to control subsidence in the Water Authority's boundaries. Fulshear voluntarily chose to participate in the Water Authority's groundwater reduction plan so that its groundwater wells would not individually be responsible for compliance with the Subsidence District's groundwater withdrawal limitations and potentially subject to the disincentive fee. To that end, Fulshear pays the GRP Fee to collectively comply with the Subsidence District's groundwater reduction requirements for Fort Bend County. The GRP Fee is adopted under the Water Authority's statutory authority that expressly grants it the power to charge user fees based on the amount of groundwater pumped from groundwater wells within its jurisdiction. The statute states numerous purposes for these fees, including to develop, implement, and

17

enforce a groundwater reduction plan. Therefore, the Commission properly concluded that the Water Authority's decision to increase the GRP Fee did not affect the amount that Fulshear pays for water service.

Additionally, the Commission properly applied the Water Code's definition of "service" and found that the Water Authority does not provide Fulshear with water service. First, the Water Authority does not furnish or supply actual water to Fulshear. Fulshear provides its retail customers with water from groundwater wells that it owns and operates and does not receive any surface water from the Water Authority. Second, the Water Authority does not have any facilities or lines committed to or used by Fulshear. The Water Authority's facilities provide surface water to some other GRP participants, but it has never provided, and none of its facilities are committed to provide, surface water to Fulshear. Therefore, the Commission correctly concluded that the Water Authority does not provide Fulshear with water service and the Commission lacked jurisdiction to hear Fulshear's petition.

## ARGUMENT

### I. The Commission lacks jurisdiction because the GRP Fee is not an amount paid for water service.

The charge at issue here, and the only charge that Fulshear pays the Water Authority, is the GRP Fee. Fulshear cannot invoke the Commission's appellate jurisdiction under Water Code § 13.043(f) because the GRP Fee is not an amount

18

paid for water service. Rather, it is an amount paid to comply with the Subsidence District's groundwater reduction requirements. The Commission's appellate jurisdiction under Section 13.043 invokes its ratemaking authority, imposing a statutory duty to ensure that *water rates* are just and reasonable. Tex. Water Code § 13.001(c). When exercising its ratemaking authority to set just and reasonable rates, the Commission looks at a utility's cost of service for providing actual water, which includes reasonable operating expenses, depreciation, taxes, and a fair and reasonable return. *Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*, 652 S.W.2d 358, 362 (Tex. 1983). Utilities are only permitted to recover expenses in their rates that are reasonable and necessary for providing water service to ratepayers. 16 Tex. Admin. Code § 24.41(b).

Under Section 13.043(f), a utility that *receives water service* from a political subdivision can invoke the Commission's appellate jurisdiction over amounts paid *for water service*. Tex. Water Code § 13.043(f). The Water Code definition of "service," which the Commission correctly applied, is "any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter." *Id*. § 13.002(21). Thus, to constitute water service, a utility must be performing a Chapter 13 duty. The primary duty of a retail public utility under Chapter 13 is to provide *potable water* for

compensation. *See id*. § 13.002(19). The Commission has no jurisdiction to review fees if they are not paid to perform a duty under Chapter 13 of the Water Code.

Although the Commission regulates the provision of water service, it has no statutory authority with regard to subsidence control. As a creature of statute, the Commission has no inherent authority and only has those powers that the Legislature expressly confers on it or the implied powers that are reasonable and necessary to carry out its express responsibilities. *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315 (Tex. 2001). Regulation of groundwater pumping and subsidence control is not one of those powers. *City of Sherman v. Pub. Util. Comm'n of Tex.*, 643 S.W.2d 681, 686 (Tex. 1983) (The Commission "is neither expressly nor impliedly granted power to regulate groundwater production or adjudicate correlative groundwater rights.").

The subsidence control measures involved here are essential because Texas water law does not generally restrict groundwater pumping. Over one hundred years ago, the Texas Supreme Court adopted the common law rule of capture for groundwater. *See generally Hous. & T.C. Ry. Co. v. East*, 81 S.W. 279 (Tex. 1904). Under this rule, a surface owner has absolute ownership of the groundwater under their property. *City of Corpus Christi v. City of Pleasanton*, 276 S.W.2d 798, 800 (Tex. 1955). Texans subsequently adopted Section 59, Article XVI, or the Conservation Amendment, to the Texas Constitution, which recognizes that the

conservation, preservation, and development of the State's natural resources are public rights and duties. *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 626 (Tex. 1996). The Texas Supreme Court has acknowledged that, because each individual landowner had ownership of groundwater with no limitation on the manner and amount of groundwater that each landowner might produce, "legislative action was essential in order to provide for conservation and protection of public interests." *Friendswood Dev. Co. v. Smith-Sw. Indus., Inc.*, 576 S.W.2d 21, 29 (Tex. 1978). Thus, groundwater regulation is "essentially a legislative function." *Barshop*, 925 S.W.2d at 633. Consequently, over time, "the State has increasingly attempted to regulate water usage and its withdrawal from the ground." *Id*. at 623.

Pursuant to the Conservation Amendment, the Legislature created the Subsidence District and the Water Authority to control and mitigate subsidence in Fort Bend County. Under this authority, the Water Authority does not collect the GRP Fee in exchange for water service. Instead, the GRP Fee is a regulatory fee that is paid to comply with the groundwater reduction requirements of the Subsidence District and is based on the amount of its own groundwater that Fulshear pumps monthly from its wells. In other words, Fulshear does not pay the GRP Fee to the Water Authority for the groundwater—it already owns it and pumps it with its own wells.

Instead, the GRP Fee is a different sort of animal. The Water Authority is authorized to establish such "user fees" to fulfill its purposes and regulatory functions. Tex. Spec. Dist. Code § 8813.103(a). Under this authority, the Water Authority may charge the owner of a well within its jurisdiction a user fee according to the amount of groundwater pumped from the well. *Id*. § 8813.103(b). GRP participants pay the GRP Fee to collectively comply with the Subsidence District's groundwater reduction requirements instead of individual compliance with these requirements and to avoid being subject to the Subsidence District's disincentive fee. RR, Suppl. AR Item 95 at 15.

The GRP Fee is not related to any of a utility's duties under Chapter 13 of the Water Code. Rather than the provision of water service, the purpose of the GRP Fee is to satisfy the groundwater reduction requirements of the Subsidence District, as established under separate statute. To that end, the Water Authority is expressly granted the authority to assess *user fees* based on the amount of groundwater pumped from a well within its jurisdiction to:

> (1) achieve water conservation; (2) prevent waste of water; (3) serve as a disincentive to pumping groundwater; (4) develop, implement, or enforce a groundwater reduction plan; (5) accomplish the purposes of this chapter, including making available alternative water supplies; (6) enable the authority to meet operation and maintenance expenses; (7) pay the principal of the interest on notes, bonds, and other obligations issued in connection with the exercise of the authority's general powers and duties; and (8) satisfy all rate covenants relating to the issuance of notes, bonds, and other obligations.

22

Tex. Spec. Dist. Code § 8813.103(f)(1)-(8). The Water Authority does not collect the GRP Fee as compensation for groundwater. Thus, it is not a "rate" designed as compensation to the Water Authority for providing water service. Instead, the primary purpose of the GRP Fee is regulatory, as it is designed to carry out the statutory duties and functions of the Water Authority to control and mitigate subsidence within its jurisdiction. The Water Authority has enacted the GRP Fee under its express statutory authority, and the GRP participants, including Fulshear, pay the GRP Fee to collectively comply with the Subsidence District's groundwater reduction requirements. The fact that funds from the GRP Fee are used to build facilities and lines for providing surface water to some GRP participants is consistent with an expressly provided for purpose of user fees in the statute—it does not mean that the GRP Fee is charged for the provision of water service. Its purpose is unrelated to the performance of any duties under Chapter 13 of the Water Code.

The GRP Fee funds this surface-water infrastructure in order to achieve the Subsidence District's subsidence-control requirements for GRP participants such as Fulshear. The Subsidence District's groundwater reduction regulations require that Fort Bend County reduce its groundwater withdrawal to 40% of total demand. RR, Suppl. AR Item 105 at 1. User fees are *necessary* to accomplish this regulatory objective of the Subsidence District. Tex. Spec. Dist. Code § 8813.008. The Water Authority's statutory obligation to comply with the Subsidence District's

requirement to convert 60% of total demand to surface water use requires the capital-intensive project of constructing an entirely new water distribution system. RR, Suppl. AR Item 97 at 5. Furthermore, the Subsidence District has acknowledged that the responsibility to transition from groundwater to surface water is on the groundwater users in the region. RR, Suppl. AR Item 105 at 1. Thus, in order to convert the region to surface water and reduce groundwater usage, the Water Authority *must* charge the GRP Fee to build the necessary infrastructure to supply surface water to some GRP participants.

That the fees at issue are based upon the volume of groundwater pumped does not make them water rates (that is, compensation for the provision of water) subject to the Commission's jurisdiction. Such regulatory fees based on the amount or volume of a regulated product are found in several statutory schemes. For example, groundwater conservation districts, created under Chapter 36 of the Water Code, are authorized to regulate the production of groundwater from wells within their jurisdiction. Tex. Water Code § 36.116(a)(2). Under the Water Code, groundwater conservation districts are expressly authorized to assess production fees based on the amount of groundwater withdrawn from a well. *Id*. § 36.205(c). This is not a fee *for* groundwater, but a regulatory fee based on the amount of groundwater produced from a well. Similarly, the Railroad Commission of Texas charges an oil-field cleanup fee to oil producers based on the amount of crude oil produced. 34 Tex.

Admin. Code § 3.731. Likewise, this is a regulatory fee based on the amount of oil produced, not a fee *for* the oil extracted from the ground.

Fulshear, as a GRP participant, pays the GRP Fee so that its groundwater withdrawal limitations are based on the collective withdrawal of all participants within the Water Authority's jurisdiction rather than having groundwater withdrawal limits placed on Fulshear's individual wells. RR, Suppl. AR Item 95 at 11. Thus, Fulshear does not pay the GRP Fee for *water service*, but rather for collective compliance with the Subsidence District's groundwater reduction requirements. Fulshear could have petitioned to have its territory excluded from the Water Authority's jurisdiction, Tex. Spec. Dist. Code § 8813.005(a), but chose not to and agreed to participate in the GRP to collectively comply with the Subsidence District's groundwater reduction requirements, RR, AR Item 64 at 2.

Review of the record evidence demonstrates that the GRP Fee is not based on the cost of service for providing potable water to Fulshear. Rather, the GRP Fee, adopted pursuant to the Water Authority's statutory authority to reduce subsidence in Fort Bend County, is designed to achieve collective compliance with the Subsidence District's groundwater reduction requirements. The Commission's cost of service analysis to determine whether rates are just and reasonable is not applicable under these circumstances. Indeed, review of the GRP Fee *would be* arbitrary and capricious because it would require the Commission to consider factors

unrelated to the cost of service and would be an expansion of its jurisdiction beyond its statutory authority. *See Tex. Indus. Energy Consumers*, 620 S.W.3d at 427 (an agency decision is arbitrary and capricious if the agency considers an irrelevant factor). Furthermore, were the Commission to exercise its ratemaking authority and set the GRP Fee at an amount different than that determined by the Water Authority, it would intrude on the legislatively created regulatory scheme and frustrate the objective of transitioning Fort Bend County from groundwater to surface water. The Commission correctly concluded that the Water Authority's decision to increase the GRP Fee did not affect the amount Fulshear paid for water service, and it lacked jurisdiction to hear Fulshear's petition. RR, AR Item 86 at 5, 6.

## II. The Commission lacks jurisdiction because Fulshear does not receive water service from the Water Authority.

As discussed, Fulshear *does not* pay the GRP Fee to receive water service from the Water Authority. The Water Code defines "service" as "any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter." Tex. Water Code § 13.002(21). Nothing that Fulshear receives from the Water Authority falls under this definition of "service."

### A. The Water Authority does not furnish Fulshear with actual water.

The primary determination of whether a utility provides water service under the statute is whether the utility "furnishes" or "supplies" water. Tex. Water Code §

13.002(21). These terms are not defined in the Water Code and are thus given their plain meaning. *See, e.g.*, Tex. Gov't Code § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). The plain meaning of furnish is to "supply, provide, or equip, for accomplishment of a particular purpose," which "contemplates an act and the relinquishment of possession." *Thomas v. State*, 733 S.W.2d 675, 676-77 (Tex. App.—Tyler 1987, writ ref'd) (quoting Black's Law Dictionary 608 (5th ed. 1979)). The term "supply" means "to make available for use" or "to furnish." *Supply*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/supply (last accessed Oct. 1, 2025). Based on the plain meaning of these terms, the Commission only has appellate jurisdiction over amounts paid for receiving *actual water*.

When construing a statute, whether or not the statute is ambiguous on its face, a court may consider laws on the same or similar subjects. Tex. Gov't Code § 311.023(4). It is presumed that the Legislature enacts statute with complete knowledge of existing law and with reference to it. *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). Furthermore, statutes on the same subject should be harmonized whenever possible. *Sommers for Ala. and Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 757 (Tex. 2017).

27

Under both Water Code §§ 12.013 and 13.043(f), the Commission has appellate jurisdiction if the subject utility "furnishes" water. Thus, to harmonize the statutes and ensure that the same meaning is applied to both uses of the term "furnish," to furnish water under Section 13.043(f) has the same meaning as to furnish water under Section 12.013. And under Water Code § 12.013, to furnish water means to provide actual water. RR, AR Item 58 at 4-5. Consequently, the Commission only has appellate jurisdiction under Water Code § 13.043(f) if the utility provides *actual water*.

As noted above, Fulshear has not challenged the Commission's conclusion regarding appellate jurisdiction under Water Code § 12.013. Under that authority, the Commission has appellate jurisdiction over retail public utilities that furnish water at wholesale. Tex. Water Code § 12.013(d). The ALJ applied the plain meaning of the term "furnish" to conclude that the Water Authority does not furnish water to Fulshear because "it does not provide water, raw or potable, to Fulshear." RR, AR Item 46 at 13. In other words, Fulshear concedes the Water Authority does not provide it with *actual water*.

Fulshear provides its retail customers with water from groundwater wells that it owns and operates. While Fulshear receives a groundwater permit from the Subsidence District, Fulshear is listed on those permits as the well owner. RR, Suppl. AR Item 96 at 1. Fulshear is responsible for the operation and maintenance of its

28

groundwater wells and controls when and how much groundwater its wells pump. RR, Suppl. AR Item 93 at 10. The common law rule, and the law in this State, is that groundwater is owned in place as part of the real property of a landowner, and that landowners have absolute title to groundwater under the surface of their land. *See Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 831-32 (Tex. 2012). The Legislature's codification of the common law rule expressly provides that it does not affect the Subsidence District's "ability to regulate groundwater in any manner." Tex. Water Code § 36.002(a), (e)(3). Therefore, the groundwater that Fulshear provides to its retail customers comes from groundwater that *Fulshear*—and not the Water Authority—owns and is pumped from wells that *Fulshear* owns and operates. Thus, the Water Authority does not "furnish" or "supply" Fulshear with groundwater.

Fulshear's permits issued by the Subsidence District and administered by the Water Authority do not equate to providing actual water to Fulshear. The Subsidence District issued an aggregate well permit to the Water Authority comprising all permitted non-exempt groundwater production within its jurisdiction. Statute requires all well owners, including Fulshear, to obtain a permit from the Subsidence District. Tex. Spec. Dist. Code § 8834.206(a). These permits are issued to carry out the Subsidence District's purpose to regulate groundwater withdrawal and prevent subsidence. *Id*. § 8834.003(a). More specifically, the aggregate permit allows for

well owners to collectively comply with the Subsidence District's groundwater reduction requirements and excuses them from the disincentive fee they would be subject to if they were permitted individually. RR, Suppl. AR Item 95 at 11, 15.

But the Water Authority does not control the amount of water that Fulshear pumps from its wells. Fulshear does. The Water Authority is only responsible for administrative matters related to the aggregate permit. RR, Suppl. AR Item 93 at 10. The permits are an essential tool for monitoring compliance with the GRP because they require permit holders to self-report the amount of groundwater pumped monthly. RR, Suppl. AR Item 94 at 29. The record establishes that the permits do not give the Water Authority *any* control over the operations of groundwater wells or the authority to determine how much groundwater may be pumped or how it may be used. RR, Suppl. AR Item 93 at 10. Based on this evidence, the ALJ expressly concluded in the PFD adopted by the Commission that the permits *do not* grant the Water Authority any control over Fulshear's groundwater wells. RR, AR Item 46 at 13. Therefore, the Water Authority does not "furnish" or "supply" actual water to Fulshear by administering the permit. Consequently, the district court improperly reweighed the evidence by finding that Fulshear receives water service from the Water Authority because the permits granted the Water Authority control over Fulshear's wells. CR at 623.

The Water Authority *does* provide actual water to some GRP participants but not to Fulshear. The Water Authority is expressly authorized to provide water service and to charge rates for the amount of surface water a utility purchases from the Water Authority. Tex. Spec. Dist. Code § 8813.103(g). The GRP participants that receive surface water from the Water Authority pay the Surface Water Fee, a different fee from the GRP Fee paid by Fulshear. RR, Suppl. AR Item 93 at 6. Those GRP participants that pay the Surface Water Fee *do* receive actual water from the Water Authority. Thus, those GRP participants receive water service from the Water Authority, and the Commission would have appellate jurisdiction over the amounts paid *for surface water*. However, it is undisputed that Fulshear has never paid the Surface Water Fee, and the Water Authority does not, and has never, provided surface water to Fulshear. RR, AR Item 64 at 2.

The district court incorrectly applied the Water Code's definition of "service" by finding that Fulshear receives water service from the Water Authority because Fulshear is a GRP participant, and *other* participants receive surface water from the Water Authority. CR at 622. Fulshear argued in the district court, and before the Commission, that it receives actual water because it is a GRP participant, and since the Water Authority provides surface water to some GRP participants, all GRP participants collectively receive actual water. CR at 72. This argument was rejected by the ALJ in the PFD adopted by the Commission. RR, AR Item 46 at 13. Fulshear's

31

interpretation of "actual water" stretches the definition to render it meaningless. The plain meaning of "actual" is "existing in fact or reality." *Actual*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/actual (last accessed Oct. 1, 2025). Thus, to receive actual water, Fulshear must receive *real existing water* from the Water Authority.

A retail public utility that *receives* water service can invoke the Commission's appellate jurisdiction over *amounts paid* for water service. Tex. Water Code § 13.043(f). While the Water Authority does furnish water to other GRP participants that receive surface water, it is undisputed that it does not furnish or supply surface water to Fulshear. The fact that other GRP Participants receive water service in the form of surface water does not mean that the Water Authority furnishes actual water to *Fulshear*. The retail public utility that *receives* water service can appeal the rates it paid for water service to the Commission, but it cannot appeal water-service rates paid by *other* retail public utilities. That the Water Authority furnishes water to other GRP participants does not change the undisputed fact that the Water Authority does not furnish actual water to Fulshear.

Fulshear owns the groundwater it provides to its retail customers. It owns the wells that pump the groundwater and is responsible for their operation and maintenance. Fulshear does not, and has never, received surface water from the

32

Water Authority. Therefore, the Commission correctly concluded that Fulshear does not receive actual water from the Water Authority. RR, AR Item 86 at 3.

**B.     The Water Authority has no lines or facilities used by or committed to Fulshear.**

The Commission also has appellate jurisdiction if the provider utility has water lines or facilities "committed to or used by" the appealing ratepaying utility. Tex. Water Code § 13.002(21). The terms "committed" and "used" are not defined in the Water Code and are given their plain meaning. *See, e.g.*, Tex. Gov't Code § 311.011(a). The common definition of "used" is "to expend or consume by putting to use." *Use*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/use (last accessed Oct. 1, 2025). The common definition of "commit" is "to pledge or assign to some particular course or use." *Commit*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/commit (last accessed Oct. 1, 2025).

Water lines or facilities are *used* by a utility if they are currently providing water to the utility. Similarly, to be *committed*, the lines or facilities do not need to be currently providing actual water, but they must intend to and be pledged to provide actual water to the utility at some defined point. Simply having lines or facilities is not sufficient if those lines or facilities are not *committed* to provide the utility with actual water. Additionally, by implication, the lines or facilities must already be existing and not planned future facilities or lines.

33

The Water Authority does not have any lines or facilities used to serve Fulshear. As discussed above, it is undisputed that Fulshear does not receive surface water from the Water Authority and has never paid the Surface Water Fee. RR, AR Item 64 at 2. Thus, Fulshear does not use, and has never used, the Water Authority's lines or facilities.

Nor are any of the Water Authority's lines or facilities committed to provide water to Fulshear. The Water Authority provided uncontroverted testimony of its Engineer, Matthew Froehlich, that: (1) none of the Water Authority's existing facilities are currently used to provide water to Fulshear; (2) none of the Water Authority's existing facilities have been designed or constructed solely for the purpose of serving Fulshear; and (3) none of the Water Authority's existing facilities are currently committed to providing water to Fulshear. RR, Suppl. AR Item 106 at 4. While the Water Authority does own and operate water lines and facilities, these facilities are committed to and used by GRP participants that receive surface water from the Water Authority and pay the Surface Water Fee—a group that does not include Fulshear.

Nor do the Water Authority's plans to build lines and facilities in the future mean the existing lines and facilities are committed to Fulshear. The Water Authority does not dispute its plans for building additional lines to provide surface water to *some* GRP participants. *See* RR, Suppl. AR Item 102. Under the GRP, new

facilities will be sized to accommodate delivery for surface water to provide 60% of the GRP participants' water demand by 2055. RR, Suppl. AR Item 94 at 21. The remaining 40% will continue to use groundwater. The surface water conversion strategy will allow the GRP participants to collectively meet the Subsidence District's groundwater reduction requirements even though some will continue to exclusively use groundwater. *Id*. at 35. The Water Authority is under no obligation to provide surface water to *all* GRP participants. RR, Suppl. AR Item 106 at 3.

Although the Water Authority previously had plans to build lines to provide surface water to Fulshear by mid-2024, those lines were never built, and it does not currently have an estimate on when those lines will be built. *Id*. at 4. The existing lines could never provide Fulshear with actual water because they are not even near Fulshear's territorial limits. *See* RR, Suppl. AR Item 101. New lines need to be built to extend the Water Authority's water distribution system to reach Fulshear before it can receive actual water from the Water Authority. *See id*. With no estimate or plan to build lines and facilities capable of providing Fulshear with surface water, it cannot be said that its current lines and facilities are *committed* to Fulshear.

The district court improperly reweighed the evidence to conclude that Fulshear receives water service because the Water Authority has constructed lines and facilities that *may* eventually be used to provide surface water to Fulshear. CR at 622-23. But the ALJ, and in turn the Commission, properly concluded that "[t]he

35

plain meaning of 'any facilities or lines committed or used' is not broad enough to encompass a mere obligation to pay for facilities or lines." RR, AR Item 74 at 9. Facilities and lines are committed to a utility under the plain language of the statute if they are *existing and pledged* to serving the utility. Fulshear's payment of the GRP Fee that is partly used to contribute to the construction of facilities and lines that *other* GRP participants use does not mean that those lines are committed to provide water to Fulshear. Therefore, the Water Authority does not provide Fulshear with water service because the unspecified plans for future lines to Fulshear, or the financial obligation to contribute to lines used by other GRP participants, are not lines or facilities committed to *Fulshear*. To the extent that any lines or facilities are "committed" to Fulshear, they are committed to comply with the Subsidence District's groundwater reduction requirements, not to perform the Chapter 13 duty of providing Fulshear with actual water.

Fulshear does not, and has never, received water from the Water Authority's lines or facilities. Additionally, the Commission weighed the record evidence to conclude that the Water Authority does not have any facilities or lines committed to Fulshear. Therefore, based on the record evidence, the Commission correctly concluded that the Water Authority does not provide water service to Fulshear, and the Commission did not have jurisdiction to hear Fulshear's petition. RR, AR Item

36

86 at 5, 6. The district court erred in holding the opposite, and its decision should be reversed.

## CONCLUSION

The Commission's decision that the Water Authority does not provide Fulshear with water service is supported by substantial evidence. The district court erred by substituting its judgment for that of the Commission to reach the contrary conclusion that Fulshear receives water service from the Water Authority. The record evidence demonstrates that the Water Authority does not furnish or supply actual water to Fulshear, the Water Authority has no lines or facilities committed to or used by Fulshear, and none of the Water Authority's acts are in performance of a Chapter 13 duty. The Commission applied the Water Code's definition of "service" to these facts to conclude that the Water Authority does not provide Fulshear with water service.

The Commission correctly concluded that the Water Authority's decision to increase the GRP Fee did not affect the amount that Fulshear pays for water service and the Commission lacked jurisdiction to review the GRP Fee under Water Code § 13.043(f). The Commission's determination was not arbitrary and capricious. The Commission did not apply any irrelevant factor, nor did the district court find that the Commission applied an irrelevant factor, and the Commission's conclusion is a reasonable result because to conclude otherwise would be a significant expansion of

its jurisdiction beyond the bounds established by the Legislature. Consequently, the district court erred by finding the Commission's Final Order was arbitrary and capricious.

## PRAYER

Fulshear has not shown any reversible error in the Commission's Final Order finding it lacked jurisdiction over Fulshear's complaint. Accordingly, the Commission respectfully requests that the Court reverse the district court's judgment and render judgment affirming the Commission's Final Order.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

 /s/ Jordan Pratt
JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

38

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Phone: (512) 463-2012
Fax: (512) 320-0911

**Attorneys for Appellant Public Utility
Commission of Texas**

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, I certify that this brief contains 8,984 words, as calculated by Microsoft Word, the computer program used to create this document.

*/s/ Jordan Pratt*
JORDAN PRATT

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the Court's electronic filing case management system and/or electronic mail on October 8, 2025.

| | |
|---|---|
| C. Joe Freeland | Andrew S. "Drew" Miller |
| jfreeland@mandf.com | drew.miller@kempsmith.com |
| MATHEWS & FREELAND, LLP | KEMP SMITH LLP |
| 2105 East MLK Jr. Blvd | 2905 San Gabriel Street, Suite 205 |
| Austin, Texas 78702 | Austin, Texas 78705 |
| Tel: (512) 404-7800 | Tel: (512) 320-5466 |
| Fax: (512) 703-2785 | Fax: (512) 320-5431 |
| | |
| ***Attorneys for Appellee*** | ***Attorneys for Appellant*** |
| ***City of Fulshear, Texas*** | ***North Fort Bend Water Authority*** |

*/s/ Jordan Pratt*
JORDAN PRATT

# INDEX TO APPENDIX

**Tab 1**     Final Judgment and Order (CR at 622)

**Tab 2**     Commission's Final Order (AR Item 86)

**Tab 3**     Proposal for Decision on Remand (AR Item 74)

**Tab 4**     Proposal for Decision (AR Item 46)

**Tab 5**     List of Stipulated Facts (AR Item 64)

**Tab 6**     Amended Rate Order (Suppl. AR Item 93)

**Tab 7**     Fulshear Well Permit (Suppl. AR Item 96)

**Tab 8**     Affidavit of Matthew L. Froehlich (Suppl. AR Item 106)

**Tab 9**     Tex. Water Code § 13.002 (Definitions)

**Tab 10**    Tex. Water Code § 13.043 (Appellate Jurisdiction)

**Tab 11**    Tex. Spec. Dist. Code § 8813.103 (Fees, User Fees, Rates, & Charges)

**Tab 12**    Tex. Spec. Dist. Code § 8834.206 (Permit Required)

# Tab 1

Final Judgment and Order (CR at 622)

CAUSE NO. D-1-GN-24-004710

| | | |
|---|---|---|
| CITY OF FULSHEAR, TEXAS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| PUBLIC UTILITY COMMISSION | § | |
| OF TEXAS, | § | 53rd JUDICIAL DISTRICT |
| *Defendant.* | § | |

## FINAL JUDGMENT AND ORDER

On May 15, 2025, the hearing on the merits was held in the judicial review of the Public Utility Commission of Texas' (the "Commission") Final Order (the "Final Order") in *Petition of the City of Fulshear Appealing the Decision of North Fort Bend Water Authority to Increase Groundwater Reduction Plan and Surface Water Fees*, PUC Docket No. 53363. All parties appeared through counsel, and the administrative record was admitted into evidence.

The Court reviewed the Final Order in this appeal pursuant to Texas Utilities Code § 15.001 and Texas Government Code § 2001.174. Based on the pleadings, administrative record, briefs submitted, and argument of counsel, it is the opinion of the Court that the Commission's Final Order erred by finding that the Plaintiff, City of Fulshear ("Fulshear"), does not receive water service from the North Fort Bend Water Authority (the "Water Authority") under Texas Water Code § 13.043(f) and this error prejudiced the substantial rights of Fulshear.

The Court specifically finds that the Final Order prejudiced the substantial rights of Fulshear and should be reversed as follows:

The Commission's finding that Fulshear does not receive water service from the Water Authority, including and as stated/incorporated in Conclusions of Law No. 8, was arbitrary and capricious because there is no rational connection between the uncontroverted facts in the record and the Commission's finding. These facts include: (1) Fulshear's status as a member of a group (the "GRP Participants") that receives surface water from the Water Authority, (2) the Water

Authority's construction of facilities to eventually provide surface water specifically to Fulshear, and (3) the Water Authority's control, as the permittee, of the production of groundwater from Fulshear's groundwater wells; and the fact that Fulshear pays the Water Authority for all of these services.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Commission's Final Order provision finding that Fulshear does not receive water service from the Water Authority is reversed and remanded to the Commission for further proceedings consistent with this Order.

The Court denies all other relief not granted in this Final Judgment. This Final Judgment disposes of all parties and all claims and is appealable. All costs of court in this cause are adjudged against Defendant.

Signed on ___May 15, 2025___

Hon. Maya Guerra Gamble
Presiding Judge

2

# Tab 2

Commission's Final Order (AR Item 86)



Control Number: 53363



Item Number: 97

RECEIVED

2024 MAY 23 PM 12: 59

PUBLIC UTILITY COMMISSION

| | | |
|---|---|---|
| PETITION OF THE CITY OF | § | PUBLIC UTILITY COMMISSION |
| FULSHEAR APPEALING THE | § | |
| DECISION OF NORTH FORT BEND | § | OF TEXAS |
| WATER AUTHORITY TO INCREASE | § | |
| GROUNDWATER REDUCTION PLAN | § | |
| AND SURFACE WATER FEES | § | |

## ORDER

This Order addresses the petition of the City of Fulshear appealing North Fort Bend Water Authority's decision to increase its groundwater-reduction-plan fee and surface-water fee under Texas Water Code (TWC) §§ 12.013 and 13.043(f). The Water Authority filed a motion asserting Fulshear's appeals under TWC § 12.013 and 13.043(f) should be dismissed for lack of jurisdiction and failure to state a claim for which relief may be granted. The State Office of Administrative Hearings (SOAH) administrative law judge (ALJ) filed a proposal for decision recommending the Commission dismiss Fulshear's appeal under both statutes. The Commission adopted the proposal for decision to extent it dismissed Fulshear's appeal under TWC § 12.013, rejected it to the extent it dismissed Fulshear's appeal under TWC § 13.043(f), and remanded the docket to SOAH for further processing.

On remand, the SOAH ALJ filed a second proposal for decision recommending the Commission dismiss Fulshear's appeal under TWC § 13.043(f) for lack of jurisdiction and failure to state a claim for which relief may be granted. The Commission agrees with the recommendation and dismisses Fulshear's appeal under TWC § 13.043(f). Accordingly, the Commission adopts the proposal for decision, including findings of fact and conclusions of law, to the extent provided in this Order.

The Commission makes the following changes to the proposal for decision. The Commission modifies finding of fact 1 and adds new findings of fact 1A and 2A to more accurately describe the parties to this proceeding, and modifies findings of fact 20 and 21 to specify the date interim orders were filed. To provide context for the Commission's decision on the first proposal for decision, the Commission adds new findings of fact 18A and 18B and modifies finding of

97

fact 19. The Commission also adds new finding of fact 21A to describe the proposal for decision on remand, deletes findings of fact 22 and 23 because they are duplicative of findings of fact 8 and 9, and deletes finding of fact 24 because it is unnecessary to support the Order.

The Commission modifies conclusions of law 2 and 5 to add needed citations, modifies conclusion of law 9 for clarity, deletes conclusions of law 10 and 11 because they are duplicative of conclusion of law 13, and adds new conclusion of law 13A to establish that dismissal is appropriate under the Commission's procedural rules. The Commission also makes non-substantive changes for such matters as capitalization, spelling, grammar, punctuation, style, correction of numbering, and readability.

## I. Findings of Fact

The Commission adopts the following findings of fact.

### *The Parties*

1. The North Fort Bend Water Authority is a regional water authority in Fort Bend and Harris County that wholesales surface water to certain water districts and municipalities within its boundaries.

1A. The Water Authority imposes a fee for groundwater use on non-exempt well owners and collects a fee for surface water delivery to certain entities within its boundaries under a groundwater reduction plan.

2. The City of Fulshear is a municipality that owns and operates non-exempt wells within the Water Authority's boundaries.

2A. Fulshear provides potable water service on a retail basis to customers.

### *Fees*

3. The Water Authority charges three types of fees: the GRP fee, the surface water fee, and the imported water fee.

4. The Water Authority has two classes of customers: those subject to the groundwater reduction plan by virtue of their location within the Water Authority's territory, and those subject to the GRP by contract. Fulshear is subject to the GRP by virtue of its location.

5.　In return for paying the GRP fee, participants in the Water Authority's GRP achieve collective compliance with the groundwater reduction requirements of the Fort Bend Subsidence District.

6.　The GRP fee, in part, funds the construction of infrastructure that will eventually provide surface water to Fulshear.

7.　The surface water fee is based on the actual amount of water a customer receives.

8.　Fulshear does not receive actual water from the Water Authority.

9.　Fulshear does not pay surface water fees to the Water Authority.

### *Ordinance Setting Rates Being Appealed*

10.　On December 16, 2021, the Water Authority approved an amended rate order, enacting new rates for the GRP fee, the surface water fee, and the imported water fee, effective January 1, 2022.

### *The Appeal*

11.　Within 90 days of the approval of the amended rate order, on March 16, 2022, Fulshear filed a petition appealing the Water Authority's new fees under TWC §§ 12.013 and 13.043(f).

12.　Fulshear appeals changes to the GRP Fee and surface water fee.

13.　On June 22, 2022, the Commission ALJ found the petition sufficient for further review.

### *Referral to SOAH*

14.　On August 24, 2022, the Commission referred this case to SOAH.

15.　On December 15, 2022, the Water Authority filed a motion to dismiss the petition for lack of jurisdiction and failure to state a claim for which relief may be granted.

16.　Fulshear and Commission Staff filed responses to the motion to dismiss on December 15, 2022, and all parties filed replies on February 27, 2023.

17.　In SOAH Order No. 7 filed on April 27, 2023, the SOAH ALJ granted the Water Authority's motion to dismiss and informed the parties that a proposal for decision would be forthcoming.

18.  In SOAH Order No. 8 filed on May 9, 2023, the SOAH ALJ abated the proceeding pending the issuance of the proposal for decision.

18A.  On June 30, 2023, the SOAH ALJ filed a proposal for decision recommending the Commission dismiss the appeals under TWC §§ 12.013 and 13.043 for lack of jurisdiction and failure to state a claim for which relief may be granted.

18B.  In the June 30, 2023 proposal for decision, the SOAH ALJ determined Fulshear's appeal under TWC § 13.043(f) should be dismissed by applying the *Crystal Clear* standard—a legal standard created by the Austin Court of Appeals to determine if a tract of land is receiving service for the purpose of a streamlined expedited release under TWC § 13.2541.[1]

19.  In an interim order filed on November 1, 2023, the Commission adopted the June 30, 2023 proposal for decision to the extent it dismissed Fulshear's appeal under TWC § 12.013, rejected the proposal for decision to the extent it dismissed Fulshear's appeal under TWC § 13.043(f), and remanded the balance of the proceeding to SOAH for further processing.

20.  In SOAH Order No. 11 filed on January 8, 2024, the SOAH ALJ set a schedule for parties to file briefs on the remaining issues.

21.  In SOAH Order No. 12 filed on February 12, 2024, the SOAH ALJ admitted evidence and granted a motion to extend the time for parties to file briefs.

21A.  On April 4, 2024, the SOAH ALJ filed a proposal for decision recommending the Commission dismiss the appeal under TWC § 13.043(f) for lack of jurisdiction and failure to state a claim for which relief may be granted.

22.  DELETED.

23.  DELETED.

24.  DELETED.

---

[1] *See Tex. Gen. Land Office v. Crystal Clear Water Supply Corp.*, 449 S.W.3d 130 (Tex. App.—Austin 2014, pet. denied).

## II. Conclusions of Law

The Commission adopts the following conclusions of law.

1.  Under TWC § 13.043(f), a retail public utility that receives water service from another retail public utility or political subdivision of the state, may appeal to the utility commission a decision of the provider of water or sewer service affecting the amount paid for water or sewer service.

2.  The Water Authority is a retail public utility under TWC § 13.002(19) and a political subdivision under TWC § 13.043(f).

3.  Fulshear is a retail public utility under TWC § 13.002(19).

4.  This docket was processed in accordance with the requirements of the Texas Water Code and Commission rules.

5.  SOAH has jurisdiction to conduct a hearing on the merits and issue a proposal for decision with findings of fact and conclusions of law for this proceeding under TWC § 13.041(c-1), PURA § 14.053, and Tex. Gov't Code § 2003.049.

6.  This appeal was timely filed with the Commission and the Water Authority under TWC § 13.043(f) and 16 TAC § 24.101(f).

7.  Under TWC § 13.002(21), *service* means any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter to other retail public utilities, as well as the interchange of facilities between two or more retail public utilities.

8.  Fulshear does not receive water service from the Water Authority under TWC § 13.043(f).

9.  The Water Authority's December 16, 2021 decision to change its GRP, surface water, and imported water fees did not affect the amount Fulshear pays for water service under TWC § 13.043(f).

10. DELETED.

11. DELETED.

12.    SOAH has jurisdiction to dismiss all issues within a proceeding and issue a proposal for decision under 16 TAC §§ 22.181(f)(2) and 22.261.

13.    Fulshear's petition does not invoke the Commission's jurisdiction under TWC §§ 12.013(a) or 13.043(f) and fails to state a claim for which relief can be granted.

13A.    Fulshear's appeal under TWC § 13.043(f) should be dismissed under 16 TAC §§ 22.181(d)(1) and (8) for lack of jurisdiction and failure to state a claim for which relief may be granted.

### III. Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders:

1.    The Commission adopts the proposal for decision, including findings of fact and conclusions of law, to the extent provided in this Order.

2.    Fulshear's petition is dismissed.

3.    The Commission denies all other motions and any other requests for general or specific relief, if not expressly granted.

Signed at Austin, Texas the 23rd day of May 2024.

PUBLIC UTILITY COMMISSION OF TEXAS

_____
THOMAS J. GLEESON, CHAIRMAN

_____
LORI COBOS, COMMISSIONER

_____
KATHLEEN JACKSON, COMMISSIONER

Office 16
q:\cadm\orders\final\53000\53363 fo.docx

# Tab 3

Proposal for Decision on Remand (AR Item 74)



# Filing Receipt

**Filing Date - 2024-04-04 10:57:40 AM**

**Control Number - 53363**

**Item Number - 85**

# State Office of Administrative Hearings

Kristofer S. Monson
Chief Administrative Law Judge

April 4, 2024

Shelah Cisneros, Commission Counsel            **<u>VIA EFILE TEXAS</u>**
Commission Advising and Docketing Management
William B. Travis State Office Building
1701 N. Congress, 7th Floor
Austin, Texas 78701

> **RE:   SOAH Docket No. 473-22-09195.WS; PUC Docket No. 53363;**
> *Petition of the City of Fulshear Appealing the Decision of North Fort Bend Water Authority to Increase Groundwater Reduction Plan and Surface Water Fees*

Dear Ms. Cisneros:

Please find attached a Proposal for Decision (PFD) on Remand in this case. By copy of this letter, the parties to this proceeding are being served with the PFD.

Please place this case on an open meeting agenda for the Commissioners' consideration. Please notify the Administrative Law Judges and the parties of the open meeting date, as well as the deadlines for filing exceptions to the PFD, replies to the exceptions, and requests for oral argument.

Enclosure

CC:  Service List

# BEFORE THE
# STATE OFFICE OF ADMINISTRATIVE HEARINGS

---

## PETITION OF THE CITY OF FULSHEAR APPEALING THE DECISION OF NORTH FORT BEND WATER AUTHORITY TO INCREASE GROUNDWATER REDUCTION PLAN AND SURFACE WATER FEES

---

## PROPOSAL FOR DECISION ON REMAND

The City of Fulshear (Fulshear) appealed a decision made by North Fort Bend Water Authority (Water Authority) pursuant to Texas Water Code (Water Code) section 13.043(f). The Public Utility Commission of Texas (Commission) referred this matter to the State Office of Administrative Hearings (SOAH) to address, among other issues, whether the Commission has jurisdiction over Fulshear's petition. For the reasons set out below, the Administrative Law Judge (ALJ) recommends that the Commission does not have jurisdiction.

# I. JURISDICTION, TIMELINESS OF APPEAL, AND PROCEDURAL HISTORY

The timeliness of the appeal is not contested and is therefore addressed only in the Findings of Fact and Conclusions of Law.

The Water Authority issued a rate order on December 16, 2021.[1] Fulshear filed an appeal under Water Code sections 13.043 and 12.013. On August 24, 2022, the Commission referred this matter to SOAH, requesting the assignment of an ALJ to conduct a hearing and issue a Proposal for Decision (PFD), if necessary.

On December 15, 2022, the Water Authority filed a motion to dismiss with prejudice, challenging the appeal and the Commission's jurisdiction over the appeal under Water Code sections 12.013 and 13.043.[2]

On June 23, 2023, the ALJ issued a PFD, finding that the Commission does not have jurisdiction over this proceeding under either statute and recommended granting the motion to dismiss.[3] The Commission adopted the PFD in part and rejected the PFD in part, to the extent that it dismissed the appeal under Water Code section 13.043(f), remanding this proceeding to SOAH for further consideration (Remand Order).[4]

---

[1] Water Authority Motion, Tab B (Rate Order) at 1.

[2] Water Authority Motion at 8 and 9 (Dec. 15, 2022).

[3] Proposal for Decision at 1 (Jun. 23, 2023) (Initial PFD).

[4] Order Remanding Proceeding at 5 (Nov. 1, 2023) (Remand Order).

A prehearing conference convened on December 5, 2023. Following the prehearing conference, all parties timely filed briefs on the sole issue on remand: whether the Commission has jurisdiction under Water Code section 13.043(f). The record closed on February 20, 2024, with the submission of response briefs.

## II.    THE MEANING OF SERVICE

Water Code section 13.043(f) provides that a retail public utility "that receives water or sewer service" from a political subdivision may appeal to the Commission a decision of the service provider affecting the amount paid for water service.[5]

The dispute focuses on whether Fulshear receives water service from the Water Authority.

As applicable here, the Water Code defines "service" as any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter to other retail public utilities.[6] A retail public utility includes a political subdivision that operates, maintains, or controls facilities for providing potable water service for

_____

[5] Water Code section 12.013(a) gives the Commission authority to fix rates for the furnishing of raw or treated water for any purpose mentioned in Chapters 11 or 12 of the Water Code. The Commission adopted the PFD's finding that the Commission does not have jurisdiction over this appeal under 12.013.

[6] Tex. Water Code § 13.002(21).

compensation.[7] Fulshear is a retail public utility.[8] The Water Authority is a political subdivision.[9]

The initial PFD relied on the *Crystal Clear* standard to find that the Water Authority did not provide service to Fulshear. In *Crystal Clear*, the phrase "receives water service" relates to whether a utility was actively supplying water to the property, whether there were particular facilities or lines committed to serving the property, and whether there are any water supply lines dedicated to meeting the future demand from the property.[10] The Commission rejected the application of *Crystal Clear*'s definition of service, distinguishing it on grounds that *Crystal Clear* addressed an application for streamlined expedited release, whereas the instant proceeding is an appeal involving rates.[11] The Commission determined that there is sufficient guidance from the Water Code's definition of "service" to determine whether Fulshear receives water service from the Water Authority.[12]

---

[7] Tex. Water Code § 13.002(19).

[8] Petition by the City of Fulshear Appealing the Decision of North Fort Bend Water Authority Affecting the Amount Paid for Water Service at 1 (Mar. 16, 2022) (Petition).

[9] Initial PFD at 3.

[10] Initial PFD at 14

[11] Remand Order at 4, referencing *Tex. Gen. Land Off. v. Crystal Clear Water Supply Corp.*, 449 S.W.3d 130 (Tex. App.—Austin 2014, pet. denied). In *Crystal Clear*, the Texas Third Court of Appeals held that whether the retail public utility provided water service to the owner of the tract of land seeking decertification is a fact-based inquiry regarding whether the retail public utility has facilities or lines committed to providing water to the particular tract of land or has performed acts or supplied anything to that tract in furtherance of its obligation to provide water to that tract under its certificate of convenience and necessity.

[12] Remand Order at 4.

## III. DISCUSSION

### A. BACKGROUND

As discussed more fully in the initial PFD, the Water Authority has developed a strategy to comply with the regulations set by the Fort Bend Subsidence District (Subsidence District).[13] The goal is to reduce groundwater use, and thereby subsidence, and convert users to surface water. To that end, groundwater users within the Water Authority's territory are subject to the Subsidence District's disincentive fee, otherwise known as the groundwater reduction plan (GRP) fee, limiting pumpage to a percentage of their total water demand.[14] This GRP fee is separate from the Surface Water fee, which is based on the actual amount of water a customer receives.[15] The City of Fulshear, along with other GRP participants, pays the GRP fee to collectively comply with relevant regulatory requirements; it does not pay the Surface Water fee because it does not receive actual water from the Water Authority.[16]

### B. ARGUMENTS

No party contends that Fulshear in fact receives water from the Water Authority. Thus, the parties' arguments focus on whether Fulshear receives water service from the Water Authority by some other theory.

---

[13] Initial PFD at 3.

[14] Initial PFD at 3.

[15] Initial PFD at 7.

[16] Initial PFD at 7.

The Water Authority contends that the definition of service does not support Fulshear's assertion that it receives water service from the Water Authority.[17] Because Fulshear neither currently receives actual water from the Water Authority, nor does the Water Authority have any facilities or lines committed to serving Fulshear, the Water Authority argues that it does not provide water service to Fulshear and, thus, the Commission does not have jurisdiction over the petition.[18]

Fulshear argues for an expansive view of the definition of "service," tied to the GRP fee.[19] First, it argues that achieving collective compliance (along with the other GRP participants), through the GRP fee, is the "water service" the Water Authority provides to Fulshear .[20] It states that, even if it never receives surface water from the Water Authority, it nevertheless receives "water service" from the Water Authority because of the service the Water Authority provides to the GRP participants as a collective in achieving compliance goals.[21]

---

[17] Initial Post-Remand Brief of Respondent North Fort Bend Water Authority at 10-20 (Jan. 29, 2024) (Water Authority Remand Initial Brief). Additionally, the Water Authority argues that uses the doctrine of *in pari materia* to argue that the analysis should include reading the defined term "service" with that of "furnish" in Water Code § 12.013(a), but the ALJ declines this application, focusing only on an analysis of the term "service," as requested by the Commission. *See* Water Authority Remand Initial Brief at 12-14.

[18] Reply of North Fort Bend Water Authority to Initial Post-Remand Brief of the City of Fulshear at 9-10 (9-11) (Water Authority Remand Reply Brief).

[19] City of Fulshear's Reply Brief on Preliminary Order Issue No. 10.a. at 5-6. (Feb. 20, 2024) (Fulshear Remand Reply Brief).

[20] Fulshear Remand Initial Brief at 3.

[21] Fulshear Remand Initial Brief at 7-8.

Next, Fulshear argues that "water service" begins with the obligation to pay for the construction of the facilities, not with the actual delivery of water.[22] Because the GRP fee, at least in part, funds the construction of infrastructure that will eventually provide surface water to Fulshear, it argues that it is an affirmative step in the direction of receiving water service and should be sufficient to confer jurisdiction upon the Commission over this proceeding.[23] Since Fulshear has a contract with the Water Authority for the eventual receipt of water, it argues that it is already receiving water service.[24]

Staff makes similar arguments.[25] It posits that, although Fulshear is not receiving water service in the form of water conveyed to Fulshear, it is receiving water service from the Water Authority from its steps taken in developing a water system to eventually deliver water to Fulshear.[26]

The Water Authority disputes that paying the GRP fee constitutes receiving water service.[27] It notes that the Surface Water fee compensates the Water Authority

---

[22] City of Fulshear's Initial Brief on Preliminary Order Issue No. 10 at 7 (Jan. 29, 2024) (Fulshear Remand Initial Brief).

[23] Fulshear Remand Reply Brief at 2-3.

[24] Fulshear Remand Initial Brief at 6.

[25] Commission Staff's Reply Brief on Preliminary Order Issue No. 10A at 1 and 4 (Feb. 20, 2024) (Staff Remand Reply Brief).

[26] Staff Remand Reply Brief at 1.

[27] Water Authority Remand Initial Brief at 17.

for actual water received by customers, while the GRP fee penalizes customers for surpassing a water withdrawal threshold.[28]

While conceding that revenue from the GRP fee might be used with other funds (such as *ad valorem* taxes or impact fees) to pay for the design and construction of infrastructure that would eventually serve its GRP participants, including Fulshear, that action, the Water Authority argues, is not sufficient to confer jurisdiction onto the Commission.[29]

## C. ANALYSIS

"Service" means any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter to its patrons, employees, other retail public utilities, and the public, as well as the interchange of facilities between two or more retail public utilities.[30] Thus, the ALJ examines whether Water Authority may be viewed as providing water service to Fulshear by any of the following acts:

1. any act performed,
2. anything furnished or supplied, or

---

[28] Water Authority Remand Reply Brief at 6-7.

[29] Water Authority Remand Reply Brief at 11.

[30] Tex. Water Code § 13.002(21). The definition further clarifies that the scope of the duties retail public utility is limited to those under Chapter 13, namely, providing potable water service. *See* Tex. Water Code § 13.002(20)("retail public utility" includes a political subdivision that provides potable water service for compensation).

8

3. any facilities or lines committed or used by a retail public utility in the performance of its duties.

The parties agree that Fulshear does not receive actual water from the Water Authority, supporting a finding that the Water Authority does not "furnish" or "supply" water to Fulshear. Thus, the question becomes whether Fulshear receives water service from the Water Authority under any other component in the definition of the term "service."

Fulshear does not dispute that that the Water Authority does not have any existing "facilities or lines committed to or used" in providing water. However, Fulshear argues that "water service" began with Fulshear's obligation to pay for the construction of the facilities. Fulshear argues that the Water Authority is paying for the construction of the facilities by paying the GRP fee. The Water Authority disputes that service begins with the *obligation* to pay for facilities. The Water Authority argues that the analysis ends with the fact that the Water Authority does not currently have any facilities or lines committed to providing actual water to Fulshear.

The ALJ agrees with the Water Authority. The plain meaning of "any facilities or lines committed or used" is not broad enough to encompass a mere obligation to pay for facilities or lines. The reference to "any facilities or lines committed or used" indicates infrastructure that currently exists, or in ratemaking terms, used and useful. There are undoubtedly many steps approaching the provision of service. The statute draws the line at those facilities or lines being

9

committed. A financial obligation for those lines and facilities in the future is too removed from committing those lines and facilities in the performance of its duties under Chapter 13. Thus, the ALJ finds that the Water Authority does not have any facilities or lines committed to or used in providing water service to Fulshear.

Finally, the ALJ considers whether "any act performed" by the Water Authority can be construed as providing water service. Fulshear again references its payment of the GRP fee to show that it receives water service from the Water Authority.

The ALJ previously rejected Fulshear's arguments that the GRP fee is the provision of water service[31] and rejects it again here. The GRP fee is a regulatory fee based on the amount of groundwater pumped in exchange for complying, as a collective, with relevant regulations. The GRP fee penalizes a customer for water drawn by a customer over a certain threshold under the groundwater reduction plan, while a rate is compensation paid for water service.[32] This is different from a rate, the Surface Water fee, paid for water received by a customer, which Fulshear acknowledges that it does not pay.

Moreover, a plain reading of the statute does not support Fulshear's argument that, even in the absence of receiving water, it nevertheless receives water service by paying the GRP fee in the form of collective compliance with regulatory

---

[31] Initial PFD at 19-20.

[32] Initial PFD at 19-20.

requirements. The acts performed by a retail public utility that constitute service must be in the performance of its duties under Chapter 13. A retail public utility provides potable water service for compensation. Paying a fee to collectively comply with other GRP participants is not the same as paying a fee to the Water Authority for potable water received. Thus, the ALJ concludes that payment of the GRP fee does not constitute compensation for water service.

Under an analysis of the statutory definition of the term "service," there is no basis for finding that Fulshear receives water service from the Water Authority. Thus, the ALJ finds that Fulshear does not receive water service from the Water Authority. Accordingly, the ALJ concludes that the Commission does not have jurisdiction over this proceeding under Water Code section 13.043(f) and recommends dismissal of the petition for lack of jurisdiction.

In support of this recommendation, the ALJ makes the following findings of fact and conclusions of law.

## IV. FINDINGS OF FACT

### The Parties

1. The North Fort Bend Water Authority (Water Authority) is a political subdivision that functions as a retail public utility.

2. The City of Fulshear (Fulshear) is a city that owns and operates non-exempt wells within the Water Authority's service territory.

### Fees

3. The Water Authority charges three types of fees: the GRP Fee, the Surface Water Fee, and the Imported Water Fee.

4. The Water Authority has two classes of customers: those subject to the Groundwater Reduction Plan (GRP) by virtue of their location within the Water Authority's territory, and those subject to the GRP by contract. Fulshear is subject to the GRP by virtue of its location.

5. The GRP Fee penalizes customers for surpassing a water withdrawal threshold to disincentivize groundwater use.

6. The GRP Fee, in part, funds the construction of infrastructure that will eventually provide surface water to Fulshear.

7. The Surface Water Fee is based on the actual amount of water a customer receives.

8. Fulshear does not receive actual water from the Water Authority.

9. Fulshear does not pay Surface Water Fees to the Water Authority.

### Ordinance Setting Rates Being Appealed

10. On December 16, 2021, the Water Authority approved an Amended Rate Order (Rate Order), enacting new rates for the GRP Fee, the Surface Water Fee, and the Imported Water Fee, effective January 1, 2022.

### The Appeal

11. Within 90 days of the approval of the Rate Order, on March 16, 2022, Fulshear filed a petition appealing the Water Authority's new fees (Petition) with the Public Utility Commission of Texas (Commission).

12. Fulshear appeals changes to the GRP Fee and the Surface Water Fee.

13. On June 22, 2022, the Commission Administrative Law Judge (ALJ) found the Petition sufficient.

## Referral to SOAH

14. On August 24, 2022, the Commission referred this case to the State Office of Administrative Hearings (SOAH).

## Water Authority's Motion to Dismiss

15. On December 15, 2022, the Water Authority filed a Motion to Dismiss (Motion).

16. Fulshear and Staff filed responses to the Motion on December 15, 2022, and all parties filed replies on February 27, 2023.

17. On April 27, 2023, SOAH Order No. 7 notified the parties that the ALJ granted the Water Authority's Motion and that a Proposal for Decision (PFD) would be forthcoming.

18. On May 9, 2023, SOAH Order No. 8 abated the proceeding pending the issuance of the PFD.

19. On November 1, 2023, the Commission adopted the PFD in part and rejected it in part, remanding the balance of the proceeding to SOAH for further processing.

20. SOAH Order No. 11 set a schedule for parties to file briefs on the remaining issues.

21. SOAH Order No. 12 admitted evidence and granted a motion to extend the time for parties to file briefs.

22. Fulshear does not pay Surface Water Fees.

23. Fulshear does not pay for water service from the Water Authority.

24. Fulshear does not receive water service from the Water Authority: the Water Authority does not have any water lines serving Fulshear, and the Water Authority has not committed lines or facilities to specifically providing water service to Fulshear.

## V. CONCLUSIONS OF LAW

1. A retail public utility that receives water service from another retail public utility or political subdivision of the state, may appeal to the utility commission a decision of the provider of water or sewer service affecting the amount paid for water or sewer service. Texas Water Code § 13.043(f).

2. The Water Authority is a political subdivision operating as a retail public utility. Texas Water Code § 13.002(16).

3. Fulshear is a municipality operating as a retail public utility. Texas Water Code § 13.002(19).

4. This docket was processed in accordance with the requirements of the Texas Water Code and Commission rules.

5. SOAH has jurisdiction to conduct a hearing on the merits and issue a PFD with findings of fact and conclusions of law for this proceeding. Tex. Gov't Code § 2003.049.

6. This appeal was timely filed with the Commission and the Water Authority. Texas Water Code § 13.043(f); 16 Tex. Admin. Code § 24.101(f).

7. "Service" means any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter to other retail public utilities, as well as the interchange of facilities between two or more retail public utilities. Texas Water Code § 13.002(21).

8. Fulshear does not receive water service from the Water Authority under Texas Water Code section 13.043(f).

9. The Water Authority did not make a decision affecting the amount Fulshear pays for water service.

10. The Commission does not have jurisdiction under Texas Water Code section 13.043(f).

11. The Petition fails to state a claim for which relief can be granted. 16 Tex. Admin. Code § 22.181(d)(1) and (8).

12. SOAH has jurisdiction to dismiss all issues within a proceeding and issue a PFD. 16 Tex. Admin. Code §§ 22.181(f)(2), .261.

13. The Petition does not invoke the Commission's jurisdiction under Texas Water Code sections 12.013(a) or 13.043(f) and fails to state a claim for which relief can be granted. 16 Tex. Admin. Code sections 22.181(d)(1) and (8).

## II. PROPOSED ORDERING PARAGRAPHS

1. The petition is dismissed.

2. The Commission denies all other motions and any other requests for general or specific relief that the Commission has not expressly granted.

**Signed April 4, 2024**

_Rachelle Robles_ (signature)

Rachelle Nicolette Robles,
Administrative Law Judge

# Tab 4

Proposal for Decision (AR Item 46)



# Filing Receipt

**Filing Date -** 2023-06-23 01:44:31 PM

**Control Number -** 53363

**Item Number -** 57

# State Office of Administrative Hearings

Kristofer S. Monson
Chief Administrative Law Judge

June 23, 2023

Stephen Journeay, Commission Counsel          **VIA EFILE TEXAS**
Commission Advising and Docketing Management
William B. Travis State Office Building
1701 N. Congress, 7th Floor
Austin, Texas 78701

> **RE: SOAH Docket No. 473-22-09195.WS; PUC Docket No. 53363;**
> *Petition of the City of Fulshear Appealing the Decision of North Fort Bend Water Authority to Increase Groundwater Reduction Plan and Surface Water Fees*

Dear Mr. Journeay:

Please find attached a Proposal for Decision (PFD) in this case. By copy of this letter, the parties to this proceeding are being served with the PFD.

Please place this case on an open meeting agenda for the Commissioners' consideration. Please notify the undersigned Administrative Law Judge and the parties of the open meeting date, as well as the deadlines for filing exceptions to the PFD, replies to the exceptions, and requests for oral argument.

Attachment

CC: Service List

# BEFORE THE
# STATE OFFICE OF ADMINISTRATIVE HEARINGS

---

### PETITION OF THE CITY OF FULSHEAR APPEALING THE DECISION OF NORTH FORT BEND WATER AUTHORITY TO INCREASE GROUNDWATER REDUCTION PLAN AND SURFACE WATER FEES

---

## PROPOSAL FOR DECISION

This matter was docketed as a petition for an appeal by the City of Fulshear (Fulshear) of a decision made by North Fort Bend Water Authority (Water Authority) affecting water rates pursuant to Texas Water Code (Water Code) section 13.043(f). The Public Utility Commission of Texas (Commission) referred this matter to the State Office of Administrative Hearings (SOAH) to address, among other issues, whether the Commission has jurisdiction over Fulshear's petition. The Water Authority filed a motion to dismiss, arguing that the Commission lacks jurisdiction and that Fulshear's appeal fails to state a claim for which relief may be granted. For the reasons set out below, the Administrative Law Judge (ALJ) recommends that the motion to dismiss be granted.

# I.   NOTICE, JURISDICTION, AND PROCEDURAL HISTORY

Notice was not contested and is therefore addressed only in the Findings of Fact and Conclusions of Law.

The Commission has jurisdiction over appeals filed under Texas Water Code section 13.043 and rate-fixing jurisdiction under Texas Water Code section 12.013. SOAH has jurisdiction to conduct a hearing and render a Proposal for Decision (PFD) under Texas Government Code section 2003.049.

The Water Authority issued an Amended Rate Order on December 16, 2021.[1] Within 90 days, Fulshear filed a petition under Texas Water Code sections 12.013 and 13.043 (Petition). On June 21, 2022, staff (Staff) of the Commission, recommended finding the Petition sufficient.[2] Referencing Staff's recommendation, the Commission ALJ found the Petition sufficient.[3]

On August 24, 2022, the Commission referred this matter to SOAH, requesting the assignment of an ALJ to conduct a hearing and issue a PFD, if necessary. On August 25, 2022, the Commission issued a Preliminary Order on Phase One Issues, listing, among others, the following matters to be addressed (including the relevant subparts):

---

[1] Water Authority Motion Tab B (Amended Rate Order) at 1.

[2] Staff's Recommendation on Sufficiency of the Petition and Request for Referral at 1-2 (Jun. 21, 2022).

[3] Order No. 3 (Jun. 22, 2022).

9.    Do the facts demonstrate that the Commission has authority under TWC section 12.013 to decide this appeal? ...

b. Does the water authority furnish water to Fulshear on a wholesale basis under TWC section 12.013(d)?

10.    Do the facts demonstrate that the Commission has authority under TWC section 13.043(f) to decide this appeal? ...

a. Does Fulshear receive water service under TWC section 13.043(f) from the water authority?

On December 15, 2022, the Water Authority filed a motion to dismiss with prejudice (Motion), challenging whether Fulshear's appeal is proper under Texas Water Code sections 12.013 and 13.043.[4] The ALJ took argument on written submission.[5] The ALJ granted the Water Authority's Motion[6] and abated the procedural schedule, notifying the parties that the ALJ would issue a PFD.[7]

In assessing the arguments made in the Water Authority's Motion, the PFD addresses the following issues: whether the Water Authority furnishes water to

---

[4] Water Authority Motion at 8 and 9 (Dec. 15, 2022).

[5] *See* Fulshear's Response to Motion to Dismiss of NFBWA (Jan. 18, 2023) (Fulshear Reply), Staff's Response to NFBWA's Motion to Dismiss and Request for Leave to File a Reply to Fulshear's Response (Jan. 18, 2023) (Staff Reply), Fulshear's Reply to Staff's Response to NFBWA's Motion to Dismiss (Feb. 27, 2023) (Fulshear Reply to Staff), NFBWA Reply to Fulshear Response to Motion to Dismiss (Feb. 27, 2023) (Water Authority Reply to Fulshear), NFBWA Reply to Commission Staff's Response to NFBWA's Motion to Dismiss (Feb. 27, 2023) (Water Authority Reply to Staff), and Commission Staff's Reply to Fulshear's Response to NFBWA's Motion to Dismiss (Feb. 27, 2023) (Staff Reply to Fulshear).

[6] SOAH Order No. 7 (Apr. 27, 2023).

[7] SOAH Order No. 8 (May 9, 2023).

Fulshear, whether Fulshear receives water service from the Water Authority, and whether Fulshear pays the Water Authority for any water service it receives.

## II. BACKGROUND

The basic facts are uncontested. No party disputes that Fulshear is a retail public utility and that the Water Authority is a political subdivision. The following sections address the Water Authority's Groundwater Reduction Plan, the fee change implemented by the Water Authority, and how these relate to Fulshear.

### A. NORTH FORT BEND WATER AUTHORITY

#### 1. Groundwater Reduction Plan

The Water Authority includes 44 utility districts and Fulshear, in addition to private well owners that lie within its boundary.[8] The Water Authority is charged with developing a strategy to comply with the regulations set by the Fort Bend Subsidence District (Subsidence District).[9] Within the Water Authority's territory, water users are subject to the Subsidence District's disincentive fee, otherwise known as the Groundwater Reduction Plan (GRP) fee, limiting groundwater pumpage to a percentage of their total water demand.[10] In March 2008, the Water Authority released its GRP, detailing its strategy for meeting those requirements.[11]

---

[8] Water Authority Motion Tab A (Groundwater Reduction Plan) at 3.

[9] Groundwater Reduction Plan at 1.

[10] Groundwater Reduction Plan at 1.

[11] *See* Groundwater Reduction Plan.

The GRP sets out the Water Authority's plan for a surface water conversion for the Water Authority's territory, with goals of 30 percent reduction in groundwater use starting in 2013, and 60 percent reduction in groundwater use starting in 2025.[12] The GRP includes details of an expansion of the water transmission system, projected to 2055.[13]

The GRP designates districts for each of the two conversion phases, selected to meet the required conversion levels for each phase.[14] The second phase of the conversion is referred to as the "2025 Conversion Strategy" (2025 Conversion), the goal of which is to reduce groundwater use by 60 percent and is designed to account for future needs through 2055.[15] Fulshear is included in the 2025 Conversion phase.[16]

The section detailing the conversion process discusses the expansion of the water transmission system, including the sizing of transmission pipelines, plant facilities costs, and a construction schedule for the GRP and the GRP participants. The information was not specific to Fulshear.[17]

---

[12] Groundwater Reduction Plan at 1.

[13] Groundwater Reduction Plan at 1.

[14] Groundwater Reduction Plan at 19.

[15] Groundwater Reduction Plan at 1 and 21.

[16] Groundwater Reduction Plan, Table 6, at 20.

[17] Groundwater Reduction Plan at 21-25.

Participants in the GRP include two types of water users: owners of wells subject to the Subsidence District disincentive fee, or GRP fee, and those included in the GRP by contract.[18] Fulshear falls into the first category.[19]

The plan acknowledges that it is a dynamic process that will evolve during the conversion process, especially in 2025, when the Water Authority predicts that demand by its users will increase dramatically, compared to the previous timeframes.[20] The Water Authority anticipates that it will need to make adjustments as time progresses, while still in keeping with the general schedule dictated by the GRP.

## 2. Powers and Authority

Under the terms of the Amended Rate Order, the Subsidence District issues an aggregate water well permit to the Water Authority for each well located in its service area.[21] As the permittee, the Water Authority is responsible for all administrative matters, including, but not limited to, permit renewal, payment of permit fees, and year-end pumpage reporting requirements.[22] Each well owner, including Fulshear, that is not exempt from the GRP maintains ownership of its respective wells and operational responsibility for those wells.[23]

---

[18] Groundwater Reduction Plan at 3.

[19] Groundwater Reduction Plan at 3.

[20] Groundwater Reduction Plan at 35.

[21] Groundwater Reduction Plan at 10.

[22] Groundwater Reduction Plan at 10.

[23] Groundwater Reduction Plan at 10; Fulshear Petition at 3.

The Water Authority's ability to aggregate permits that operate within its service area gives it flexibility in its operation and planning to ensure that it achieves the required groundwater reduction goals.[24] It monitors groundwater pumpage by requiring each well owner to self-report on a monthly basis.[25] This allows it to observe compliance with the GRP and to impose corrective actions, if necessary.[26]

The Water Authority may impose fees, user fees, rates, and charges on any person within its service area, including owners of wells located within the service territory.[27] It adopted three different types of fees: the GRP fee, the Surface Water fee, and the Imported Water fee.[28] The GRP fee is based on the amount pumped from owners of non-exempt wells on a monthly basis, which must be paid to the Water Authority.[29] Each person that receives surface water from the Water Authority must pay a separate Surface Water fee, based on surface water received from the Water Authority.[30] Fulshear pays the GRP fee for pumping groundwater from its own wells, but it does not pay any Surface Water fees.[31]

---

[24] Groundwater Reduction Plan at 28.

[25] Groundwater Reduction Plan at 29.

[26] Groundwater Reduction Plan at 29.

[27] Groundwater Reduction Plan at 27.

[28] Water Authority Motion Tab C, Affidavit of Matthew Froelich (Froelich Affidavit) at 2.

[29] Froelich Affidavit at 2.

[30] Froelich Affidavit at 2.

[31] Fulshear Reply Brief at 3.

### 3. The Amended Rate Order

On December 16, 2021, the Water Authority, through its Board of Directors, increased the GRP fee from $4.25 per 1,000 gallons to $4.55 per 1,000 gallons and the Surface Water fee from $4.60 to $4.90.[32] These changes are the basis for Fulshear's Petition.

## B.    CITY OF FULSHEAR

Fulshear is a municipal corporation providing retail water utility service within its corporate and extraterritorial boundaries.[33] Fulshear falls under the definition of a retail public utility, as defined by the Texas Water Code.[34] Fulshear pumps water from its own wells within the Water Authority's service territory.[35]

As stated above, Fulshear pays the GRP fee, but it does not pay the Surface Water fee, because it does not receive surface water from the Water Authority.[36] Additionally, none of the water rights acquired by the Water Authority have been dedicated to Fulshear, nor does the Water Authority have any existing facilities that are dedicated to or currently committed to providing water to Fulshear.[37] Initially, the Water Authority estimated that it would be able to provide surface water to

---

[32] Amended Rate Order at 5-6.

[33] Fulshear Appeal at 1 (Mar. 16, 2022).

[34] Tex. Water Code § 13.002(19).

[35] Fulshear Reply Brief at 1.

[36] Froelich Affidavit at 2.

[37] Froelich Affidavit at 4.

Fulshear in mid-2024, but the timeframe is outdated and the Water Authority will not be providing surface water to Fulshear by the initial estimated date, or in the immediate future.[38]

## III.   APPLICABLE LAW

Texas Water Code section 12.013(a) states that the Commission shall fix reasonable rates for the furnishing of raw or treated water for any purpose mentioned in Chapters 11 or 12 of the Texas Water Code. The relevant chapters of the Texas Water Code do not define the term "furnish."

Additionally, Texas Water Code section 13.043(f) provides:

A retail public utility that receives water ... from ... [a] political subdivision of the state ... may appeal to the utility commission a decision of the provider of water ... affecting the amount paid for water or sewer service.

The Texas Water Code defines "service" as any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility[39] in the performance of its duties to its patrons, employees, other retail public utilities, and the public, as well as the interchange of facilities between two or more retail public utilities.[40]

---

[38] Froelich Affidavit at 4.

[39] Under Texas Water Code section 13.002(19), the definition of a retail public utility includes political subdivisions.

[40] Tex. Water Code § 13.002(21).

Two cases address whether a tract of land is receiving water service, in the context of an owner seeking release from a holder of a water Certificate of Convenience and Necessity (CCN). In *Texas General Land Office v. Crystal Clear Water Supply Corporation*, the Texas Third Court of Appeals held that whether the retail public utility provided water service to the owner of tract of land seeking decertification is a fact-based inquiry regarding whether the retail public utility has facilities or lines committed to providing water to the particular tract of land or has performed acts or supplied anything to that tract in furtherance of its obligation to provide water to that tract under its CCN.[41]

In *Johnson County Special Utility District v. Public Utility Commission of Texas*, the Texas Third Court of Appeals performed a similar analysis, citing *Crystal Clear*.[42] In addition to the fact-based inquiry, the court cited other considerations: whether any qualifying services were received by the property; whether a dedicated water line was installed to serve the particular property, even if the line was not currently operative; and that a tract of land would not necessarily be receiving water service simply because the retail public utility had entered into a contract to secure water supply, unless the act was performed in furtherance of providing water to the tract seeking decertification.[43]

---

[41] *See Tex. Gen. Land Off. v. Crystal Clear Water Supply Corp.*, 449 S.W.3d 130 (Tex. App.—Austin 2014, pet. denied).

[42] *Johnson Cnty. Special Util. Dist. v. Pub. Util. Comm'n of Tex.*, 2018 WL 2170259, at *8 (Tex. App.—Austin May 11, 2018, pet. denied).

[43] *Johnson County*, 2018 WL at *8.

Under Title 16 Texas Administrative Code section 22.181, the presiding officer may recommend that the Commission dismiss, with or without prejudice, any proceeding for any reason specified in that section, including, but not limited to, lack of jurisdiction and failure to state a claim for which relief can be granted.[44]

## IV. ARGUMENTS AND ANALYSIS

The Water Authority makes three distinct arguments for dismissal, which generally follow Preliminary Order Issue Nos. 9 and 10: the Commission lacks ratemaking jurisdiction under Texas Water Code section 13.043(f); the Commission lacks jurisdiction under Texas Water Code section 12.013(a); and Fulshear's Petition fails to state a claim for which relief may be granted under Texas Water Code section 12.013(a). Each argument is addressed in turn below.

### A. ISSUE NO. 9: DO THE FACTS DEMONSTRATE THAT THE COMMISSION HAS AUTHORITY UNDER TEXAS WATER CODE SECTION 12.013 TO DECIDE THIS APPEAL?

#### 1. Arguments

Texas Water Code section 12.013 addresses the Commission's rate-fixing authority where a retail public utility furnishes water.

The Water Authority argues that, because it does not furnish water to Fulshear, the Commission does not have rate-fixing authority over Fulshear's

---

[44] 16 Tex. Admin. Code § 22.181 (a) and (d)(1) and (8).

petition under Texas Water Code section 12.013(a).[45] The Water Authority acknowledges that it furnishes potable water for compensation to GRP participants within its service territory, but not to Fulshear.[46] Because neither Chapter 11 nor 12 of the Texas Water Code defines the term "furnish,"[47] the ALJ uses the plain meaning of the term.[48]

Staff agrees with the Water Authority, adding that the term "furnish" is a synonym for the words "supply" or "provide."[49] Staff argues that the facts do not support Fulshear's contention that the Water Authority furnishes water, raw or potable, to Fulshear by paying the GRP Fee.[50]

By contrast, Fulshear argues that the Water Authority's interpretation of "furnish" is too narrow in scope.[51] Fulshear states that, because it is part of a group to whom the Water Authority furnishes water and collectively pays for the Water Authority's expenses, the Water Authority "furnishes" water to Fulshear.[52] Fulshear admits its argument that the Water Authority "furnishes" water to

---

[45] Texas Water Code section 12.013(a) provides that the Commission shall fix reasonable rates for the furnishing of raw or treated water for any purpose mentioned in Chapters 11 or 12 of the Texas Water Code.

[46] Water Authority Initial Brief at 9; *see* Groundwater Reduction Plan.

[47] *See* Tex. Water Code chapters 11 and 12.

[48] *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011).

[49] Staff Reply Brief at 2.

[50] Staff Reply Brief at 2.

[51] Fulshear Reply Brief at 5-6.

[52] Fulshear Reply brief at 6.

Fulshear is based solely on the fact that it is a GRP participant and that that it does not yet receive surface water from the Water Authority.[53]

## 2. Analysis

The ALJ agrees with the Water Authority and Staff. Using the plain meaning of "furnish," the evidence establishes that the Water Authority does not furnish water to Fulshear. As stated in the affidavit provided by the Water Authority, it does not provide water, raw or potable, to Fulshear, nor has it in the past.[54]

The ALJ is not persuaded by Fulshear's argument that the Water Authority furnishes water to Fulshear. Although Fulshear's wells are located within the Water Authority's territory, Fulshear pumps the groundwater out of its own wells and maintains operational responsibility for those wells.[55]

Moreover, contrary to Fulshear's argument, the Water Authority does not control Fulshear's wells. The Water Authority holds the permits for Fulshear's wells, but it only performs administrative functions, such as renewing the permits, paying the associated fees, and requiring self-reports from well owners to track the amount of groundwater drawn. The Water Authority performs those administrative duties with the aim of meeting requirements set by the Subsidence District regarding

---

[53] Fulshear Reply Brief at 2.

[54] *See* Froelich Affidavit.

[55] *See* Groundwater Reduction Plan at 10.

the amount of groundwater drawn by GRP participants, which is a separate consideration from providing water to the well owners.

Fulshear does not refer to any other acts that the Water Authority performed that might be construed as "furnishing" water to Fulshear, other than the fact that Fulshear's wells lie within the Water Authority's area of responsibility within the Subsidence District. Thus, Fulshear has not established that the Water Authority furnishes water to Fulshear.

Because the ALJ finds that the Water Authority does not furnish water to Fulshear, ALJ finds that the Commission does not have rate-fixing jurisdiction over Fulshear's appeal under Texas Water Code section 12.013.

## B. ISSUE NO. 10: DO THE FACTS DEMONSTRATE THAT THE COMMISSION HAS AUTHORITY UNDER TEXAS WATER CODE SECTION 13.043 TO DECIDE THIS APPEAL?

### 1. Arguments

Texas Water Code section 13.043(f) allows a retail public utility that receives water service to appeal to the Commission a decision of the water service provider that affects the amount paid for that service.

The Water Authority argues that Fulshear neither receives water services from the Water Authority, nor does it pay the Water Authority for water service.[56] For this reason, it maintains, the Commission lacks jurisdiction over this appeal and Fulshear's petition fails to state a claim for which relief may be granted.[57]

The Water Authority cites the interpretation of the phrase "receives water service" discussed in *Crystal Clear*, positing that it stands for the proposition that a property was not "receiving water service" from a water utility where the utility was not actively supplying water to the property, as there were no particular facilities or lines committing to serving the property, and there was no water supply line dedicated to meeting the future demand from the property.[58] In *Johnson County*, the court further crystallized these factors: the water services must be received by the property, a dedicated water line might be sufficient, and a tract of land would not necessarily be receiving water service simply because the utility performed an act, unless that act was performed in furtherance of providing water to the specific tract.[59]

The Water Authority acknowledges that it has taken steps to acquire surface water supplies and transport, treat, sell, and deliver that water to certain customers inside its boundaries.[60] For example, it acquired surface water rights from the City

---

[56] Water Authority Initial Brief at 9-10.

[57] Water Authority Motion at 6.

[58] Water Authority Initial Brief at 11; *Crystal Clear*, 449 S.W.3d at 141.

[59] Johnson County, 2018 WL 2170259 at 8.

[60] Water Authority Initial Brief at 12.

of Houston, and arranged for the design and construction of a pump station and over 50 miles of surface water transmission lines, to deliver surface water to some of its GRP participants.[61] Additionally, it has chosen the pipe size it deems to be appropriate to serve future demand for the GRP participants as a whole, but not to Fulshear in particular.[62]

The Water Authority maintains that it has not sold, transported, or delivered any water to Fulshear.[63] Additionally, contrary to Fulshear's contentions, the Water Authority emphasizes that none of its existing facilities are currently used to provide surface water to Fulshear, none of the existing facilities were designed or constructed solely for the purpose of serving Fulshear, nor are any of the Water Authority existing facilities currently committed to providing water to Fulshear.[64]

The Water Authority acknowledges that it has taken steps to develop surface water supplies and provide treated surface water to certain participants in the GRP, but it distinguishes those actions from providing, and Fulshear receiving, water service.[65] The GRP, created in 2008, details a multi-decade plan to address the goals of the groundwater conservation efforts and a surface water conversion process accomplished in phases, including building facilities and laying down infrastructure

---

[61] Water Authority Initial Brief at 12.

[62] Groundwater Reduction Plan at 21.

[63] Water Authority Initial Brief at 12.

[64] Froehlich Affidavit at 4.

[65] Water Authority Initial Brief at 11.

to deliver potable water.[66] The GRP lists Fulshear as scheduled to begin implementation in the second phase, the 2025 Conversion, but the Water Authority states that it might not even be able to meet that deadline, as they have had to make adjustments.[67] Thus, the Water Authority argues that, Fulshear is not currently receiving water service, has not received water service, and will not receive water service from the Water Authority in the immediate future.

Staff generally agrees with the Water Authority's position, disagreeing only with the contention that Fulshear must actively receive surface water to constitute "receiving water service."[68]

Fulshear's view of receiving water service is broader.[69] It argues that it receives water service from the Water Authority and that it pays the Water Authority for water service. Fulshear argues that it "receives 'water service'" from the Water Authority because the Water Authority designs, constructs, operates, and charges for a surface water system for the GRP participants as a whole, including Fulshear.[70] Moreover, it argues that the Water Authority controls Fulshear's groundwater wells by holding the associated permits for those wells, and, thus, the Water Authority provides "water service" to Fulshear.[71]

---

[66] *See* Groundwater Reduction Plan.

[67] Water Authority Motion at 13.

[68] Commission Staff Reply Brief at 3.

[69] Fulshear Reply Brief at 6.

[70] Fulshear Reply Brief at 1-2.

[71] Fulshear Reply Brief at 6-7.

Proposal for Decision
SOAH Docket No. 473-22-09195.WS; PUC Docket No. 53363

Alternatively, Fulshear argues that, if the Commission were to find that Fulshear does not receive "water service" from the Water Authority, the Water Authority includes in its GRP an intention to effect a 60 percent reduction in groundwater use, starting in 2025, through 2055.[72] Fulshear admits that it is not yet receiving surface water from the Water Authority, but argues that the Water Authority has "committed facilities or lines" for Fulshear's future use with its inclusion in the GRP.[73]

As to whether Fulshear pays for water service, Fulshear argues that the GRP fee, the disincentive fee it pays for drawing water from the groundwater wells, amounts to paying for water service.[74]

## 2. Analysis

The ALJ agrees with the Water Authority and Staff that Fulshear is neither receiving water service from the Water Authority, nor paying the Water Authority for water service.

The Water Authority does not have any dedicated water lines serving Fulshear, nor has the Water Authority has committed lines to provide water to Fulshear, as Fulshear argues. Rather, the Water Authority has *plans* to commit lines,

---

[72] Water Authority Ex. A at 1 and 21.

[73] Fulshear Reply Brief at 7.

[74] Fulshear Reply Brief at

which is one crucial step removed from the factors set out in *Crystal Clear* and *Johnson County*.

Because Fulshear admits that it does not currently receive surface water from the Water Authority, the next consideration is whether the Water Authority has committed water lines to serve Fulshear or taken any other steps in furtherance of providing water service to Fulshear. As stated above, the Water Authority established that it has not committed water lines to serve Fulshear. As to the final consideration, Fulshear only refers to actions taken by the Water Authority for the GRP participants as a whole, not specifically with respect to Fulshear. The Water Authority designs, constructs, operates, and charges fees to the GRP participants in accordance with the conversion schedule detailed in the GRP, but none of the plans revolve specifically around serving Fulshear. Thus, the ALJ is not persuaded by Fulshear's arguments and finds that Fulshear is not receiving water service from the Water Authority.

Because it does not receive water service from the Water Authority, it naturally follows that Fulshear does not pay the Water Authority for water service. Moreover, because Fulshear does not pay the Water Authority for water service, the Water Authority did not make a decision in the Amended Rate Order affecting the amount that Fulshear pays for water service. The GRP fee Fulshear pays is a disincentive fee for drawing groundwater from its own wells within a subsidence district, which does not rise to the level of paying the Water Authority for water service. Moreover, if Fulshear received water service, it would trigger the Surface Water fee, which Fulshear acknowledges that it does not pay. The former penalizes

a customer for water drawn by a customer over a certain threshold under a groundwater reduction plan, while the latter is compensation to a utility for services rendered.

Fulshear may, at some point in the future, have the ability to appeal rates set by the Water Authority; however, currently, it does not. Fulshear does not receive water service from the Water Authority, nor does it pay the Water Authority for water service. Accordingly, the ALJ finds that the Commission does not have jurisdiction over Fulshear's appeal under Texas Water Code section 13.043(f).

## V.    RECOMMENDATION

Because the Water Authority does not furnish water or provide water service and because Fulshear does not pay for water service, the Commission does not have jurisdiction over Fulshear's Petition under Texas Water Code section 12.013 or 13.043. Accordingly, the ALJ recommends that the Commission dismiss this proceeding for lack of jurisdiction and failure to state a claim for which relief can be granted.

## VI.    FINDINGS OF FACT

### *The Parties*

1.    The North Fort Bend Water Authority (Water Authority) is a political subdivision that functions as a retail public utility.

2.    The City of Fulshear (Fulshear) is a city that owns and operates non-exempt wells within the Water Authority's service territory.

### *The Groundwater Reduction Plan*

3.    The Water Authority has two classes of customers: those subject to the Groundwater Reduction Plan (GRP) by virtue of their location within the Water Authority's territory, and those that enter into a contract to participate in the GRP. Fulshear is categorized into the former class of customers.

4.    The Water Authority charges three types of fees: the GRP Fee, the Surface Water Fee, and the Imported Water Fee.

5.    The GRP Fee is the fee imposed by the Water Authority in accordance with the GRP adopted by the Water Authority in March 2008.

### *Ordinance Setting Rates Being Appealed*

6.    On December 16, 2021, the Water Authority issued an Amended Rate Order, enacting new rates for the GRP Fee, the Surface Water Fee, and the Imported Water Fee.

### *The Appeal*

7.    Within 90 days, on March 16, 2022, Fulshear filed a petition appealing the Water Authority's new fees (Petition) with the Public Utility Commission of Texas (Commission).

8.    Fulshear appeals changes to the GRP Fee and the Surface Water Fee.

9.    On June 22, 2022, the Commission Administrative Law Judge (ALJ) found the Petition sufficient.

### *Referral to SOAH*

10.    On August 24, 2022, the Commission referred this case to the State Office of Administrative Hearings (SOAH).

11. On August 25, 2022, the Commission issued its Preliminary Order on Phase One Issues (Preliminary Order), establishing a list of issues to be addressed in the proceeding.

12. The Commission listed the following issues, among others, in the Preliminary Order:

    a. Do the facts demonstrate that the Commission has authority under TWC section 12.013 to decide this appeal?

        i. Does the water authority furnish water to Fulshear on a wholesale basis under TWC section 12.013(d)?

    b. Do the facts demonstrate that the Commission has authority under TWC section 13.043(f) to decide this appeal?

        i. Does Fulshear receive water service under TWC section 13.043(f) from the water authority?

On November 7, 2022, the SOAH ALJ convened a prehearing conference. Fulshear, the Water Authority, and Commission staff (Staff) appeared through legal counsel.

*Water Authority's Motion to Dismiss*

13. On December 15, 2022, the Water Authority filed a Motion to Dismiss (Motion).

14. Fulshear and Staff filed responses to the Water Authority's Motion on December 15, 2022, and all parties filed replies on February 27, 2023.

15. On April 27, 2023, SOAH Order No. 7 notified the parties that the ALJ granted the Water Authority's Motion and that a Proposal for Decision (PFD) would be forthcoming.

16. On May 9, 2023, SOAH Order No. 8 abated the proceeding pending the issuance of the PFD.

17. Fulshear pays the GRP Fee for drawing water from its wells.

18. Fulshear does not pay Surface Water Fees.

19. Fulshear does not receive water service from the Water Authority, because the Water Authority does not have any water lines serving Fulshear, the Water Authority has not committed lines to specifically providing water service to Fulshear, and it has not taken steps in furtherance of providing water service specifically to Fulshear.

20. Fulshear does not pay for water service from the Water Authority.

21. The Water Authority does not furnish water to Fulshear.


## VII. CONCLUSIONS OF LAW

1. A retail public utility that receives water service from another retail public utility or political subdivision of the state, may appeal to the utility commission a decision of the provider of water or sewer service affecting the amount paid for water or sewer service. Texas Water Code § 13.043(f).

2. The Water Authority is a political subdivision operating as a retail public utility. Texas Water Code § 13.002(16).

3. This docket was processed in accordance with the requirements of the Texas Water Code and Commission rules.

4. SOAH has jurisdiction to conduct a hearing on the merits and issue a PFD with findings of fact and conclusions of law for this proceeding. Tex. Gov't Code § 2003.049.

5. This appeal was timely filed with the Commission and the Water Authority. Texas Water Code § 13.043(f); 16 Tex. Admin. Code § 24.101(f).

6. The Commission shall fix reasonable rates for the furnishing of raw or treated water for any purpose mentioned in Chapters 11 or 12 of the Texas Water Code. Texas Water Code § 12.013(a).

7.     The Water Authority does not furnish water to Fulshear under Texas Water Code section 12.013(a).

8.     A retail public utility that receives water ... from ... [a] political subdivision of the state ... may appeal to the utility commission a decision of the provider of water ... affecting the amount paid for water or sewer service. Tex. Water Code § 13.043(f).

9.     Fulshear does not receive water service from the Water Authority under Texas Water Code section 13.043(f).

10.    The Water Authority did not make a decision affecting the amount Fulshear pays for water service because Fulshear does not pay the Water Authority for water service.

11.    SOAH has authority to dismiss all issues within a proceeding and issue a PFD. 16 Tex. Admin. Code §§ 22.181(f)(2), .261.

12.    The Petition does not invoke the Commission's jurisdiction under Texas Water Code sections 12.013(a) or 13.043(f) and fails to state a claim for which relief can be granted. 16 Tex. Admin. Code § 22.181(d)(1) and (8).

## VIII. PROPOSED ORDERING PARAGRAPHS

1.     Fulshear's appeal is dismissed.

2.     The Commission denies all other motions and any other requests for general or specific relief that the Commission has not expressly granted.

**Signed June 22, 2023**

Rachelle Nicolette Robles
Presiding Administrative Law Judge

# Tab 5

List of Stipulated Facts (AR Item 64)



# Filing Receipt

**Filing Date - 2024-01-29 10:49:00 AM**

**Control Number - 53363**

**Item Number - 75**

| PETITION BY THE CITY OF | § | BEFORE THE STATE OFFICE |
|---|---|---|
| FULSHEAR APPEALING THE | § | |
| DECISION OF NORTH FORT BEND | § | OF |
| WATER AUTHORITY TO INCREASE | § | |
| GROUNDWATER REDUCTION PLAN | § | ADMINISTRATIVE HEARINGS |
| AND SURFACE WATER FEES | § | |

**LIST OF STIPULATED FACTS AND MOTION TO ADMIT EVIDENCE**

TO THE HONORABLE ADMINISTRATIVE LAW JUDGE:

COME NOW, the City of Fulshear (Fulshear), and North Fort Bend Water Authority (NFBWA) and file this List of Stipulated Facts and Motion to Admit Evidence. Fulshear and NFBWA are in agreement on the stipulated facts and motion to admit evidence and Commission Staff is unopposed.

## I.  BACKGROUND

Pursuant to the Joint Proposed Procedural Schedule filed by the parties in this proceeding on December 20, 2023, the parties set a proposed due date of January 29, 2024, for filing a List of Stipulated Facts and Motion to Admit Evidence. The stipulated facts and documents in the attached Appendix are intended to provide evidentiary support for the briefing contemporaneously filed by the Parties in the docket regarding Preliminary Order No. 10.a and to provide necessary facts to allow the ALJ to respond to the issues raised by the Commission in its Preliminary Order on Phase One Issues. Fulshear and NFBWA anticipate that the ALJ will be able to resolve Phase One based on the stipulations, documents, and accompanying briefing.

## II.  STIPULATED FACTS

**Disclaimer**: These stipulations are solely for purposes of the Phase One proceeding in this Docket No. 53363 and are not binding on any party in any cost-of-service docket or any other proceeding.

1.  Fulshear is a retail public utility under TWC § 13.002(19) and 16 TAC § 24.3(31). Fulshear is a municipality that maintains and controls in this state facilities for providing potable water service for compensation.

2.  NFBWA maintains and controls in this state facilities for providing potable water for compensation and furnishes potable water for compensation to certain entities.

3.  The Fort Bend Subsidence District (FBSD) is a political subdivision and a conservation and reclamation district created by the Texas Legislature in 1989 to regulate the

withdrawal of groundwater within the FBSD to prevent subsidence that contributes to flooding and infrastructure damages.

4. NFBWA is a political subdivision and a conservation and reclamation district created by the Texas Legislature in 2005.

5. Fulshear owns groundwater wells used to provide retail water service that are located within FBSD's Regulatory Area A and NFBWA's boundaries. Fulshear is a participant in NFBWA's Groundwater Reduction Plan (GRP).

6. Fulshear pays GRP Fees to NFBWA. Fulshear does not pay (and has never paid) Surface Water Fees to NFBWA and has never received surface water from NFBWA.

7. NFBWA is listed as the permittee on all of the permits issued by FBSD for Fulshear's wells.

8. The GRP Fee is charged to participants in NFBWA's GRP based on the amount of groundwater produced from wells owned by that participant.

9. The Surface Water Fee is charged to participants in NFBWA's GRP based on the amount of surface water received from NFBWA by that participant.

10. NFBWA determined the amount of the GRP Fee and Surface Water Fee using the American Water Works Association Manual M-1 (M-1 Manual) as the source of the methodology. NFBWA used its estimated total costs (debt service, reserves, and operating costs) divided by the estimated total amount of water (surface and groundwater) used by the GRP Participants to establish the Surface Water Fee. NFBWA then reduced the Surface Water Fee by an amount ($.35) which is intended to reflect average operating costs per gallon borne by well owners to establish the GRP Fee.

11. Fulshear did not file a petition for exclusion (to opt out of NFBWA's jurisdiction) pursuant to NFBWA's enabling legislation within 60 days of the effective date of that legislation.

**III.**

**IV. MOTION TO ADMIT EVIDENCE**

Fulshear and NFBWA request the entry of the following documents into the record of this proceeding and waive all objections to the admission of the documents:

1. NFBWA Amended Rate Order (Dec. 16, 2021) [Appendix Tab 1].

2. NFBWA Groundwater Reduction Plan (March 2008) (NFBWA00001-000265) [Appendix Tab 2].

3. Fort Bend Subsidence District Rules (Amended 2019) [Appendix Tab 3].

4. Fort Bend Subsidence District Water Well Permit No. 2022-107-29287-0, Well No. 493 (Oct. 6, 2022) (NFBWA000312-000314) [Appendix Tab 4].

5. NFBWA Rate Study and Long-Term Financial Forecast (Nov. 2016) (without Appendix A) [Appendix Tab 5].

6. NFBWA Response to Fulshear's First RFI (Oct. 3, 2022) [Appendix Tab 6].

7. NFBWA Response to Fulshear's Second RFI (Dec. 12, 2022) [Appendix Tab 7].

8. NFBWA Water Use (Actual/Projected) Spreadsheet (NFBWA000871-000877) [Appendix Tab 8].

9. NFBWA Infrastructure Schematic (BGE) (Aug. 2022) (NFBWA000878) [Appendix Tab 9].

10. NFBWA 2025 System Schedule (BGE) (NFBWA000879-000886) [Appendix Tab 10].

11. NFBWA Financial Report (Dec. 31, 2021) [Appendix Tab 11].

12. 2020 Cost of Service Rate Study (Board Presentation) (October 2020) (Willdan) [Appendix Tab 12].

13. FBSD 2013 District Plan (Amended June 22, 2022) [Appendix Tab 13].

14. Affidavit of Matthew L Froehlich (12-15-2022) [Appendix Tab 14].

15. Affidavit of Matthew L. Froehlich (2-22-2023) (with Exhibits) [Appendix Tab 15].

16. Affidavit of Nelisa Heddin (1-16-2023) [Appendix Tab 16].

## V. CONCLUSION

Fulshear and NFBWA respectfully request that the ALJ adopt the proposed stipulations and admit the referenced documents into the evidentiary record in this docket.

**Dated: January 29, 2024**

Respectfully submitted,

C. Joe Freeland
State Bar No. 07417500

**Mathews & Freeland, LLP**
8140 N. MoPac Expy, Ste 4-200
Austin, Texas 78759
Telephone (512) 404-7800
Facsimile (512) 703-2785
jfreeland@mandf.com

**ATTORNEYS FOR CITY OF FULSHEAR**

With Permission
for Drew Miller

Andrew S. "Drew" Miller
Drew.Miller@kempsmith.com
State Bar No. 00786857
Sergio M. Estrada

Sergio.Estrada@kempsmith.com
State Bar No. 24080886

**KEMP SMITH LLP**
2905 San Gabriel St., Suite 205
Austin, TX 78705
(512) 320-5466
(512) 320-5431 (Fax)

**ATTORNEYS FOR NORTH FORT BEND WATER AUTHORITY**

## CERTIFICATE OF SERVICE

I certify that, unless otherwise ordered by the presiding officer, notice of the filing of this document was provided to all parties of record via electronic mail on January 29, 2024, in accordance with the Orders Suspending Rules filed in Project No. 50664.

_____
C. Joe Freeland

# Tab 6

Amended Rate Order (Suppl. AR Item 93)

# CERTIFICATE FOR ORDER

THE STATE OF TEXAS                          §
                                            §
COUNTIES OF FORT BEND AND HARRIS            §

I, the undersigned officer of the Board of Directors of the North Fort Bend Water Authority, do hereby certify as follows:

1.     The Board of Directors of the North Fort Bend Water Authority convened in regular session on the 16th day of December, 2021, and the roll was called of the members of the Board:

| | |
|---|---|
| Peter Houghton | President |
| Robert Patton | Vice President |
| Melony Gay | Secretary |
| Robert Darden | Assistant Vice President |
| Bruce Fay | Assistant Secretary |
| Donald Abrahamson, II | Assistant Secretary |
| Dana Hollingsworth | Assistant Secretary |

and all of said persons were present except Director(s) _Houghton and Gay_, thus constituting a quorum. Whereupon, among other business, the following was transacted at the meeting: a written

## AMENDED RATE ORDER

was introduced for the consideration of the Board. It was then duly moved and seconded that the Amended Rate Order be adopted; and, after due discussion, the motion, carrying with it the adoption of the Amended Rate Order, prevailed and carried unanimously.

2.     A true, full, and correct copy of the aforesaid Amended Rate Order adopted at the meeting described in the above and foregoing paragraph is attached to and follows this certificate; the action approving the Amended Rate Order has been duly recorded in the Board's minutes of the meeting; that the persons named in the above and foregoing paragraph are the duly chosen, qualified, and acting officers and members of the Board as indicated therein; each of the officers and members of the Board was duly and sufficiently notified officially and personally, in advance, of the time, place, and purpose of the aforesaid meeting, and that the Amended Rate Order would be introduced and considered for adoption at the meeting, and each of the officers and members consented, in advance, to the holding of the meeting for such purpose; the meeting was open to the public as required by law; and public notice of the time, place, and subject of the meeting was given as required by Chapter 551, Texas Government Code, and Section 49.063, Texas Water Code.

SIGNED AND SEALED the 16th day of December, 2021.

Asst Secretary, Board of Directors

(SEAL)

987166

NORTH FORT BEND WATER AUTHORITY
AMENDED RATE ORDER

STATE OF TEXAS                                    §
                                                 §
COUNTIES OF FORT BEND AND HARRIS      §

WHEREAS, the North Fort Bend Water Authority (the "Authority") is a regional water authority created pursuant to Senate Bill 1798 of the 79th Legislature, as amended (the "Act"), which amended the Special District Local Laws Code by adding Chapter 8813 ("Section 8813"), and Article XVI, Section 59 of the Texas Constitution; and

WHEREAS, the Authority was created, among other purposes, to accomplish the purposes of Article XVI, Section 59 of the Texas Constitution, including the acquisition and provision of surface water and groundwater for residential, commercial, industrial, agricultural, and other uses, the reduction of groundwater withdrawals, the conservation, preservation, protection, recharge of groundwater and of groundwater reservoirs or their subdivisions, the prevention of waste of groundwater, and the control of subsidence caused by the withdrawal of water from groundwater reservoirs or their subdivisions; and

WHEREAS, the Act provides that the Authority may: (1) provide for the conservation, preservation, protection, recharge, and prevention of waste of groundwater, and for the reduction of groundwater withdrawals as necessary to develop, implement, or enforce a groundwater reduction plan, in a manner consistent with the purposes of Article XVI, Section 59 of the Texas Constitution; and (2) acquire or develop surface water and groundwater supplies from sources inside or outside the boundaries of the Authority and may conserve, store, transport, treat, purify, distribute, sell, and deliver water to or among persons, corporations, municipalities, municipal corporations, political subdivisions of the state, and others, inside and outside the boundaries of the Authority, and allocate water among persons participating in the Authority's groundwater reduction plan whether they are located inside or outside the Authority's boundaries; and

WHEREAS, the Act authorizes the Authority to establish fees, user fees, rates, and charges and classifications of fee and ratepayers, as necessary to enable the Authority to fulfill its purposes and regulatory functions provided in the Act; and

WHEREAS, Section 8813.008 provides that the Authority may establish fees, user fees, rates, charges, or special assessments, that are necessary to pay for the costs of accomplishing the purposes of the Authority, including: (1) the reduction of groundwater withdrawals; (2) the facilitation of compliance with the requirements of the Fort Bend Subsidence District and the Harris Galveston Subsidence District, as applicable; and (3) the provision of services, facilities, and systems; and

WHEREAS, prior to the Board's adoption of the GRP Fee, Surface Water Fee, and Imported Water Fee hereinafter set forth in this Amended Rate Order, the Board provided municipalities and districts within the Authority written notice of the date, time, and location of the meeting at which the Board would adopt the GRP Fee, Surface Water Fee, Imported Water Fee and the amount of said fees; and

WHEREAS, the Board has determined that the fees, user fees, rates, and charges established in this Amended Rate Order are necessary to accomplish those purposes set forth in the Act; and

WHEREAS, it is necessary that the Authority establish fees, user fees, rates, charges, and conditions and terms of service from the Authority System, the Authority's GRP and any other services provided by the Authority, and rules related thereto;

NOW, THEREFORE, IT IS ORDERED BY THE BOARD OF DIRECTORS OF THE NORTH FORT BEND WATER AUTHORITY THAT:

ARTICLE I
DEFINITIONS

Section 1.01.  Definitions.  As used herein, the following terms shall have the respective meanings set forth or referred to below:

"Act" means Senate Bill 1798 of the 79th Texas Legislature, as amended.

"AMI" means the Authority's Advanced Metering Infrastructure.

"Authority" means the North Fort Bend Water Authority.

"Authority Engineer" means the Authority's general operating engineer (currently BGE, Inc.), which may be changed from time to time by the Authority.

"Authority Operator" means the operating company performing operations for the Authority (currently Inframark Water Infrastructure Operations), which may be changed from time to time by the Authority.

"Authority System" means the Authority's facilities, pipelines, storage tanks, conduits, canals, pumping stations, treatment plants, meters, valves, and any other construction, device, or related appurtenance or connection used to treat, transport, or store Surface Water, including all easements, rights-of-way, and sites owned or utilized by the Authority, together with all Authority rights related thereto.

"Board" means the Board of Directors of the Authority.

"Chloramine System" is defined hereinafter.

987166

- 2 -

"Commission" means the Texas Commission on Environmental Quality, and any successor agency.

"Control Valve Assembly" is defined hereinafter.

"Converted Customer" means a District (or other Authority customer) whose water supply facilities have been actually and directly connected to the Authority System and who is actually receiving Surface Water directly from the Authority System. A District that merely has a water interconnect with (or receives water through a water interconnect from) a Converted Customer is not considered a Converted Customer, unless said District's own water supply facilities have been actually and directly connected to the Authority System and said District is itself actually receiving Surface Water directly from the Authority System.

"Current Calendar Year" is defined hereinafter.

"District" means any district created pursuant to Article III, Section 52(b)(1), (2) or Article XVI, Section 59, Texas Constitution, regardless of the manner of creation other than a navigation district or a district governed by Chapter 36 of the Texas Water Code.

"Delivery Point" is defined hereinafter.

"Exempt Well" means a Well with a casing diameter of less than five inches that solely serves a single family dwelling, a Well that is regulated under Chapter 27 of the Texas Water Code, or a Well that is not subject to any groundwater reduction requirement imposed by the FBSD or HGSD (as appropriate).

"FBSD" means the Fort Bend Subsidence District.

"GRP" means that certain groundwater reduction plan adopted by the Authority's Board in March 2008, as amended; and all directives, determinations and requirements issued by the Authority (or the Authority Engineer or Authority Operator) pursuant to such plan, as all of same may be amended from time to time.

"GRP Fee" means the groundwater reduction plan fee/rate adopted by the Board pursuant to Section 8813.103 and set forth hereinafter.

"HGSD" means the Harris Galveston Subsidence District.

"Houston" means the City of Houston, Texas.

"Imported Water" means water of any type that is produced outside of the boundaries of the Authority and transported into the boundaries of the Authority for distribution to an end user within the boundaries of the Authority. The term "Imported Water" does not include Surface Water delivered through or by the Authority System.

987166

"Imported Water Fee" means the imported water fee/rate adopted by the Board pursuant to Section 8813.103(h) of the Texas Special District Local Laws Code and set forth hereinafter.

"Interest Rate" is defined hereinafter.

"Maximum Daily Amount" is defined hereinafter.

"Minimum Daily Amount" is defined hereinafter.

"Non-Exempt Well" means any Well within the Authority other than an Exempt Well.

"Non-Potable Water" means water other than potable Surface Water or other ground water, including but not limited to, rain water, storm water, and/or effluent reuse water.

"Online Reporting System" means the Authority's online pumpage reporting system.

"Person" means any individual, corporation, organization, government or governmental subdivision or agency, District, municipality, county, political subdivision, business trust, trust, estate, partnership, association, or any other legal entity.

"Rate Order" means this Amended Rate Order.

"Realty Interest Document" means a written document (in a form acceptable to the Authority) that grants the following rights to the Authority across, along, under, over, and upon any property (whether or not a water plant site) owned by a Person, or in which a Person has any interest: (i) water line and/or water meter easement(s), (ii) consent to conveyance of Authority easement(s), (iii) subordination of a Person's realty interests to the Authority's rights under Authority easement(s), or (iv) any other property interest necessary or convenient for the Authority to provide and/or meter Surface Water delivered by the Authority to any Authority customers.

"Shut-off Valve(s)" means the shutoff valve(s) installed by the Authority or the Person in the Surface Water line(s) on a Person's water plant site(s).

"Surface Water" means water (whether surface, ground, or a blend of both) that is delivered through or by the Authority System.

"Surface Water Availability Date" means the date Surface Water is generally available to a Person, as determined by the sole discretion of the Authority

987166

- 4 -

"Surface Water Fee" means the surface water fee/rate adopted by the Board pursuant to Section 8813.103 of the Act and set forth hereinafter.

"Three Year Time-Period" means the three year time-period preceding the date Surface Water is generally available to a Person, as determined by the sole discretion of the Authority.

"Water Importer" means a Person located, in whole or in part, within the Authority's boundaries that uses or distributes Imported Water. The term "Water Importer" does not include an owner of an Exempt Well if, and only if, such owner does not own any Non-Exempt Wells.

"Water Line Tank Connection" is defined hereinafter.

"Well" means a facility, device, or method used to withdraw groundwater: (i) from a groundwater source that is located within the boundaries of the Authority; or (ii) from a groundwater source that is located outside the boundaries of the Authority, but is part of the GRP pursuant to a written contract with the Authority.

Section 1.02. Interpretations. The article and section headings of this Rate Order are included herein for convenience of reference purposes only and shall not constitute a part of this Rate Order or affect its interpretation in any respect. Except where the context otherwise requires, words imparting the singular number shall include the plural and vice versa.

Section 1.03. References, Etc. Any reference in this Rate Order to a document shall mean such document and all exhibits thereto as amended or supplemented from time to time.

ARTICLE II
FINDINGS

Section 2.01. Findings. Each of the recitals stated in this Rate Order are hereby adopted as a finding of the Board. All statutory requirements and conditions (including those of Section 8813.103) have been met for the establishment of those fees, user fees, rates and charges set forth in this Rate Order.

ARTICLE III
RATES AND CHARGES

Section 3.01. GRP Fee. The Board hereby adopts a GRP Fee pursuant to Section 8813.103. The owner of each Non-Exempt Well within the Authority shall pay the Authority the GRP Fee for monthly pumpage, as provided in this Section. Effective January 1, 2022, the GRP Fee shall be equal to $4.55 for each 1,000 gallons of water pumped from each Non-Exempt Well. Payment of the GRP Fee is due by the last day of

987166

- 5 -

the month two months after which pumpage is required to be calculated (the "Due Date"). (For example, payment for January pumpage is due by March 31st; payment for February pumpage is due by April 30th; etc.) The Authority will not send invoices or billings to Non-Exempt Well owners for the amount of GRP Fees that are due. Each Non-Exempt Well owner shall be responsible for remitting to the Authority the GRP Fee on or before the Due Date. The GRP Fee for any billing period beginning on or after January 1, 2022, shall be calculated on the Online Reporting System, as further described in Section 4.01.

Section 3.02. Surface Water Fee. The Board hereby adopts a Surface Water Fee pursuant to Section 8813.103. Each Person that receives Surface Water from the Authority shall pay the Authority the Surface Water Fee for Surface Water received monthly, as provided in this Section. Effective January 1, 2022, the Surface Water Fee shall be equal to $4.90 for each 1,000 gallons of Surface Water received. Payment of the Surface Water Fee is due by the last day of the month two months after which Surface Water usage is required to be calculated, the Due Date. (For example, payment for January Surface Water usage is due by March 31st; payment for February Surface Water usage is due by April 30th; etc.) The Authority will not send invoices or billings to Surface Water users for the amount of Surface Water Fees that are due. Each Surface Water user shall be responsible for remitting to the Authority the Surface Water Fee on or before the due date. The Surface Water Fee for any billing period beginning on or after January 1, 2022, shall be calculated completed as further described in Section 4.01.

Section 3.03. Imported Water Fee.

(a) Adoption of Imported Water Fee. The Board hereby adopts an Imported Water Fee pursuant to Chapter 8813 (including Section 8813.103(h)) of the Texas Special District Local Laws Code. If a Water Importer obtains Imported Water to serve all or any portion of the property it serves, then such Water Importer must immediately notify the Authority in the method set forth below and must pay to the Authority monthly the following Imported Water Fee: (i) a fee equal to the then-current GRP Fee applied on all Imported Water if the Water Importer is not a Converted Customer; or (ii) a fee equal to the then-current Surface Water Fee applied on all Imported Water, if the Water Importer is a Converted Customer. Notification of interconnect use shall be requested through the Authority's Online Reporting System. Notification of Imported Water from any other source must be submitted in writing to the Authority. The Imported Water Fee is due and payable to the Authority monthly even if the Water Importer also pays another entity for the Imported Water and even if the Authority is not then providing Surface Water to the Water Importer.

(b) Imported Water Fee Payment. The Imported Water Fee is due and payable to the Authority monthly at the same time as the Water Importer's GRP Fee or Surface Water Fee payment, even if the Water Importer also pays another entity for the

Imported Water and even if the Authority is not then providing any water to the Water Importer. The Imported Water Fee for any billing period beginning on or after January 1, 2022, shall be calculated on the Online Reporting System.

(c) <u>Emergency Situations</u>. If the Water Importer is experiencing an emergency situation and receiving surface water from the Authority, then the Water Importer will be charged the Imported Water Fee unless a variance is granted in accordance with subsection (d) below. Notwithstanding the foregoing, if special circumstances exist, as determined in the sole discretion of the Authority pursuant to subsection (e) below, in which the Authority is unable to deliver water to the Water Importer, then the Imported Water Fee shall not be imposed for the time period in which the Authority cannot deliver surface water. If the Water Importer is experiencing an emergency situation, as determined in the sole discretion of the Authority, but is not receiving surface water from the Authority, then the Water Importer shall not be charged an Imported Water Fee on the Imported Water that it receives during a period not to exceed 60 consecutive or inconsecutive days during any calendar year. Such time period may be extended by the Authority, in its sole discretion and as appropriate, on a case by case basis considering the circumstances of the particular emergency.

(d) <u>Variance Requests</u>. If the Water Importer is obtaining Imported Water due to other special circumstances, including but not limited to system repairs, the Water Importer may submit a variance request to the Authority detailing the special circumstances and any supporting reasons for which the Imported Water Fee should not be assessed in that particular situation. Such variance request must be submitted within 30 days of the earlier of (a) the date on which the Water Importer receives written notification from the Authority that an Imported Water Fee will be charged to the Water Importer, (b) the date on which Water Importer self-reported receiving Imported Water via the Online Reporting System, or (c) 30 days before any scheduled system repairs or maintenance creating the possible need for Imported Water by the Water Importer. The Authority will consider the variance request and advise the Water Importer of its decision. The Authority's decision shall be final, and should the Authority deny the variance request, all outstanding amounts due related to the Imported Water Fee shall be due and payable to the Authority within 30 days of written notification from the Authority alerting the Water Importer of the variance denial. Any Imported Water Fees incurred by the Water Importer following the delivery of the written notification of the Authority's determination will become due and payable as otherwise set forth in subsection (b) above. Once granted a variance by the Authority, a Water Importer shall not be required to pay the Imported Water Fee on Imported Water for the time period that the Authority has agreed in writing that no Imported Water Fee applies to the particular Imported Water. Such time period may be extended by the Authority, in its sole discretion and as appropriate, on a case-by-case basis considering the circumstances of the special circumstances.

987166

(e) <u>Interruptions in Surface Water Delivery</u>. In the event that the Authority is otherwise regularly delivering Surface Water to a Converted Customer and special circumstances exist in which the Authority is unable to deliver such Surface Water, as determined in the sole discretion of the Authority, to the Converted Customer, then the Imported Water fee shall not be imposed during the time period in which the Authority determines it was unable to deliver water to the Converted Customer. The foregoing sentence shall not apply in instances in which a Converted Customer annexes additional property, whether contiguous or otherwise, into the boundaries of the Converted Customer following the Authority's initial conversion of the Converted Customer, where the Authority is not currently providing Surface Water to the property annexed into the Converted Customer. The Imported Water Fee for Imported Water related to such annexed property shall be equal to the Authority's then-current Surface Water Fee.

Section 3.04. <u>Payment of Fees</u>. All fees payable to the Authority shall be paid in money which is legal tender in the United States of America. Payments will be accepted only by check or money order made payable to the "North Fort Bend Water Authority" or by wire transfer according to written wiring instructions provided by the Authority. No cash will be accepted. All payments must be received by the bookkeeper of the Authority (currently, Municipal Accounts & Consulting, L.P., 1281 Brittmoore Road, Houston, TX 77043) by the Due Date. Written wire instructions are available upon request.

Section 3.35. <u>Special Assessments</u>. Section 8813.105 allows the Board to impose special assessments. To date, the Board has not imposed such special assessments. The Board reserves the right to impose such special assessments at any time by adopting a resolution, rule, requirement, or order (or amendment to this Rate Order) that expressly provides for the imposition of such special assessments.

ARTICLE IV<br>WELL PUMPAGE

Section 4.01. <u>Self-Reporting</u>. Each Non-Exempt Well owner shall be responsible for reading the meter which measures the amount of water pumped from each Non-Exempt Well at the end of each month. Such measurement (even if it shows zero pumpage for the month) shall be reported to the Authority: (i) through the Online Reporting System, or (ii) if the Authority determines that access to the Online Reporting System is not reasonably available to a Person, then reporting may be made via the non-electronic reporting form attached hereto as Exhibit "A," provided permission to use the non-electronic reporting form is obtained in writing from the Authority. Along with the owner's monthly GRP Fee payment, the owner shall report its usage to the Authority no later than the last day of the month following the month for which pumpage is required to be calculated. (For example, reporting for January pumpage is

987166

due by February 28th; reporting for February pumpage is due by March 31st; etc.). The Authority reserves the right to request more frequent reporting, at its sole discretion.

Section 4.02. Audits. The Authority shall have the right to audit the Well pumpage measurements submitted by the Well owner by reading the meter at the Well. The Authority may also, at its discretion, read the meter for any other reason. In addition, the Authority shall have the right, upon reasonable notice, to install necessary equipment or conduct repairs in order for the Authority to read the meter remotely. If a Well owner reports an amount of pumpage to the Authority that differs from the amount of pumpage that the Authority determines occurred based on the Authority's reading of the meter, or if a well Owner reports an amount of pumpage to the FBSD that differs from the amount of pumpage that the Well owner reports to the Authority, the Authority may utilize any of said amounts to determine the total GRP Fees due the Authority. If such Authority determination shows that the Well owner underpaid the Authority, then, in addition to all other remedies available to the Authority, the Authority may invoice the Well owner for the shortfall. (Any such invoice will be due to the Authority no later than the date provided in the invoice.) If such Authority determination shows that the Well owner overpaid the Authority, then the Authority may pay the Well owner the amount of the overage. Notwithstanding the previous two sentences, the Board may refrain from sending invoices for shortfalls and/or payments for overages that are below any threshold amount that is from time to time determined by the Board.

Section 4.03. Failure to Read Meter. In the event a Non-Exempt Well owner fails to read the meter, which measures the amount of water pumped from its Well, the Authority shall have the right to read the meter. The Authority may establish the Well owner's GRP Fee based on the Authority's reading, regardless of when the Authority reads the meter.

Section 4.04. Accuracy of Meters. Each Non-Exempt Well owner shall be responsible to install and maintain a Well meter on each Non-Exempt Well that meets all FBSD requirements, including but not limited to, registering a meter accuracy within the range of 97% to 103% accuracy (the "Meter Accuracy Range"). In addition, effective January 1, 2022, each Non-Exempt Well owner installing a new Well meter is responsible for ensuring that such Well meter is compliant with the Authority's AMI. If the Authority at any time believes that the meter accuracy fails to fall within the Meter Accuracy Range, it may notify the Well owner and require that such meter be independently tested and the results reported to the Authority. If the testing reveals that the meter accuracy is within the Meter Accuracy Range, the Authority shall pay the cost of such testing and the cost of any necessary temporary meter used. If the testing reveals that the meter accuracy is not within the Meter Accuracy Range, then the Well owner shall pay the cost of such testing, the cost of any necessary temporary meter used, and the cost to recalibrate the meter such that the meter accuracy falls within the Meter Accuracy Range, and the owner shall be responsible for payment to the

987166

- 9 -

Authority of the GRP Fee for unread gallons, as determined by the Authority. If the owner refuses to test the meter after the Authority requires it to do so, the Authority may remove the Well meter for independent testing and recalibration, and replace it with a temporary meter. The Authority shall pay for the cost of such testing and temporary meter, unless the results show that the meter accuracy was not within the Meter Accuracy Range, in which case the Well owner shall be responsible for the cost of testing and recalibration of the meter, the cost of the temporary meter, and payment to the Authority of the GRP Fee for unread gallons, as determined by the Authority. Payment of the GRP Fee under this Section, for unread gallons resulting from a meter with meter accuracy not in compliance with the Meter Accuracy Range, shall be due to the Authority within 45 days after the Authority submits an invoice to the Well owner for same.

Section 4.05. Fort Bend Subsidence District Water Well Permitting. The FBSD has issued an aggregate water well permit to the Authority comprising all of the permitted non-exempt groundwater production for the Authority's GRP within Fort Bend County. The Authority shall be responsible for all administrative matters related to the aggregate water well permit, including permit renewal, payment of permit fees, requests for permit rebates, and year-end pumpage reporting requirements. Each Well owner listed on the Authority's aggregate water well permit shall provide the Authority data and information required by the Authority for the Authority to prepare and file documents with the FBSD related to well permitting. Each Non-Exempt Well owner shall maintain: (i) ownership of its Well(s) and operational responsibility therefor, and (ii) subject to groundwater reduction requirements imposed by the Authority, the terms of the GRP, and any limitations imposed by the FBSD, the right to pump from such Well(s) the amount of groundwater reasonably determined by such owner to be needed by such owner, for itself or for its customers, to provide water in accordance with at least the minimum regulatory requirements for pressure and supply, including, without limitation, during an emergency requiring immediate use of groundwater (such as for firefighting purposes) so long as such owner is not committing waste or being wasteful. For purposes of this provision "waste" and "wasteful" shall have the most restrictive meaning ascribed to such terms in the following: (i) the Special District Local Laws Code Chapter 8834 with respect to Non-Exempt Wells in the FBSD, (ii) rules or requirements of the FBSD with respect to Non-Exempt Wells in the FBSD, or (iii) the terms of the aggregate water well permit issued to the Authority.

Section 4.06. Well Procedures. All requests for new Wells or changes in status to existing Wells subject to the Authority's GRP must first be submitted to the Authority and shall not be submitted directly to Fort Bend Subsidence District. Requests must be submitted to the Authority on the New Well or Activity Status Change Request form attached as Exhibit "B."

987166

- 10 -

ARTICLE V
SURFACE WATER USE AND CONVERSION

Section 5.01.  Self-Reporting.  Each Surface Water user shall be responsible for reading the meter, which measures the amount of Surface Water delivered by the Authority, at the end of each month. Such measurement (even if it shows zero Surface Water usage for the month) shall be reported to the Authority: (i) through the Online Reporting System, or (ii) if the Authority determines that access to the Online Reporting System is not reasonably available to a Person, then reporting may be made via the non-electronic reporting form attached hereto as Exhibit "A," provided permission to use the non-electronic reporting form is obtained in writing from the Authority.  Along with the user's monthly Surface Water Fee payment, the user shall report its usage to the Authority no later than the last day of the month following the month for which Surface Water usage is required to be calculated.  (For example, the reporting form for January Surface Water usage is due by February 28th; the reporting form for February Surface Water usage is due by March 31st; etc.)  The Authority reserves the right to request more frequent reporting, at its sole discretion.

Section 5.02.  Audits. The Authority shall have the right to audit the Surface Water usage measurements submitted by the Surface Water user by reading the Surface Water meter.  The Authority may also, at its discretion, read the meter for any other reason. In addition, upon reasonable notice, the Authority shall have the right to install necessary equipment or conduct repairs in order for the Authority to read the meter remotely.

Section 5.03.  Failure to Read Meter.  In the event a Surface Water user fails to read the meter, which measures the amount of Surface Water delivered, the Authority shall have the right to read the meter.  The Authority may establish the Surface Water user's Surface Water Fee based on the Authority's reading, regardless of when the Authority reads the meter.

Section 5.04.  Delivery Point and Measuring and Control Equipment.  The delivery point of water (the "Delivery Point") by the Authority to a Person receiving Surface Water shall be the output flange of the meter and control valve assembly (collectively, the "Control Valve Assembly") installed by the Authority to serve such Person.  No Person shall connect to the Authority System, unless and until the Authority consents in writing to such connection.  If the Authority, at its option, so consents, the connection shall be made, provided the connection: (i) is in strict conformity with the terms and conditions of such Authority consent, (ii) has prior approval for the connection from the Commission, and (iii) meets all applicable Commission requirements.  The Authority shall furnish, install, and operate, at its own expense, at the Delivery Point the necessary equipment and devices of standard type for measuring the quantity of Surface Water delivered by the Authority.  Such Control

987166

Valve Assembly and other equipment installed by the Authority shall remain the property of the Authority.

Section 5.05. Testing of Measuring Equipment. The Authority may from time to time test the measuring equipment. Should the test of the measuring equipment show that the equipment is registering more than one hundred two percent (102%) or less than ninety-five percent (95%) of the water delivered, the total quantity of water delivered to the Person will be deemed to be the average daily consumption as measured by the measuring equipment when in working order, and the meter shall be corrected, repaired, or replaced by the Authority with accurate measuring equipment. In such event, the Person's payments for Surface Water to the Authority shall be adjusted (increased or decreased) for a period extending back to the time when the inaccuracy began, if such time is ascertainable; and if such time is not ascertainable, for a period extending back to the last test of the measuring equipment or 120 days, whichever is shorter.

Section 5.06. Delivery, Facilities and Title to Water. Each Person receiving Surface Water from the Authority shall be responsible to deliver water from the Delivery Point to and into the Person's water system. The Authority, and not the Person receiving Surface Water from the Authority, shall own, operate, and maintain: (i) any sensor equipment installed by the Authority on the Person's ground storage tank facilities or other water plant facilities and related electrical and control connections by conduit pipe, or other means, connecting such sensor equipment to the Authority's facilities (the "Sensor Line and Equipment"); and (ii) the Control Valve Assembly installed by the Authority. The Person receiving Surface Water from the Authority, and not the Authority, shall own, operate, and maintain all equipment, facilities, tanks, buildings, materials, wells, and lines downstream of the Control Valve Assembly, except for the Sensor Line and Equipment, and shall be responsible for any malfunctions of said items, including tank overflows. Unless otherwise agreed to in writing by the Authority, the Person receiving Surface Water from the Authority shall at all times, at the Person's expense, maintain an air gap, in accordance with a location and specifications approved by the Authority, downstream of the Delivery Point before the water delivered by the Authority enters the Person's ground storage tank(s); provided, however, the Authority, at its option, may provide an alternative backflow prevention procedure or mechanism. Title to, possession, and control of Surface Water shall remain with the Authority until it passes through the Control Valve Assembly, where title to, possession, and control of the Surface Water shall pass from the Authority to the Person receiving same.

Section 5.07. Chloramine Disinfection. Usually, Surface Water delivered by the Authority will be disinfected with chloramines. Each Converted Customer is required to: (i) convert its water treatment system to a chloramine disinfection system, or install a chloramine disinfection system, prior to becoming a Converted Customer and no later than the date required by the Authority; and (ii) maintain use of such chloramine

disinfection system thereafter for so long as such Converted Customer is connected to the Authority System and for so long as the Surface Water delivered by the Authority is disinfected with chloramines. The Authority shall provide notice to each Person to be Converted to Surface Water of the required conversion to chloramines. It shall be the responsibility of each Converted Customer (and each Person that receives water from a Converted Customer, for example and without limitation, via a water interconnect), and not the Authority, to: (i) notify such Converted Customer's (or such Person's) water customers and water users about its conversion to and use of chloramine disinfection; (ii) comply with any applicable United States Environmental Protection Agency and Commission (and other applicable agency) regulations and requirements, and applicable laws; and (iii) comply with any applicable Commission regulations and requirements, including the variance process for chloramines conversion and approval for interconnections. Prior to completion of design (and commencement of construction) of the chloramine disinfection system required by this Section, the Person to be converted to Surface Water shall submit plans and specifications to the Authority Engineer for review and approval. ANY SUCH APPROVAL DOES NOT RELIEVE THE PERSON, AND ITS ENGINEER, OF ADEQUATELY DESIGNING AND CONSTRUCTING THE FACILITIES AND ANY SUCH APPROVAL IS NOT AN ASSUMPTION BY THE AUTHORITY (OR THE AUTHORITY ENGINEER) OF RESPONSIBILITY OR LIABILITY FOR THE ADEQUACY (OR INADEQUACY) OF SUCH PLANS AND SPECIFICATIONS OR THE FACILITIES CONSTRUCTED THEREBY, ALL OF SAME BEING EXPRESSLY DISCLAIMED.

Section 5.08. Daily Amount. The Authority, the Authority Engineer, or the Authority Operator may from time to time designate a maximum daily amount of Surface Water (the "Maximum Daily Amount") to be taken by a Person and/or a minimum daily amount of Surface Water ("Minimum Daily Amount") to be taken by a Person. In such event, during any one day, no Person shall take from the Authority more than either the Maximum Daily Amount or less than the Minimum Daily Amount. The Authority may from time to time increase or decrease a Person's Maximum Daily Amount and/or Minimum Daily Amount, as determined necessary by the Authority, the Authority Engineer, or the Authority Operator. If in violation of this Rate Order, and in addition to all other remedies available to the Authority (including, without limitation, those set forth in this Rate Order), a Person takes more than its Maximum Daily Amount or less than its Minimum Daily Amount in any one day, the Person shall be responsible for payment for any damages suffered by the Authority and payment for any charges incurred by the Authority related thereto (including, without limitation, any charges or fees charged to the Authority by Houston, the FBSD, or the HGSD).

Section 5.09. Quantity or Pressure of Water. Notwithstanding any provision of this Rate Order, and unless otherwise specified in a water supply commitment agreement, the Authority does not and will not guarantee to any Person a specific

quantity or pressure of water for any purpose whatsoever. Unless such a water supply commitment agreement is in place, the above limitations on quantity and pressure may be inadequate to fulfill the Commission's regulations and requirements for capacity and water quality. In no case shall the Authority be liable for the failure or refusal to furnish water or any particular amount or pressure of water.

Section 5.10. <u>Interruptions in Service</u>. The Authority shall use reasonable efforts to deliver to any Person with whom the Authority has entered into a written water supply commitment agreement a constant and uninterrupted supply of Surface Water in the amount provided in such agreement. Notwithstanding any provision of this Rate Order or any applicable agreement entered into by the Authority, the Authority may interrupt, reduce, or cease deliveries of Surface Water if such interruption or reduction is necessary: (i) due to limitations in the Authority System or Houston's water system; (ii) in case of emergencies or breakdowns in the Authority System or Houston's water system; or (iii) for equipment installation, repairs, modifications, replacements, inspections, or maintenance on the Authority System or Houston's water system. In addition, the Authority may interrupt, reduce, or cease deliveries of Surface Water if such interruption or reduction is necessary for purposes of the Authority's GRP. The Authority shall have no liability to any Person for any damages caused by any interruption in service or any failure (partial or total) to deliver Surface Water.

Section 5.11. <u>Maintenance of Groundwater Wells</u>. In order to have an alternative water supply source in the event that the Authority's water service is interrupted or ceases for any reason, Persons that have converted, in whole or in part, to usage of Surface Water are strongly encouraged by the Authority to at all times: (i) maintain their existing groundwater well(s) and other groundwater facilities; and (ii) maintain water line interconnect(s) with other political subdivision(s) of this State that have functioning groundwater well facilities.

Section 5.12. <u>Early Conversion</u>. To the extent that a Person desires to purchase Surface Water for any reason in advance of the date that the Authority intends to provide Surface Water to such Person, such Person may submit a written request for Surface Water to the Authority, which request will be evaluated by the Authority, in its sole discretion, on economic feasibility, GRP cost, and other factors; and the Authority will determine, in its sole discretion, if such request can be satisfied, in what amount, and according to what time frame and terms.

Section 5.13. <u>Compliance with GRP</u>. Pursuant to the Act, the Authority is authorized to develop, prepare, revise, adopt, implement, enforce, manage, or participate in the GRP. The GRP may specify the measures to be taken to reduce groundwater withdrawals and the dates and extent to which Persons shall reduce or terminate withdrawal of groundwater and instead receive water from alternative sources. The Authority, the Authority Engineer, and/or the Authority Operator shall manage and enforce the GRP, including without limitation coordination with the FBSD

987166

or HGSD, monitoring compliance with the GRP, and enforcing the terms of the GRP. All Persons shall comply with the terms of the GRP and all other Authority orders and requirements (including, without limitation, those from the Authority Engineer or the Authority Operator) for the reduction of groundwater usage and the allocation of Surface Water. The Authority, the Authority Engineer, and/or the Authority Operator may from time to time issue groundwater reduction requirements to Persons in order to: (a) comply with or exceed FBSD or HGSD groundwater reduction requirements; (b) satisfy the terms of the GRP; and/or (c) allocate Surface Water among Persons, including requiring Persons to from time to time timely take Surface Water from the Authority in amounts determined by the Authority.

Section 5.14    Early-Conversion/Over-Conversion Credits.  The Authority, and not the Person within the Authority's GRP, shall receive and be entitled to any early-conversion or over-conversion credits issued by the FBSD or HGSD related to Surface Water or any water other than groundwater (including but not limited to Non-Potable Water) consumed or utilized by any Person within the Authority's GRP.  No Person within the Authority's GRP shall obtain (or attempt to obtain) for such Person's own benefit or the benefit of anyone other than the Authority or sell (or attempt to sell), any such early-conversion or over-conversion credits.  If requested by the Authority, Persons within the Authority's GRP shall cooperate with the Authority (including, without limitation, by amending their HGSD or FBSD well permits, as applicable), in order to enable the Authority to receive such early-conversion or over-conversion credits.

Section 5.15.    Inadequate Groundwater Facilities.  Districts or users that need or desire Surface Water because they do not have adequate groundwater facilities (or for any other reason) may request a water supply commitment agreement from the Authority.  At the Authority's discretion, the Authority may, according to terms and conditions acceptable to the Authority, enter into such an agreement.  Only water supply commitment agreements guaranteeing quantity and pressure may be adequate to fulfill the Commission's regulations and requirements for capacity and water quality.

Section 5.16.    Compliance of Person's Water System.  In order to protect the Authority's System, each Person's water system that is receiving Surface Water from the Authority, shall be constructed and operated to comply with the rules promulgated by the Commission, or any successor agency, and the policy requirements of Houston regarding backflow prevention and cross connections.  Should a condition in violation of these requirements be discovered, such Person shall promptly cure same.  If determined necessary by the Authority or if the Person fails to promptly cure same, the Authority, in addition to all other remedies available to it (including, without limitation, those provided in this Rate Order), may cure same, at the cost and expense of the Person.  The Authority may conduct inspections from time to time to determine that no conditions exist in such Person's water system and in connections to the Person's customers' premises which would or might adversely affect the Authority System.

987166

Section 5.17.  Termination and Reconnection of Service.  The Authority may, in its discretion, disconnect service for failure to pay all charges, including penalties and interest, by the 50th day after the Due Date; provided, however, that prior to disconnecting services, the Authority shall send written notice by United States first class mail to the Person at the appropriate address and provide the Person with an opportunity to contest, explain, or correct the charges, services, or disconnection, at a meeting of the Board.  The written notice shall inform the Person of the amount of the delinquent payment, the date service will be disconnected or additional service withheld if payment is not made, the date, time, and place of the next scheduled meeting of the Board, and of the opportunity to contest, explain, or correct the charges, services, or disconnection, by presenting in person or in writing such matter to the Board at the next scheduled meeting as shown on the notice.  The date specified for disconnection shall be ten (10) days after the date of the next scheduled meeting of the Board as shown in the notice, and the date for withholding additional service shall be ten (10) days after the date of that Board meeting.  The notice shall be deposited, postpaid, in a post office or official depository under the care and custody of the United States Postal Service at least ten (10) days prior to the date of the scheduled meeting of the Board.  A written statement by the Authority Operator that the notice was so mailed and a certificate of mailing by the United States Postal Service shall be prima facie evidence of delivery of same.  If the Person appears before the Board in person or in writing, the Board shall hear and consider the matter and inform the Person of the Board's determination by sending written notice by United States first class mail to the Person at the appropriate address.  If service to a Person is disconnected for nonpayment of a delinquent bill or for any cause legally authorized, a reconnection fee of $500 shall be paid prior to service being restored.  In the event that the Authority Operator removes a Person's meter due to unauthorized reconnection of service subsequent to its termination by the Authority, a reinstallation fee of $500 shall be paid prior to service being restored, which fee is in addition to any other fees imposed (including, without limitation, the reconnection fee).

Section 5.18.  Authority Reimbursement to a Converted Customer.  In lieu of the Authority designing or installing the Water Line Tank Connection or the Chloramine System (both defined below), the Authority has determined to require Persons that will become Converted Customers to design and install the Water Line Tank Connection and the Chloramine System and to allow certain of the related costs incurred by Converted Customers to be eligible for potential reimbursement from the Authority, as provided in this Section.   Nothing in this Section shall be construed as limiting the Authority's right to require a Person, at the Person's sole cost, to:  (i) convert to Surface Water, or (ii) install the Water Line Tank Connection or the Chloramine System.  Unless agreed to otherwise in writing by the Board, the Converted Customer, and not the Authority, shall own, maintain, operate, and repair (and be responsible to obtain any appropriate insurance for) the Water Line Tank Connection and Chloramine System and also the Converted Customer's water plant buildings, tanks, and water wells.

987166

Notwithstanding the foregoing, nothing in this Section shall be construed as limited the Converted Customer's obligations as the receiving system to comply with Commission regulations and requirements. For example, in the event of a violation, the Commission will hold the Converted Customer responsible for any problems associated with the connection or chloramines system.

(a) If a written request for reimbursement is made by a Converted Customer to the Authority as set forth in this Section, then such Converted Customer may be eligible for Authority reimbursement of construction and engineering costs for the Water Line Tank Connection and the Chloramine System as follows:

(i)      The Converted Customer may be eligible for reimbursement of the actual and reasonable construction and engineering costs incurred by the Converted Customer to construct a segment of water line ("Water Line Tank Connection") from the Authority's water meter/vault facilities to such Customer's ground storage tank facilities (or other water plant facilities). A Converted Customer shall not be eligible for this reimbursement if the Converted Customer fails to execute a Realty Interest Document in favor of the Authority in a form and at the time required by the Authority, and at no expense to the Authority. The Authority may require that such Realty Interest Document, among other things, allow the Authority the right to: (i) install, own, operate, and maintain water line and/or meter facilities and related appurtenances, and (ii) install, own, operate, and maintain sensor equipment on such Customer's ground storage tank facilities (or other water plant facilities) and electrical and control connections by conduit pipe (or other means) connecting such sensor equipment to the Authority System. No costs for repair, maintenance, operation, upgrade, or replacement of the Water Line Tank Connection shall be eligible for reimbursement from the Authority. Such items that are ineligible for reimbursement include, but are not limited to, painting of water tanks beyond those areas that are affected by the conversion to chloramines disinfection system, modifications to a Converted Customer's facilities downstream of its water tanks, building modifications, and access modifications.

(ii)      The Converted Customer may be eligible for reimbursement of the actual and reasonable construction and engineering costs incurred by the Converted Customer to convert its water treatment system from a chlorine disinfection system to a chloramine disinfection system ("Chloramine System"), including but not limited to adding ammonia storage and feed facilities, modifying chlorine storage and feed facilities, making control system modifications, and installing all necessary appurtenances thereto.

987166

(iii)    The purpose of this reimbursement is intended for costs associated with converting a pre-existing disinfection system to a chloramines disinfection system.  Accordingly, unless approved in writing by the Authority, Persons scheduled by the Authority to become Converted Customers will not be eligible for a Chloramine System reimbursement on any new water plants constructed within three years before such time as Surface Water is generally available from the Authority, as determined by the sole discretion of the Authority.  No costs for repair, maintenance, operation, upgrade, or replacement of a Chloramine System shall be eligible for reimbursement from the Authority.  Such items that are ineligible for reimbursement include, but are not limited to, painting of water tanks beyond those areas that are affected by the conversion to chloramines disinfection system, modifications to a Converted Customer's facilities downstream of its water tanks, building modifications, and access modifications.  In addition to the foregoing, in the event that a Converted Customer annexes additional land into the boundaries of the Converted Customer, whether contiguous or otherwise, costs related to the Chloramine System on any new water plants constructed by the previously Converted Customer shall not be eligible for reimbursement by the Authority.  The foregoing sentence shall apply regardless of the timeline on which the Authority may deliver Surface Water to the property annexed by the Converted Customer.

(b)    Actual and reasonable engineering costs will be eligible for reimbursement by the Authority under this Section, in a maximum amount determined by the Board at the Board's sole discretion.

(b)    Any reimbursement pursuant to this Section shall be subject to approval by the Authority Engineer; and any such reimbursement shall be made in accordance with standards approved by the Authority Engineer and the Board, which standards may change from time to time.  Prior to completion of design (and commencement of construction) of the Water Line Tank Connection and Chloramine System, the Person to be converted to Surface Water shall submit plans and specifications to the Authority Engineer for review and approval. The Authority Engineer will provide written approval of the plans and specifications that are not eligible for reimbursement by the Authority in accordance with this Section.  ANY SUCH APPROVAL DOES NOT RELIEVE THE PERSON, AND ITS ENGINEER, OF ADEQUATELY DESIGNING AND CONSTRUCTING THE FACILITIES AND ANY SUCH APPROVAL IS NOT AN ASSUMPTION BY THE AUTHORITY (OR THE AUTHORITY ENGINEER) OF RESPONSIBILITY OR LIABILITY FOR THE ADEQUACY (OR INADEQUACY) OF SUCH PLANS AND SPECIFICATIONS OR THE FACILITIES CONSTRUCTED THEREBY, ALL OF SAME BEING EXPRESSLY DISCLAIMED.

987166

(d) Construction of the Water Line Tank Connection and the Chloramine System shall be done pursuant to the competitive bidding requirements of Chapter 49, Texas Water Code, or, if applicable, the Commission emergency approval of negotiated contracts under Section 49.274, Texas Water Code.  In the event the Water Line Tank Connection and Chloramine System are constructed pursuant to a contract negotiated under said Section 49.274 (instead of a contract that was competitively bid pursuant to said Chapter 49), the Board may disapprove any amount of reimbursement sought by the Converted Customer if the Board determines that the reimbursement exceeds the costs that would have been incurred had the contract been competitively bid.

(e) Unless otherwise agreed to in writing by the Board in its sole discretion, the potential reimbursement eligibility set forth in this Section shall not be available until and after a Person becomes a Converted Customer.  Accordingly, for example and without limitation, a Person that is not directly connected to the Authority System but that receives water through a water interconnect with a Converted Customer shall not be eligible for the potential reimbursement described in this Section until and after such Person becomes a Converted Customer.  In addition to and without limiting the other provisions of this Section, and in addition to any other remedies available to the Authority, some or all of the potential reimbursement eligible to a Converted Customer under this Section may be reduced or eliminated by the Board:  (i) if the Converted Customer fails to install the Water Line Tank Connection and Chloramine System and commence receiving Surface Water by the date that the Authority is able to deliver Surface Water; or (ii) if the Converted Customer fails to submit a written request for reimbursement (with adequate supporting documentation) to the Authority within 180 days after the Person becomes a Converted Customer.  No interest or interest expenses shall be included in any potential reimbursement eligible under this Section.

(f) A Converted Customer shall not be eligible for the reimbursement described in this Section if the Converted Customer fails to obtain approval of its plans and specifications by the Authority Engineer in accordance with the provisions above.

(g) Any and all reimbursement pursuant to this Section shall be subject to Board approval, which approval may be granted or denied based on the Board's sole discretion.  Any requests for variances from the reimbursement procedures and policies contained in this Section must be submitted to the Board in writing prior to a Person commencing the design of the Water Line Tank Connection or the Chloramine System.  The Authority may require a Person to execute a receipt and release in a form acceptable to the Authority prior to receiving any reimbursement under this Section.

Section 5.19.  Realty Interest Documents.   During the course of constructing the facilities necessary to serve an intended Converted Customer with Surface Water, the Authority will need certain realty interests to provide and/or meter Surface Water delivered by the Authority to the intended Converted Customer.  An intended Converted Customer shall execute any Realty Interest Documents in favor of the

987166

- 19 -

Authority in a form and at the time required by the Authority, and at no expense to the Authority, necessary to provide the intended Converted Customer with Surface Water, as determined by the Authority in its sole and reasonable discretion.

ARTICLE VI
COLLECTION OF FEES

Section 6.01. <u>Late Penalties and Interest</u>. Payments of any fees, charges, or rates shall be considered delinquent if they are received more than 10 days after the Due Date (the "Delinquent Date"). A payment postmarked after the Delinquent Date shall be deemed delinquent. Payments of any fees, charges or rates received by the Authority after the Delinquent Date will be subject to a late penalty of 2% of the fees, charges, or rates due, and such 2% penalty shall be due to the Authority on the first day such fees, charges, or rates are late. Notwithstanding the foregoing, the 2% late penalty shall not exceed an amount of $2,000. An additional 5% penalty (for a total penalty of the lesser of 7% or $2,000 plus 5%) shall be imposed if the payment is received more than 30 days after the Due Date, and such additional 5% penalty shall be due to the Authority on the 31st day after the Due Date. Additionally, overdue amounts (including late penalties) shall accrue interest, from the day after the Delinquent Date until the day the overdue amount is paid to the Authority, at an annual interest rate ("Interest Rate") of 4.25%. On September 1st of each calendar year (the "Current Calendar Year"), the Interest Rate shall automatically reset to the lesser of: (1) one percent <u>plus</u> the prime rate as published in the Wall Street Journal on the first day of July of the current calendar year that does not fall on a Saturday or Sunday; or (2) one percent <u>plus</u> the prime rate as published in the Wall Street Journal on the first day of July of the year preceding the current calendar year that does not fall on a Saturday or Sunday. (For example, if said prime rate was 5.5% on July 1, 2020 and is 3.25% on July 1, 2021, then on September 1, 2021, the Interest Rate shall be 3.25% plus 1%, or 4.25% per annum. The prime rates reflected in the previous sentence represent hypothetical rates, which may or may not be the actual prime rates as published in the Wall Street Journal.)

Section 6.02. <u>Collection Costs</u>. If the Authority is required to incur costs to collect an overdue account, all such costs, including court costs, reasonable attorney's fees, and expenses, shall be paid by the delinquent Person, and the Authority shall be entitled to collect such costs in any suit for collection of a delinquent account.

Section 6.03. <u>Expulsion from GRP</u>. The Board may exclude a Person, or any territory or Well owned or controlled by a Person, from the GRP for failure to make a complete or timely payment to the Authority of fees, user fees, rates, penalties, interest, or any other charges due to the Authority.

987166

- 20 -

# ARTICLE VII
# AUTHORITY RULES

Section 7.01. Self-Reporting Violations. Each Non-Exempt Well owner and Surface Water user shall be responsible for reading the meter(s) to measure the amount of water pumped from each Non-Exempt Well and the amount of Surface Water received at the end of each month and for accurately reporting, in the manner provided in this Rate Order, such measurements (even if the measurements show zero pumpage or zero Surface Water usage) to the Authority through the Online Reporting System on or before the due date. The Authority reserves the right to request more frequent reporting, at its sole discretion. Failure to make such measurements, or failure to accurately or timely report them to the Authority, shall be a violation of the Authority's rules. If a Person reports higher pumpage or higher Surface Water usage to the FBSD or HGSD than the Person reported to the Authority, the Authority shall be entitled to find that such Person did not accurately report to the Authority and therefore violated the Authority's rules.

Section 7.02. Failure to Comply with Measurement Requirements. Each Non-Exempt Well owner and Surface Water user is required to comply with the provisions of this Rate Order, including without limitation, allowing the Authority the right to: (1) audit Well pumpage and Surface Water usage; (2) read the Well owner's meter and the Surface Water meter; (3) enter the Well owner's land to audit and/or measure Well pumpage and Surface Water usage; (4) test and recalibrate, if necessary, the Well owner's meter and the Surface Water meter. Failure of the Well owner to comply with such provisions, or any other provision of this Rate Order, shall be a violation of the Authority's rules.

Section 7.03. Calibration of Meters. Each Non-Exempt Well owner is responsible for keeping its Well meter within the Meter Accuracy Range (as defined in Section 4.04 above). It shall be a violation of the Authority's rules for any Well owner who knows or should reasonably know that its Well meter's accuracy is not within the Meter Accuracy Range to fail to promptly correct such meter and to correct any reports previously made to the Authority of inaccurate data. In addition to the foregoing, each Non-Exempt Well owner shall be required to conduct a meter calibration test, at its sole cost and expense, on each Non-Exempt Well once per calendar year. Notwithstanding anything to the contrary in the FBSD's requirements related to meter calibration, the requirement set forth in the preceding sentence shall apply to all Non-Exempt Wells regardless of meter diameter. Only equipment capable of accuracy results of plus or minus one percent of actual flow with repeatable accuracy of ½ of 1 percent may be used to calibrate or test meters. A copy of the accuracy verification report must be submitted to the Authority on or before December 31st of each calendar year confirming that the meter accuracy is within the Meter Accuracy Range.

987166

Section 7.04. Payment Violations. Each Person shall be responsible for paying the Authority the GRP Fees, Surface Water Fees, Imported Water Fees, and any other charges (including, without limitation, any penalties and interest) due the Authority on or before the due date. Failure to make such payment when due shall be a violation of the Authority's rules.

Section 7.05. GRP. Each Person shall be responsible to promptly comply with the GRP and all directives and requirements issued by the Authority, the Authority Engineer, or the Authority Operator for the purposes of or related to the GRP, including, without limitation, all requirements that the Person: (i) take (or refrain from taking) amount(s) of Surface Water from time to time required by the Authority; and (ii) install the Water Line Tank Connection and Chloramine System by the date the Authority is able to deliver Surface Water to the Person. In addition, no Person shall utilize the Shut-off Valve(s) to control the rate of flow of Surface Water being delivered by the Authority, as such Shut-off Valves are intended only to be used in the event a waterline needs to be taken out of service. Failure to comply with the provisions of this Section shall be a violation of the Authority's rules.

Section 7.06. Daily Amount. If the Authority, Authority Engineer, or Authority Operator has designated a Maximum Daily Amount or Minimum Daily Amount for a Person connected to the Authority System, then such Person shall be responsible to take no more than its Maximum Daily Amount and no less than its Minimum Daily Amount during any one day. Failure to so comply shall be a violation of the Authority's rules.

Section 7.07. Water Conservation Program. To encourage efficient use of water, the Authority requires Non-Exempt Well owners and/or Persons receiving Surface Water to (i) submit a water conservation plan meeting or exceeding the minimum State requirements for retail water providers with 3,300 or more connections prior to receiving Surface Water, and (ii) submit Annual Reports documenting the implementation of the water conservation plan to the Authority by May 1st of each year on the Annual Report form promulgated by the Texas Water Development Board. If such Person intends to resell the Surface Water to a wholesale customer of such Person, then the Person shall require its wholesale customer to also implement water conservation measures pursuant to 30 Texas Administrative Code § 288.

Section 7.08. Right of Entry. Each Person shall be responsible: (1) to timely comply with the Section of this Rate Order entitled "Right to Enter Land"; and (2) to not prevent or hinder the Authority's rights under the Section of this Rate Order entitled "Right to Enter Land." Failure to do so shall be a violation of the Authority's rules.

Section 7.09. Authority Rules and Orders. All requirements set forth in this Article VII are adopted as rules of the Authority. All requirements and rules set forth in any part of this Rate Order shall be considered orders of the Authority.

987166

Section 7.10. Interconnect Agreements. In order for the Authority to maintain an accurate inventory of the interconnects for all of the Non-Exempt Well owners and/or Persons within its boundaries, each Non-Exempt Well owner and/or Person that is a party to an interconnect agreement, regardless of whether or not the other party is located within the boundaries of the Authority, must submit copies of all interconnect agreements currently in effect or entered into in the future to the Authority. Copies of interconnect agreements entered into by all Non-Exempt Well owners and/or Persons within the Authority's boundaries must be submitted within 30 days of execution. Any new interconnects constructed for the benefit of a Non-Exempt Well owner and/or Person located within the Authority's boundaries with parties located outside of the Authority's boundaries must be metered; provided, however, interconnects in which all parties are located within the Authority's boundaries or interconnects that were constructed prior to October 1, 2012 with parties outside of the Authority's boundaries shall not be subject to this requirement.

Section 7.11. Regional System Agreements. If a Non-Exempt Well is part of a regional system, the Non-Exempt Well owner must submit the agreement relating to such regional system, including the regional system's participating entities and/or persons, to the Authority within 30 days of execution. Additionally, if any new agreements and/or amendments relating to Non-Exempt Wells within regional systems are entered into, such agreement and/or amendment must be submitted to the Authority within 30 days of execution.

Section 7.12. Contact Information Submission. In order to have accurate contact information to be able to readily contact all Non-Exempt Well owners in the case of an emergency or to transmit other necessary communication, each Non-Exempt Well owner has the responsibility to inform the Authority of the key persons involved with their system, including, as applicable, the Non-Exempt Well owner's operator, engineer, bookkeeper, attorney, and management company. Should the contact information for any of the foregoing persons change, the Non-Exempt Well owner should submit notification to the Authority as soon as reasonably practicable.

ARTICLE VIII
CIVIL PENALTIES AND MISCELLANEOUS

Section 8.01. Civil Penalty. A Person is subject to a civil penalty of up to $10,000 for each violation or each day of a continuing violation if the Person: (i) violates any provision of this Rate Order, the GRP, any rules contained in either of same, or any other order or rule of the Authority, (ii) makes unauthorized use of Authority services or facilities, or (iii) causes damage to Authority facilities by using such facilities in a manner or for a purpose contrary to the purpose for which such facilities were designed. The Board may set the penalty based on (all as determined by the Board): (i) the severity of the offense; (ii) whether such violation was willful, knowing, reckless, or inadvertent; (iii) the history of conduct by such Person; (iv) the damages sustained by

987166

the Authority; (v) the risk or damage to the GRP; and (vi) any other factors determined appropriate by the Board. The Authority may bring an action to recover the penalty in a district court in the county where the violation occurred. The penalty shall be paid to the Authority.

Section 8.02.    Other Penalties for Rate Order or GRP Violations.  Any Person who violates any provision of this Rate Order or the GRP in addition to being subject to the penalties described in this Rate Order, shall be subject to: (i) having Surface Water service terminated; or (ii) expulsion from the Authority's GRP; provided, however, that prior to disconnecting Surface Water service for violations that do not constitute a hazard to health or safety or endanger the integrity of the Authority System or adversely affect the Authority's GRP or excluding a Person from the Authority's GRP, the Authority shall give written notice by first class mail or otherwise, to such Person of the pending disconnection or anticipated expulsion, and shall give such Person the opportunity to contest, explain, or correct the violation at a meeting of the Board.  Such disconnection or expulsion shall be in addition to penalties that may be imposed by the Authority under this Rate Order and remedies that may otherwise be available to the Authority.

Section 8.03.    Injunction. The Authority may bring an action for injunctive relief in a district court in the county where a violation of an authority rule or order occurs or is threatened to occur.  The Authority may bring an action for a civil penalty and injunctive relief in the same proceeding

Section 8.04.    Right to Enter Land. In addition to any other rights that the Authority may have (by easement or otherwise), the Authority and its representatives shall have the authority to enter upon any public property (including, without limitation, property owned by a District) or private property within the Authority's boundaries or property adjacent to any property owned by the Authority (and enter upon any property owned by a Person included in the Authority's GRP by contract) at any reasonable time in order to:  (1) inspect, repair, install, test, maintain, or operate any Authority facilities or to test or monitor the Surface Water delivered by the Authority; (2) upon reasonable notice, access a Well meter to replace, retrofit, or install a cellular endpoint for remote meter reading; (3) audit Well pumpage or Surface Water measurements submitted by a Person to the Authority; (4) measure Well pumpage or Surface Water usage; (5) inspect and investigate conditions relating to the quality of water in the State of Texas; and/or (6) investigate compliance with any Authority rule, regulation, permit, or order.  If requested by the Authority or Authority Operator, a Person shall immediately cooperate with the Authority or Authority Operator to allow the Authority or Authority Operator to enter such site(s) for any of such purposes. Authority representatives entering private property pursuant to this Section shall observe the establishment's rules and regulations concerning safety, internal security, and fire protection and shall notify any occupant or management of their presence and shall exhibit proper credentials.

987166

Section 8.05. <u>Groundwater Reduction Plan Participation Agreements</u>. Any Person that is a member or participant of the Authority's GRP through a written contract with the Authority shall be subject to all of the terms, provisions, rules, requirements, and penalties of this Rate Order and all other orders, resolutions, and requirements of the Authority, to the extent they are not inconsistent with the terms and provisions of such written contract.

Section 8.06. <u>Non-Potable Water Agreements</u>. The Authority from time to time may enter into written contracts governing the purchase and/or use of Non-Potable Water and/or related infrastructure. All such contracts shall be subject to all of the terms, provisions, rules, requirements, and penalties of this Rate Order and all other orders, resolutions, and requirements of the Authority, to the extent that they are not inconsistent with the terms and provisions of such written contract. Necessary reporting for all metered Non-Potable Water required pursuant to the terms of each contract shall be reported to the Authority on the reporting form promulgated by the Authority (i) available electronically on the Online Reporting System, or (ii) if the Authority determines that access to the Online Reporting System is not reasonably available to a Person, then reporting may be made via the non-electronic reporting form attached hereto as Exhibit "C," provided permission to use the non-electronic reporting form is obtained in writing from the Authority. If in the sole and reasonable discretion of the Authority, it is determined that neither of the foregoing reporting methods are suitable for the specific project, the Authority may request direct reporting to the Authority Engineer. Such reporting shall be provided to the Authority no later than the last day of the second month following the month for which Non-Potable Water usage is required to be calculated. (For example, the reporting form for January pumpage is due by February 28th; the reporting form for February pumpage is due by March 31st; etc.). The Authority reserves the right to request more frequent reporting, at its sole discretion.

Section 8.07. <u>Prior Resolutions Establishing Groundwater Reduction Plan Fees and Rate Orders</u>. The Authority retains all of its rights and remedies under all prior Authority Resolutions Establishing Groundwater Reduction Plan Fee, as amended.

Section 8.08. <u>Amendments to Rate Order and GRP</u>. As determined necessary by the Authority, the Authority reserves the right to modify from time to time: (1) the rates, charges, and fees contained in this Rate Order; (2) any other terms and provisions of this Rate Order; and (3) its GRP.

Section 8.09. <u>Authority Designee</u>. The Authority hereby designates the Board President, Board Vice President, Board Assistant Vice President, the Authority Engineer, and/or the Authority Operator to exercise the Authority's powers under its GRP and this Rate Order.

987166

Section 8.10. <u>Refusal to Add Persons to GRP</u>. The Board, at its discretion, may refuse to add Persons (and their wells) to the GRP, including, without limitation, any Person seeking to be re-admitted to the GRP who at any time had been removed from the GRP because the Person's groundwater pumpage reduced below the amount required for the Person to be subject to FBSD or HGSD groundwater reduction requirements.

Section 8.11. <u>No Waiver</u>. The failure of the Authority to insist, in any one or more instances, upon a Person's performance of any of the terms, requirements, or conditions of this Rate Order shall not be construed as a waiver or relinquishment of the future performance of any such term, requirement, or condition by that Person or any other Person.

Section 8.12. <u>Lien</u>. Pursuant to Section 8813.108, fees and user fees imposed by the Authority under Section 8813.103(b), any related penalties and interest, collection expenses, and reasonable attorney's fees incurred by the Authority are a first and prior lien against the well to which the fees or user fees apply. The Authority may enforce said lien in any manner provided by the Act or other law.

[EXECUTION PAGE FOLLOWS]

987166

- 26 -

ADOPTED THIS 16th DAY OF DECEMBER, 2021.

NORTH FORT BEND WATER AUTHORITY

By:_____

President, Board of Directors

ATTEST:

By: _____

Asst Secretary, Board of Directors



(SEAL)

**NORTH FORT BEND WATER AUTHORITY**
**Pumpage/Surface Water and Billing Form Effective January 1, 2022**

Name of Well Owner or Recipient of Surface Water:_____
Identify:  Well #1: _____; Well #2: _____; Well #3: _____; Well #4: _____
Identify:  Meter #1: _____; Meter #2: _____; Meter #3: _____; Meter #4: _____

*Check the billing period for which this report is being filed*

| | *Billing Period* | *Rate* | *Due Date* |
|---|---|---|---|
| □ | January 1-31, 20__ | $4.55 pumpage/ $4.90 surface | February 28, 20__ |
| □ | February 1-28/29, 20__ | $4.55 pumpage/ $4.90 surface | March 31, 20__ |
| □ | March 1-31, 20__ | $4.55 pumpage/ $4.90 surface | April 30, 20__ |
| □ | April 1-30, 20__ | $4.55 pumpage/ $4.90 surface | May 31, 20__ |
| □ | May 1-31, 20__ | $4.55 pumpage/ $4.90 surface | June 30, 20__ |
| □ | June 1-30, 20__ | $4.55 pumpage/ $4.90 surface | July 31, 20__ |
| □ | July 1-31, 20__ | $4.55 pumpage/ $4.90 surface | August 31, 20__ |
| □ | August 1-31, 20__ | $4.55 pumpage/ $4.90 surface | September 30, 20__ |
| □ | September 1-30, 20__ | $4.55 pumpage/ $4.90 surface | October 31, 20__ |
| □ | October 1-31, 20__ | $4.55 pumpage/ $4.90 surface | November 30, 20__ |
| □ | November 1-30, 20__ | $4.55 pumpage/ $4.90 surface | December 31, 20__ |
| □ | December 1-31, 20__ | $4.55 pumpage/ $4.90 surface | January 31, 20__ |

*Gallons of Water Pumped, Imported, or Purchased for Billing Period*

| | Start Meter Reading | End Meter Reading | Total |
|---|---|---|---|
| Well #1 | | | |
| Well #2 | | | |
| Well #3 | | | |
| Well #4 | | | |
| Imported Water | | | |
| Surface Water | | | |
| For additional wells, attach a second reporting form and put total from all wells below. | | | |
| ALL | | | |

| | | |
|---|---|---|
| 1 | Enter total gallons of water pumped | |
| 2 | Divide by 1,000 | |
| 3 | Total pumpage fee due (multiply line 2 x 4.55) | |
| 4 | Enter total gallons of surface water received | |
| 5 | Divide by 1,000 | |
| 6 | Total surface water fee due (multiply line 5 x 4.90) | |
| 7 | Enter total gallons of water imported | |
| 8 | Divide by 1,000 | |
| 9 | Total import fee due (multiply line 8 x 4.55 or 4.90) | |
| 10 | LESS APPLICABLE CREDIT DUE FROM CAPITAL CONTRIBUTION | |
| 11 | Total due (add lines 3, 6, and 9 then subtract line 10 ) | |

I declare that the above information is true and correct to the best of my knowledge and belief.

Dated: _____          By: _____

Name: _____          Title: _____

**If your payment is received late (as defined in the Authority's Amended Rate Order) the Authority will send you an invoice for the late penalties and interest set forth in the Authority's Amended Rate Order.**

Make check payable to:  North Fort Bend Water Authority; c/o Municipal Accounts & Consulting, L.P., 1281 Brittmoore Road, Houston, TX  77043 **(rates effective 1/1/2022)**

**NOTE: This Form is to be used only in the event that the Authority's Online Reporting System is unavailable.**

987166

**Date of Request** _____



## NEW WELL REQUEST OR CHANGE OF WELL STATUS REQUEST

**Request Type**

☐ New Well (Complete Sections 1 through 3)
☐ Change Existing Well Status (Complete Sections 1 and 4)

**1. Well Owner Information**

Well Owner Name _____

Mailing Address _____

Email _____ Phone _____

**2. Pumpage Reporting**

Requirements for water usage reporting are detailed in the NFBWA Rate Order and on <u>our website</u>.

Contact Name for Pumpage Reporting _____

Company _____

Mailing Address _____

Email _____ Phone _____

**3. Well Information**

Well Location Address _____

Well Coordinates    Latitude: _____    Longitude: _____

Date Pumpage to Begin _____   Well Capacity (gpm) _____

Casing Diameter (in) _____   Aquifer _____

Location    ☐ Located at Water Plant    ☐ Remote Well

Proposed Disinfectant    ☐ Chlorine    ☐ Chloramine    ☐ Other: _____

Intended Well Use (See Page 2 for Definitions)

☐ Agricultural Irrigation      ☐ Industrial           ☐ Public Supply
☐ Commercial/Domestic      ☐ Irrigation           ☐ Single-Family Dwelling
☐ Geothermal               ☐ Lake/Pond/Pool    ☐ Single-Family Irrigation
☐ Other: _____

987166

**4. Change in Existing Well Status**

Well Number _____     Effective Date of Change _____

Change Status to
☐ Active / Add to NFBWA Permit
☐ Abandoned / Remove from NFBWA Permit
☐ Exempt from GRP Requirement / Remove from NFBWA Permit

Comments: _____

**Intended Use Definitions**

- Agricultural Irrigation: Wells used in production of food or fiber commodities grown for resale or commercial purposes. Includes wholesale nursery growers.
- Commercial/Domestic: Wells used by commercial or business establishments for potable or sanitary needs. (Examples: offices, warehouse, churches, schools, duplexes, etc.)
- Geothermal: Wells used for a geothermal heat exchanger. Specify whether closed-loop, reinjection, or pump and dump.
- Industrial: Wells used as part of an industrial process or in the manufacturing of a product. (Examples: boiler feed, paper manufacturing, chemical process feed, etc.)
- Irrigation: Wells used only for non-exempt irrigation purposes such as irrigation of golf courses, landscapes, parks, etc.
- Lake/Pond/Pool: Wells used to file or maintain the level of lakes, ponds, or pools.
- Public Supply: Wells used for retail or wholesale water supply. (Example: cities, water districts, private utilities, apartments, mobile home parks, etc.)
- Single-Family Dwelling: Wells connected to one single-family dwelling and used for typical domestic and sanitary needs.
- Single-Family Irrigation: Wells used for landscape irrigation at one single family residence, but not connected to and serving the dwelling.
- Other: Wells used for other non-exempt uses such as livestock watering, etc.

987166

# EXHIBIT C
## NORTH FORT BEND WATER AUTHORITY
### Non-Potable Water and Billing Form Effective January 1, 2022

Name of Non-Potable Water System: _____

Billing Period: _____

**Incentive Type**

☐ Credit of $0.75 per 1,000 gallons (i.e., the system is not owned by the NFBWA)

☐ Reduced fee of $3.80 per 1,000 gallons (i.e., the system is owned by the NFBWA)

**System Type**

☐ Effluent Reuse (**fill out Section A only**)

☐ Stormwater and/or Rainwater Capture System (**fill out Section B only**)

### Section A: Effluent Reuse

| Meter Type | Start Meter Reading (gallons) | End Meter Reading (gallons) | Total Effluent Reuse (gallons) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| 1 Enter total gallons of effluent reuse | | | |
| 2 Divide line 1 by 1,000 | | | |
| 3 Enter $0.75 credit or $3.80 reduced fee see Incentive Type | | | |
| 4 Total credit earned or fee owed (multiply line 2 by line 3) | | | |

*If you need additional space, please fill out a second form*

### Section B: Stormwater and/or Rainwater Capture System

| Meter Description | Start Meter Reading (gallons) | End Meter Reading (gallons) | Total Metered (gallons) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| 1 Enter total metered usage from Irrigation Meters (gallons) | | | |
| 2 Enter total pumpage from Make-Up Wells (gallons) | | | |
| 3 Subtract line 2 from line 1 (enter 0 if negative) | | | |
| 4 Divide line 3 by 1,000 | | | |
| 5 Enter $0.75 credit or $3.80 reduced fee see Incentive Type | | | |
| 6 Total credit earned or fee owed (multiply line 4 by line 5) | | | |

*If you need additional space, please fill out a second form*

I declare that the above information is true and correct to the best of my knowledge and belief.

Dated: _____   By: _____

Signature: _____   Title: _____

If your payment is received late (as defined in the Authority's Amended Rate Order) the Authority will send you an invoice for the late penalties and interest as set forth in the Authority's Amended Rate Order.

Make check payable to: North Fort Bend Water Authority; c/o Municipal Accounts & Consulting, L.P. 1281 Brittmoore Rd. Houston, TX 77043.

**Submit to NFBWA@bgeinc.com**

987166

# Tab 7

Fulshear Well Permit (Suppl. AR Item 96)

# Fort Bend Subsidence District

301 Jackson St. Suite 639 - Richmond, TX 77469
www.fbsubsidence.org
281-342-3273



## WATER WELL PERMIT

October 06, 2022

**I. PERMITTEE:**
North Ft. Bend Water Authority
Contact: Brown & Gay Engineers
10777 Westheimer, Ste. 400
Houston, TX 77042

**PERMIT NO.:**   W2022-107-29287-0

**II. LOCATION OF WELL:**

LATITUDE:      29.66666600

LONGITUDE:   -95.63472200

**III. WELL NO.:**   493          Well Owner:   Fulshear, City of

The authorized withdrawal below is the TOTAL COMBINED amount that may be withdrawn from the following wells:

147, 353, 723, 912, 932, 938, 1029, 1116, 1122, 1148, 1154, 1238, 1273, 1296, 1363, 1389, 1395, 1481, 1507, 1611, 1910, 2003, 2185, 2341, 148, 235, 244, 724, 780, 884, 910, 939, 1027, 1088, 1158, 1178, 1181, 1187, 1213, 1239, 1245, 1248, 1271, 1274, 1303, 1306, 1361, 1390, 1422, 1491, 1511, 1576, 1579, 1612, 1978, 2100, 2103, 2126, 2135, 2433, 251, 738, 744, 827, 926, 929, 1046, 1052, 1075, 1107, 1142, 1171, 1226, 1316, 1380, 1406, 1533, 1753, 1901, 1936, 2335, 245, 248, 824, 911, 1037, 1101, 1127, 1130, 1153, 1188, 1252, 1275, 1278, 1281, 1304, 1307, 1336, 1339, 1394, 1518, 1550, 1577, 1580, 1982, 1985, 2072, 2104, 2262, 243, 493, 825, 828, 886, 918, 976, 979, 1038, 1128, 1157, 1247, 1276, 1282, 1465, 1519, 1522, 1525, 1931, 1954, 2079, 2137, 2289, 2353, 247, 250, 823, 887, 925, 980, 1074, 1106, 1138, 1222, 1286, 1503, 1523, 1691, 108, 538, 686, 716, 743, 839, 905, 937, 999, 1022, 1028, 1060, 1115, 1118, 1150, 1205, 1231, 1237, 1263, 1295, 1301, 1321, 1388, 1411, 1544, 1637, 1851, 2057, 171, 380, 505, 718, 865, 927, 956, 1047, 1114, 1137, 1143, 1175, 1236, 1291, 1323, 1352, 1413, 1531, 1850, 2056, 2365, 2391, 2488, 107, 2439, 2188

**IV. PERMIT TERM:**      October 01, 2022          **THROUGH**      September 30, 2023

**V. AUTHORIZED WITHDRAWAL:**

Only that which is required without being wasteful during the permit term, but not to exceed 11,500.00 million gallons (combined total for all wells listed above).

Any pumpage in excess of the amount authorized in this permit is a violation of the District's rules. Applications for an amendment to increase authorized withdrawal must be submitted prior to exceeding the permitted amount.

**VI. SPECIAL PROVISIONS:**

D1, E, G1, M, O

SUBJECT TO CONDITIONS AND REQUIREMENT ON ATTACHED PAGE
APPROVED THIS 24 DAY OF August 2022
Fort Bend Subsidence District

BY: _[signature]_

General Manager

NFBWA000312

# Fort Bend Subsidence District

301 Jackson St. Suite 639 - Richmond, TX 77469
www.fbsubsidence.org
281-342-3273



## WATER WELL PERMIT

October 06, 2022

**PERMIT NO.:** W2022-107-29287-0

### SPECIAL PROVISIONS FOR PERMIT

PROV-G1     This permit is exempt from disincentive permit fees based on and subject to the permittee's continued compliance with the requirements and provisions outlined in its groundwater reduction plan certified by the Board of Directors on ___. The permittee shall timely achieve the implementation actions, milestones, and other requirements set forth in its groundwater reduction plan. Any change in the plan with respect to the amount or source of surface water or in the timing of reduction of groundwater shall be filed with the District for its approval in the form of an amendment to the GRP. The permittee shall submit any required progress reports in a form that adequately addresses the projects that have been undertaken to timely reduce its use of groundwater in accordance with its GRP.

PROV-E     AUTHORIZED WITHDRAWAL is the total aggregate allocation for all wells.

PROV-D1     On January 9, 2013 the Board of Directors of the Subsidence District adopted the 2013 District Regulatory Plan. There have been significant changes between the 1999 and the 2013 District Plans. As a result, some of the changes may directly affect you. You can obtain a copy of the 2013 District Plan at our web site www.subsidence.org. If you have any questions or if you do not have access to the Internet, you can contact the Subsidence Districts office.

PROV-O     The permittee shall furnish the District with proof that the meter is installed according to the manufacturers specifications or a certified affidavit confirming the accuracy of the water meter in accordance with Rule 8.5 of the Rules of the District, on or before ___

PROV-M     Within sixty days of the beginning of the permit term, the permittee shall furnish the District with proof that the meter is installed according to the manufacturers specifications or a certified affidavit confirming the accuracy of the water meter in accordance with Rule 8.5 of the Rules of the District.

NFBWA000313

# Fort Bend Subsidence District

301 Jackson St. Suite 639 - Richmond, TX 77469
www.fbsubsidence.org
281-342-3273



## WATER WELL PERMIT

October 06, 2022

**PERMIT NO.:**   W2022-107-29287-0

**CONDITIONS AND REQUIREMENTS**

a.      This permit is granted in accordance with the provisions of Chapter 8834, and the rules and orders of the District, and acceptance of this permit constitutes an acknowledgment and agreement that the permittee will comply with Chapter 8834, all the terms, provisions, conditions, requirements, limitations, and restrictions embodied in this permit and with the rules, regulations, and orders of the District.

b.      This permit confers no vested rights in the holder, and it may be revoked or suspended, or its terms may be modified or amended pursuant to the provisions of Chapter 8834. Any person who becomes the owner of a permitted well must notify the District of the name and contact information for the new owner within 90 calendar days from the date of the change in ownership.

c.      The operation of the well for the authorized withdrawal must be conducted in a non- wasteful manner.

d.      Except as provided in Rule 8.2, a water meter must be installed and operated in accordance with Section Eight of the District's Rules.

e.      The permittee must keep accurate records, on a monthly basis, of the amount of groundwater withdrawn and the purpose of the withdrawal, and such records must be provided to the District and available for inspection by District representatives. If a meter is required, the meter must be read, and the meter reading and actual amount of pumpage recorded each month in accordance with Rule 8.7 of the District's rules. Immediate written notice must be given to the District in the event a withdrawal exceeds the quantity authorized by this permit.

f.      The well site must be accessible to District representatives for inspection, and the permittee agrees to cooperate fully in any reasonable inspection of the well and well site by the District representatives.

g.      The application pursuant to which this permit has been issued is incorporated in this permit, and this permit is granted on the basis of and contingent upon the accuracy of the information supplied in that application and in any amendments to the application. A finding that false information has been supplied is grounds for immediate revocation of the permit. In the event of conflict between the provisions of this permit and the contents of the application, the provisions of this permit shall control.

h.      Violation of this permit's terms, conditions, requirements, or special provisions, including pumping amounts in excess of authorized withdrawal, is punishable by civil penalties as provided by Section 8834.252, Special District Local Laws Code.

i.    Wherever special provisions are inconsistent with other provisions or rules of the District, the special

NFBWA000314

# Tab 8

Affidavit of Matthew L. Froehlich
(Suppl. AR Item 106)

STATE OF TEXAS     )
                           )
COUNTY OF FORT BEND  )

## AFFIDAVIT OF MATTHEW L. FROEHLICH

BEFORE ME, the undersigned authority, on this day personally appeared Matthew L. Froehlich who, after being duly sworn on his oath, said and deposed as follows:

### Introduction

1.     My name is Matthew L. Froehlich. I am over 21 years of age, of sound mind, and in all respects qualified to make this affidavit. I have personal knowledge of the facts stated in this affidavit.

2.     I have read the Motion to Dismiss of North Fort Bend Water Authority and the factual assertions set forth in that document are true and correct to the best of my knowledge.

### Background/Experience

2.     I have 19 years of engineering and project management experience. My experience includes the design and management of both small- and large-scale water lines, sanitary sewer, storm sewer, and stormwater detention facility projects. I have successfully completed projects for many governmental entities of various sizes and needs. I have been heavily engaged in all project aspects, including preliminary engineering and final design, cost estimating, scheduling, and construction phase services.

3.     I am currently employed by BGE, Inc. ("BGE"). I currently lead BGE's team as Program Manager and Engineer for the North Fort Bend Water Authority ("NFBWA"). I am a licensed professional engineer in the State of Texas (No. 100213) and received my degree in civil engineering from Texas A&M University in 2003.

4.     Leading BGE's team as Program Manager for NFBWA, I oversee the planning, permitting, conservation, communication, easement acquisition, engineering, and construction efforts for NFBWA to execute its Groundwater Reduction Plan ("GRP"). I work closely with NFBWA's Board of Directors, attorney, operator and bookkeeper on both day-to-day operations and long-term planning. I also manage the work of third-party engineering consultants, service providers, and construction contractors to facilitate NFBWA's meeting of Fort Bend Subsidence District's requirements on behalf of its GRP participants.

### NFBWA Does Not Furnish Water to Fulshear

5.     NFBWA does not provide, supply or furnish water of any type (either raw or treated, potable or non-potable) to the City of Fulshear ("Fulshear") for compensation or otherwise. NFBWA has never done so.

## Fulshear Does Not Receive Water or Water Service from NFBWA

6.     Fulshear does not receive water from NFBWA. Fulshear has never received water from NFBWA.

7.     Fulshear does not come into possession of or acquire any water from NFBWA.

8.     Fulshear does not receive water service from NFBWA.

9.     Fulshear does not pay NFBWA for water service.

## Fees

10.     NFBWA has adopted three fees pursuant to its statutory authority as follows: (1) a Groundwater Reduction Plan Fee ("GRP Fee"); (2) a Surface Water Fee; and (3) an Imported Water Fee.

11.     The GRP Fee is based on monthly pumpage of groundwater by owners of non-exempt wells within NFBWA's boundaries. The owner of each non-exempt well within NFBWA's boundaries is required to pay a GRP Fee to NFBWA.

12.     Each person that receives surface water from NFBWA is required to pay a Surface Water Fee to NFBWA for surface water received monthly from NFBWA. The term "person" is defined broadly by the applicable statute and includes municipalities and water districts.

13.     Although Fulshear pays GRP Fees to NFBWA, because Fulshear does not receive surface water from NFBWA, Fulshear does not pay a Surface Water Fee to NFBWA. Fulshear has never paid a Surface Water Fee to NFBWA.

## Who Receives Surface Water from NFBWA?

14.     The following entities receive surface water from NFBWA:

> Big Oaks Municipal Utility District
> Cinco Southwest Municipal Utility District No. 1
> Cinco Southwest Municipal Utility District No. 2
> Cinco Southwest Municipal Utility District No. 3
> Cinco Southwest Municipal Utility District No. 4
> Fort Bend County Fresh Water Supply District No. 2
> Fort Bend County Improvement District No. 24
> Fort Bend County Municipal Utility District No. 002
> Fort Bend County Municipal Utility District No. 030
> Fort Bend County Municipal Utility District No. 034
> Fort Bend County Municipal Utility District No. 035
> Fort Bend County Municipal Utility District No. 041

2

Fort Bend County Municipal Utility District No. 050
Fort Bend County Municipal Utility District No. 057
Fort Bend County Municipal Utility District No. 058
Fort Bend County Municipal Utility District No. 118
Fort Bend County Municipal Utility District No. 119
Fort Bend County Municipal Utility District No. 122
Fort Bend County Municipal Utility District No. 123
Fort Bend County Municipal Utility District No. 132
Fort Bend County Municipal Utility District No. 133
Fort Bend County Municipal Utility District No. 134A
Fort Bend County Municipal Utility District No. 134B
Fort Bend County Municipal Utility District No. 134C
Fort Bend County Municipal Utility District No. 142
Fort Bend County Municipal Utility District No. 143
Fort Bend County Municipal Utility District No. 146
Fort Bend County Municipal Utility District No. 156
Fort Bend County Municipal Utility District No. 165
Fort Bend County Municipal Utility District No. 190
Fort Bend County Municipal Utility District No. 194
Fort Bend County Municipal Utility District No. 206
Grand Lakes Municipal Utility District No. 1
Grand Lakes Municipal Utility District No. 2
Grand Lakes Municipal Utility District No. 4
Grand Mission Municipal Utility District No. 1
Grand Mission Municipal Utility District No. 2
Kingsbridge Municipal Utility District
North Mission Glen Municipal Utility District

This list is current as of December 14, 2022. Fulshear is not on this list.

15.     NFBWA does not expect nor plan to deliver surface water to all water providers (or all participants in its GRP) within NFBWA's boundaries. The purpose of the GRP is to allow participants to *collectively* meet FBSD groundwater reduction requirements, so that each water providers does not need to so individually. Thus, some GRP participants may never receive surface water from NFBWA and may not need to reduce their groundwater withdrawals.

Actions Taken by NFBWA to Conserve
Groundwater and for the Reduction of Groundwater Withdrawals

16.     NFBWA has taken actions to encourage, promote and provide for the conservation of groundwater, and for the reduction of groundwater withdrawals as necessary to implement its GRP. Indeed, the majority of actions taken by NFBWA are ultimately aimed (either directly or indirectly) at reducing groundwater withdrawals within its jurisdiction.

17. NFBWA has also developed and adopted a water conservation plan and a voluntary water conservation program to address the opportunities within its boundaries to reduce overall demand for water.

## Actions Taken by NFBWA to
## Acquire Surface Water Rights and to Transport and Deliver Surface Water

18. NFBWA has taken actions to acquire surface water supplies, and to transport, treat, sell and deliver such water to persons (including water districts and municipalities) inside its boundaries.

19. NFBWA has negotiated for and acquired surface water rights from the City of Houston.

20. NFBWA has arranged for the design and construction of a 40 million gallon per day pump station and over 50 miles of surface water transmission lines to deliver surface water to some of its GRP participants

21. Although NFBWA provides, supplies or furnishes potable (treated) water for compensation to certain entities, NFBWA has never transported, sold, delivered, supplied or furnished any water to Fulshear.

22. Although it can be said that water rights have been acquired by NFBWA and facilities have been designed and constructed so that some amount of surface water could ultimately be conveyed to Fulshear: (1) none of the water rights acquired by NFBWA (including any of the water rights referred to in ¶ 19 above) are dedicated in particular to Fulshear; (2) none of NFBWA's existing facilities are currently used to provide surface water (or any water) to Fulshear; (3) none of NFBWA's existing facilities have been designed or constructed solely for the purpose of serving Fulshear; and (4) none of NFBWA's existing facilities are currently committed to providing water to Fulshear.

## Timeframe for Providing Water to Fulshear

23. Although NFBWA had at one time projected that it would be able to provide water service (*i.e.*, treated surface water) to Fulshear (at City of Fulshear Water Plant No. 1) sometime in mid-2024, that estimate is now considered to be outdated and unlikely to be met.

FURTHER AFFIANT SAYETH NOT

_____
Matthew L. Froehlich, Affiant

Sworn to and subscribed before me on this 15 day of Dec, 2022.

_____
Notary Public in and for the State of Texas

4

<u>01/09/2024</u>
My Commission Expires



Annika Nicole Green
My Commission Expires
01/09/2024
ID No 132305977

# Tab 9

Tex. Water Code § 13.002 (Definitions)



KeyCite Yellow Flag

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
        Chapter 13. Water Rates and Services (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)

V.T.C.A., Water Code § 13.002

§ 13.002. Definitions

Currentness

In this chapter:

(1) "Affected person" means any landowner within an area for which a certificate of public convenience and necessity is filed, any retail public utility affected by any action of the regulatory authority, any person or corporation whose utility service or rates are affected by any proceeding before the regulatory authority, or any person or corporation that is a competitor of a retail public utility with respect to any service performed by the retail public utility or that desires to enter into competition.

(1-a) "Landowner," "owner of a tract of land," and "owners of each tract of land" include multiple owners of a single deeded tract of land as shown on the appraisal roll of the appraisal district established for each county in which the property is located.

(2) "Affiliated interest" or "affiliate" means:

(A) any person or corporation owning or holding directly or indirectly five percent or more of the voting securities of a utility;

(B) any person or corporation in any chain of successive ownership of five percent or more of the voting securities of a utility;

(C) any corporation five percent or more of the voting securities of which is owned or controlled directly or indirectly by a utility;

(D) any corporation five percent or more of the voting securities of which is owned or controlled directly or indirectly by any person or corporation that owns or controls directly or indirectly five percent or more of the voting securities of any utility or by any person or corporation in any chain of successive ownership of five percent of those utility securities;

(E) any person who is an officer or director of a utility or of any corporation in any chain of successive ownership of five percent or more of voting securities of a public utility;

(F) any person or corporation that the utility commission, after notice and hearing, determines actually exercises any substantial influence or control over the policies and actions of a utility or over which a utility exercises such control or that is under common control with a utility, such control being the possession directly or indirectly of the power to direct or cause the direction of the management and policies of another, whether that power is established through ownership or voting of securities or by any other direct or indirect means; or

(G) any person or corporation that the utility commission, after notice and hearing, determines is exercising substantial influence over the policies and actions of the utility in conjunction with one or more persons or corporations with which they are related by ownership or blood relationship, or by action in concert, that together they are affiliated within the meaning of this section, even though no one of them alone is so affiliated.

(3) "Allocations" means, for all retail public utilities, the division of plant, revenues, expenses, taxes and reserves between municipalities or between municipalities and unincorporated areas, where those items are used for providing water or sewer utility service in a municipality or for a municipality and unincorporated areas.

(4) "Board" means the Texas Water Development Board.

(4-a) "Class A utility" means a public utility that provides retail water or sewer utility service through 10,000 or more taps or connections.

(4-b) "Class B utility" means a public utility that provides retail water or sewer utility service through 2,300 or more taps or connections but fewer than 10,000 taps or connections.

(4-c) "Class C utility" means a public utility that provides retail water or sewer utility service through 500 or more taps or connections but fewer than 2,300 taps or connections.

(4-d) "Class D utility" means a public utility that provides retail water or sewer utility service through fewer than 500 taps or connections.

(5) "Commission" means the Texas Commission on Environmental Quality.

(6) "Commissioner" means a member of the commission.

(7) "Corporation" means any corporation, joint-stock company, or association, domestic or foreign, and its lessees, assignees, trustees, receivers, or other successors in interest, having any of the powers or privileges of corporations not possessed by individuals or partnerships but does not include municipal corporations unless expressly provided in this chapter.

(8) "Executive director" means the executive director of the commission.

(9) "Facilities" means all the plant and equipment of a retail public utility, including all tangible and intangible real and personal property without limitation, and any and all means and instrumentalities in any manner owned, operated, leased, licensed, used, controlled, furnished, or supplied for, by, or in connection with the business of any retail public utility.

(10) "Incident of tenancy" means water or sewer service, provided to tenants of rental property, for which no separate or additional service fee is charged other than the rental payment.

(11) "Member" means a person who holds a membership in a water supply or sewer service corporation and is a record owner of a fee simple title to property in an area served by a water supply or sewer service corporation or a person who is granted a membership and who either currently receives or will be eligible to receive water or sewer utility service from the corporation. In determining member control of a water supply or sewer service corporation, a person is entitled to only one vote regardless of the number of memberships the person owns.

(12) "Municipality" means cities existing, created, or organized under the general, home-rule, or special laws of this state.

(13) "Municipally owned utility" means any utility owned, operated, and controlled by a municipality or by a nonprofit corporation whose directors are appointed by one or more municipalities.

(13-a) "Municipal utility district" means a political subdivision of this state operating under Chapter 54.

(14) "Order" means the whole or a part of the final disposition, whether affirmative, negative, injunctive, or declaratory in form, of the regulatory authority in a matter other than rulemaking, but including issuance of certificates of convenience and necessity and rate setting.

(15) "Person" includes natural persons, partnerships of two or more persons having a joint or common interest, mutual or cooperative associations, water supply or sewer service corporations, and corporations.

(16) "Proceeding" means any hearing, investigation, inquiry, or other fact-finding or decision-making procedure under this chapter and includes the denial of relief or the dismissal of a complaint.

(16-a) "Public utility agency" means a public utility agency created under Chapter 572, Local Government Code.

(17) "Rate" means every compensation, tariff, charge, fare, toll, rental, and classification or any of those items demanded, observed, charged, or collected whether directly or indirectly by any retail public utility for any service, product, or commodity described in Subdivision (23) of this section and any rules, regulations, practices, or contracts affecting that compensation, tariff, charge, fare, toll, rental, or classification.

(18) "Regulatory authority" means, in accordance with the context in which it is found, the commission, the utility commission, or the governing body of a municipality.

(19) "Retail public utility" means any person, corporation, public utility, water supply or sewer service corporation, municipality, public utility agency, political subdivision or agency operating, maintaining, or controlling in this state facilities for providing potable water service or sewer service, or both, for compensation.

(20) "Retail water or sewer utility service" means potable water service or sewer service, or both, provided by a retail public utility to the ultimate consumer for compensation.

(21) "Service" means any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility in the performance of its duties under this chapter to its patrons, employees, other retail public utilities, and the public, as well as the interchange of facilities between two or more retail public utilities.

(22) Repealed by Acts 2025, 89th Leg., ch. 521 (H.B. 2712), § 5, eff. Sept. 1, 2025.

(22-a) "Utility commission" means the Public Utility Commission of Texas.

(23) "Water and sewer utility," "public utility," or "utility" means any person, corporation, cooperative corporation, affected county, or any combination of these persons or entities, other than a municipal corporation, public utility agency, water supply or sewer service corporation, or political subdivision of the state, except an affected county, or their lessees, trustees, and receivers, owning or operating for compensation in this state equipment or facilities for the transmission, storage, distribution, sale, or provision of potable water to the public or for the resale of potable water to the public for any use or for the collection, transportation, treatment, or disposal of sewage or other operation of a sewage disposal service for the public, other than equipment or facilities owned and operated for either purpose by a municipality or other political subdivision of this state or a water supply or sewer service corporation, but does not include any person or corporation not otherwise a public utility that furnishes the services or commodity only to itself or its employees or tenants as an incident of that employee service or tenancy when that service or commodity is not resold to or used by others.

(24) "Water supply or sewer service corporation" means a nonprofit corporation organized and operating under Chapter 67 that provides potable water service or sewer service for compensation and that has adopted and is operating in accordance with by-laws or articles of incorporation which ensure that it is member-owned and member-controlled. The term does not include a corporation that provides retail water or sewer service to a person who is not a member, except that the corporation may provide retail water or sewer service to a person who is not a member if the person only builds on or develops property to sell to another and the service is provided on an interim basis before the property is sold.

(25) "Wholesale water or sewer service" means potable water or sewer service, or both, provided to a person, political subdivision, or municipality who is not the ultimate consumer of the service.

(26) "Affected county" is a county to which Subchapter B, Chapter 232, Local Government Code, applies.

**Credits**

Added by Acts 1985, 69th Leg., ch. 795, § 3.005, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 539, §§ 1, 2, eff. Sept. 1, 1987; Acts 1989, 71st Leg., ch. 567, § 2, eff. Sept. 1, 1989; Acts 1991, 72nd Leg., ch. 678, § 1, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., 1st C.S., ch. 3, § 1.058, eff. Aug. 12, 1991; Acts 1995, 74th Leg., ch. 400, § 1, eff. Sept. 1, 1995; Acts 1995, 74th Leg., ch. 979, § 6, eff. June 16, 1995; Acts 1997, 75th Leg., ch. 1010, § 6.02, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 62, § 18.52, eff. Sept. 1, 1999; Acts 1999, 76th Leg., ch. 404, § 29, eff. Sept. 1, 1999; Acts 2005, 79th Leg., ch. 1145, § 1, eff. Sept. 1, 2005; Acts 2007, 80th Leg., ch. 1430, § 2.05, eff. Sept. 1, 2007; Acts 2013, 83rd Leg., ch. 170 (H.B. 1600), § 2.08, eff. Sept. 1, 2013; Acts 2013, 83rd Leg., ch. 171 (S.B. 567), § 8, eff. Sept. 1, 2013; Acts 2017, 85th Leg., ch. 948 (S.B. 1842), § 1, eff. Sept. 1, 2017; Acts 2019, 86th Leg., ch. 967 (S.B. 700), § 1, eff. Sept. 1, 2019; Acts 2025, 89th Leg., ch. 90 (S.B. 1169), § 12, eff. May 20, 2025; Acts 2025, 89th Leg., ch. 521 (H.B. 2712), § 5, eff. Sept. 1, 2025; Acts 2025, 89th Leg., ch. 776 (S.B. 740), § 2, eff. Sept. 1, 2025.

V. T. C. A., Water Code § 13.002, TX WATER § 13.002

Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 10

Tex. Water Code § 13.043 (Appellate Jurisdiction)

KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
   Water Code (Refs & Annos)
     Title 2. Water Administration (Refs & Annos)
      Subtitle B. Water Rights
       Chapter 13. Water Rates and Services (Refs & Annos)
        Subchapter C. Jurisdiction

V.T.C.A., Water Code § 13.043

§ 13.043. Appellate Jurisdiction

Currentness

(a) Any party to a rate proceeding before the governing body of a municipality may appeal the decision of the governing body to the utility commission. This subsection does not apply to a municipally owned utility. An appeal under this subsection must be initiated within 90 days after the date of notice of the final decision by the governing body, or within 30 days if the appeal relates to the rates of a Class A utility, by filing a petition for review with the utility commission and by serving copies on all parties to the original rate proceeding. The utility commission shall hear the appeal de novo and shall fix in its final order the rates the governing body should have fixed in the action from which the appeal was taken and may include reasonable expenses incurred in the appeal proceedings. The utility commission may establish the effective date for the utility commission's rates at the original effective date as proposed by the utility provider and may order refunds or allow a surcharge to recover lost revenues. The utility commission may consider only the information that was available to the governing body at the time the governing body made its decision and evidence of reasonable expenses incurred in the appeal proceedings.

(b) Ratepayers of the following entities may appeal the decision of the governing body of the entity affecting their water, drainage, or sewer rates to the utility commission:

  (1) a nonprofit water supply or sewer service corporation created and operating under Chapter 67;

  (2) a utility under the jurisdiction of a municipality inside the corporate limits of the municipality;

  (3) a municipally owned utility, if the ratepayers reside outside the corporate limits of the municipality, including a decision of a governing body that results in an increase in rates when the municipally owned utility takes over the provision of service to ratepayers previously served by another retail public utility;

  (4) a district or authority created under Article III, Section 52, or Article XVI, Section 59, of the Texas Constitution that provides water or sewer service to household users;

  (5) a public utility agency; and

(6) a utility owned by an affected county, if the ratepayer's rates are actually or may be adversely affected. For the purposes of this section ratepayers who reside outside the boundaries of the district or authority shall be considered a separate class from ratepayers who reside inside those boundaries.

(b-1) A municipally owned utility shall:

(1) disclose to any person, on request, the number of ratepayers who reside outside the corporate limits of the municipality; and

(2) provide to any person, on request, a list of the names and addresses of the ratepayers who reside outside the corporate limits of the municipality.

(b-2) Unless a ratepayer has requested that a municipally owned utility disclose the ratepayer's personal information under Section 182.052, Utilities Code, the municipally owned utility may not disclose the address of the ratepayer under Subsection (b-1)(2).

(b-3) The municipally owned utility may not charge a fee for disclosing the information under Subsection (b-1)(1). The municipally owned utility may charge a reasonable fee for providing information under Subsection (b-1)(2). The municipally owned utility shall provide information requested under Subsection (b-1)(1) by telephone or in writing as preferred by the person making the request.

(b-4) Subsection (b)(3) does not apply to a municipally owned utility that takes over the provision of service to ratepayers previously served by another retail public utility if the municipally owned utility:

(1) takes over the service at the request of the ratepayer;

(2) takes over the service in the manner provided by Subchapter H; or

(3) is required to take over the service by state law, an order of the commission, or an order of the utility commission.

(c) An appeal under Subsection (b) must be initiated by filing a petition for review with the utility commission and the entity providing service within 90 days after the effective day of the rate change or, if appealing under Subdivision (b)(2) or (6) , within 90 days after the date on which the governing body of the municipality or affected county makes a final decision. The petition must be signed by the lesser of 10,000 or 10 percent of those ratepayers whose rates have been changed and who are eligible to appeal under Subsection (b).

(d) In an appeal under Subsection (b) of this section, each person receiving a separate bill is considered a ratepayer, but one person may not be considered more than one ratepayer regardless of the number of bills the person receives. The petition for review is considered properly signed if signed by a person, or the spouse of a person, in whose name utility service is carried.

(e) In an appeal under Subsection (b), the utility commission shall hear the appeal de novo and shall fix in its final order the rates the governing body should have fixed in the action from which the appeal was taken. The utility commission may establish the effective date for the utility commission's rates at the original effective date as proposed by the service provider, may order refunds or allow a surcharge to recover lost revenues, and may allow recovery of reasonable expenses incurred by the retail public utility in the appeal proceedings. The utility commission may consider only the information that was available to the governing body at the time the governing body made its decision and evidence of reasonable expenses incurred by the retail public utility in the appeal proceedings. The rates established by the utility commission in an appeal under Subsection (b) remain in effect until the first anniversary of the effective date proposed by the retail public utility for the rates being appealed or until changed by the service provider, whichever date is later, unless the utility commission determines that a financial hardship exists.

(f) A retail public utility that receives water or sewer service from another retail public utility or political subdivision of the state, including an affected county, may appeal to the utility commission a decision of the provider of water or sewer service affecting the amount paid for water or sewer service. An appeal under this subsection must be initiated within 90 days after the date of notice of the decision is received from the provider of water or sewer service by the filing of a petition by the retail public utility.

(f-1) Subsection (f) does not apply to a decision of a municipality regarding wholesale water or sewer service provided to another municipality.

(g) An applicant for service from an affected county or a water supply or sewer service corporation may appeal to the utility commission a decision of the county or water supply or sewer service corporation relating to any fee or amount to be paid to obtain service, other than the regular membership or tap fees or a groundwater conservation district or other governmental fee. In addition to the factors specified under Subsection (j), in an appeal brought under this subsection the utility commission shall determine whether the amount paid by the applicant is consistent with the tariff of the water supply or sewer service corporation and is reasonably related to the cost of installing on-site and off-site facilities to provide service to that applicant. If the utility commission finds the amount charged to be clearly unreasonable, it shall establish the fee to be paid for that applicant. An appeal under this subsection must be initiated within 90 days after the date written notice is provided to the applicant or member of the decision of an affected county or water supply or sewer service corporation relating to the applicant's initial request for that service. A determination made by the utility commission on an appeal under this subsection is binding on all similarly situated applicants for service, and the utility commission may not consider other appeals on the same issue until the applicable provisions of the tariff of the water supply or sewer service corporation are amended.

(g-1) An applicant for service from a water supply or sewer service corporation may appeal to the utility commission for a determination of whether the regular membership fee or tap fee required to be paid to obtain service is consistent with the tariff of the water supply or sewer service corporation. If the utility commission finds that the fee is inconsistent with the tariff of the water supply or sewer service corporation, the utility commission shall issue an order requiring the water supply or sewer service corporation to charge the applicant an amount consistent with the tariff. An appeal under this subsection must be initiated not later than the 30th day after the date the water supply or sewer service corporation provides the applicant with the cost of obtaining service.

(h) The utility commission may, on a motion by the utility commission or by the appellant under Subsection (a), (b), or (f), establish interim rates to be in effect until a final decision is made.

(i) The governing body of a municipally owned utility or a political subdivision, other than a public utility agency, within 60 days after the date of a final decision on a rate change, shall provide individual written notice to each ratepayer eligible to appeal

who resides outside the boundaries of the municipality or the political subdivision. The notice must include, at a minimum, the effective date of the new rates, the new rates, and the location where additional information on rates can be obtained. The governing body of a municipally owned utility or a political subdivision may provide the notice electronically if the utility or political subdivision has access to a ratepayer's e-mail address.

(i-1) The board of directors of a public utility agency, within 60 days after the date of a final decision on a rate change, shall provide individual written notice to each ratepayer eligible to appeal the rates. The notice must include, at a minimum, the effective date of the new rates, the new rates, and the location where additional information on rates can be obtained. The board of directors of the public utility agency may provide the notice electronically if the agency has access to a ratepayer's e-mail address.

(j) In an appeal under this section, the utility commission shall ensure that every appealed rate is just and reasonable. Rates shall not be unreasonably preferential, prejudicial, or discriminatory but shall be sufficient, equitable, and consistent in application to each class of customers. The utility commission shall use a methodology that preserves the financial integrity of the retail public utility.

(j-1) Notwithstanding Subsection (j), in an appeal under this section of a rate charged by a public utility agency, the utility commission shall ensure that the rate complies with Section 572.061(e), Local Government Code.

(k) Not later than the 30th day after the date of a final decision on a rate change, the commissioners court of an affected county shall provide written notice to each ratepayer eligible to appeal. The notice must include the effective date of the new rates, the new rates, and the location where additional information on rates may be obtained.

**Credits**
Added by Acts 1985, 69th Leg., ch. 795, § 3.005, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 539, § 7, eff. Sept. 1, 1987; Acts 1989, 71st Leg., ch. 567, § 6, eff. Sept. 1, 1989; Acts 1991, 72nd Leg., ch. 678, § 2, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., ch. 852, § 2, eff. June 16, 1991; Acts 1993, 73rd Leg., ch. 549, § 1, eff. Sept. 1, 1993; Acts 1995, 74th Leg., ch. 400, § 2, eff. Sept. 1, 1995; Acts 1995, 74th Leg., ch. 979, § 7, eff. June 16, 1995; Acts 1999, 76th Leg., ch. 62, § 18.53, eff. Sept. 1, 1999; Acts 2011, 82nd Leg., ch. 1021 (H.B. 2694), § 9.01, eff. Sept. 1, 2011; Acts 2013, 83rd Leg., ch. 170 (H.B. 1600), § 2.15, eff. Sept. 1, 2013; Acts 2013, 83rd Leg., ch. 171 (S.B. 567), § 15, eff. Sept. 1, 2013; Acts 2015, 84th Leg., ch. 853 (S.B. 1148), § 4, eff. Sept. 1, 2015; Acts 2021, 87th Leg., ch. 1025 (H.B. 872), § 5, eff. June 18, 2021; Acts 2021, 87th Leg., ch. 279 (H.B. 3689), § 1, eff. Sept. 1, 2021; Acts 2021, 87th Leg., ch. 367 (S.B. 387), § 1, eff. Sept. 1, 2021; Acts 2023, 88th Leg., ch. 1051 (S.B. 317), § 1, eff. June 18, 2023; Acts 2025, 89th Leg., ch. 90 (S.B. 1169), § 13, eff. May 20, 2025; Acts 2025, 89th Leg., ch. 776 (S.B. 740), § 3, eff. Sept. 1, 2025.

Notes of Decisions (9)

V. T. C. A., Water Code § 13.043, TX WATER § 13.043
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 11

Tex. Spec. Dist. Code § 8813.103
(Fees, User Fees, Rates, & Charges)

Vernon's Texas Statutes and Codes Annotated
    Special District Local Laws Code (Refs & Annos)
        Title 6. Water and Wastewater
            Subtitle H. Districts Governing Groundwater
                Chapter 8813. North Fort Bend Water Authority
                    Subchapter C. Powers and Duties

V.T.C.A., Special Districts Code § 8813.103

§ 8813.103. Fees, User Fees, Rates, and Charges

Currentness

(a) The authority may establish fees, user fees, rates, and charges and classifications of payers of fees and rates as necessary to enable the authority to fulfill the authority's purposes and regulatory functions provided by this chapter. The authority may impose fees, user fees, rates, and charges on any person within the authority.

(b) The authority may charge the owner of a well located within the authority's boundaries a fee or user fee according to the amount of water pumped from the well. If ownership of a well changes, both the prior and subsequent well owners are liable to the authority, jointly and severally, for all fees and user fees imposed by the authority under this subsection, and any related penalties and interest, for water pumped from that well before the change in well ownership.

(c) The board shall make reasonable efforts to send districts and municipalities written notice of the date, time, and location of the meeting at which the board intends to adopt a proposed charge under Subsection (b) and the amount of the proposed charge. The board's failure to comply with this subsection does not invalidate a charge adopted by the board under Subsection (b).

(d) For wells located in Harris County or Fort Bend County, the board shall exempt from the charge under Subsection (b) classes of wells that are not subject to any groundwater reduction requirement imposed by the Harris-Galveston Subsidence District or the Fort Bend Subsidence District, as applicable. If any of those classes of wells become subject to a groundwater reduction requirement imposed by the applicable subsidence district, the authority may impose the charge under Subsection (b) on those classes. The board by rule may exempt any other classes of wells from the charge under Subsection (b). The board may not apply the charge under Subsection (b) to a well:

  (1) with a casing diameter of less than five inches that serves only a single-family dwelling; or

  (2) regulated under Chapter 27, Water Code.

(e) For purposes of Subsection (d), a well is subject to a groundwater reduction requirement if the Harris-Galveston Subsidence District or the Fort Bend Subsidence District, as applicable, has adopted or adopts a requirement or rule that groundwater withdrawals from the well, or from the well and other wells collectively, be reduced, including a groundwater reduction that is not required until a future date.

(e-1) Notwithstanding Subsection (d), the authority may impose a charge under Subsection (b) on a well or class of wells located in Harris or Fort Bend County that, on or after February 1, 2013:

(1) ceases to be subject to a groundwater reduction requirement imposed by the Harris-Galveston Subsidence District or the Fort Bend Subsidence District, as applicable; or

(2) is no longer subject to the regulatory provisions, permitting requirements, or jurisdiction of the Harris-Galveston Subsidence District or the Fort Bend Subsidence District, as applicable.

(f) The authority may establish fees, user fees, rates, and charges that are sufficient to:

(1) achieve water conservation;

(2) prevent waste of water;

(3) serve as a disincentive to pumping groundwater;

(4) develop, implement, or enforce a groundwater reduction plan;

(5) accomplish the purposes of this chapter, including making available alternative water supplies;

(6) enable the authority to meet operation and maintenance expenses;

(7) pay the principal of and interest on notes, bonds, and other obligations issued in connection with the exercise of the authority's general powers and duties; and

(8) satisfy all rate covenants relating to the issuance of notes, bonds, and other obligations.

(g) The authority may charge rates established by the authority for water purchased from the authority.

(h) The authority may impose fees, user fees, or charges for the importation of water into the authority's boundaries from a source located outside the authority's boundaries.

**Credits**
Added by Acts 2005, 79th Leg., ch. 893, § 1, eff. June 17, 2005. Amended by Acts 2013, 83rd Leg., ch. 89 (S.B. 595), § 1, eff. May 18, 2013; Acts 2013, 83rd Leg., ch. 161 (S.B. 1093), § 18.010, eff. Sept. 1, 2013.

V. T. C. A., Special Districts Code § 8813.103, TX SPEC DIST § 8813.103

Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Tab 12

Tex. Spec. Dist. Code § 8834.206 (Permit Required)

Vernon's Texas Statutes and Codes Annotated
  Special District Local Laws Code (Refs & Annos)
    Title 6. Water and Wastewater
      Subtitle H. Districts Governing Groundwater
        Chapter 8834. Fort Bend Subsidence District
          Subchapter E. Regulatory Provisions

V.T.C.A., Special Districts Code § 8834.206

§ 8834.206. Permit Required

Currentness

(a) A well owner must obtain a permit from the board before:

(1) drilling, equipping, or completing the well;

(2) substantially altering the size of the well or a well pump; or

(3) operating the well.

(b) An operational well must have a permit.

(c) A well owner commits a violation if the well owner does not obtain a permit as required by Subsection (a). A violation occurs on the first day the drilling, equipping, completing, altering, or operation begins. Each day that a violation continues is a separate violation.

**Credits**
Added by Acts 2009, 81st Leg., ch. 1139, § 1.05, eff. April 1, 2011. Amended by Acts 2013, 83rd Leg., ch. 200 (S.B. 1811), § 11, eff. May 25, 2013.

V. T. C. A., Special Districts Code § 8834.206, TX SPEC DIST § 8834.206
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of Jordan Pratt
Bar No. 24140277
david.laurent@oag.texas.gov
Envelope ID: 106611554
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of Appellant Public Utility Commission of Texas
Status as of 10/8/2025 3:19 PM CST

Associated Case Party: NORTH FORT BEND WATER AUTHORITY

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Andrew Miller | 786857 | Drew.Miller@kempsmith.com | 10/8/2025 3:14:05 PM | SENT |
| Sharnezia Mitchell | | sharnezia.mitchell@kempsmith.com | 10/8/2025 3:14:05 PM | SENT |

Associated Case Party: CITY OF FULSHEAR, TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Clarence Freeland | 7417500 | jfreeland@mandf.com | 10/8/2025 3:14:05 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Laurent | | david.laurent@oag.texas.gov | 10/8/2025 3:14:05 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/8/2025 3:14:05 PM | SENT |